No. 23-16123

# IN THE UNITED STATES COURT OF APPEAL
# FOR THE NINTH CIRCUIT

---

SACRAMENTO HOMELESS UNION, a local of the
California Homeless Union/Statewide Organizing Council; et
al.,
*Plaintiffs-Appellees,*

vs.

CITY OF SACRAMENTO,
*Defendant/Appellant.*

---

On Appeal from the United States District Court for the
Eastern District of California
Case No. 2:22-cv-01095-TLN-KJN
Judge: Hon. Troy L. Nunley

---

## APPELLANT'S OPENING BRIEF

---

*Lee H. Roistacher, Esq.
(SBN 179619)
Dean Gazzo Roistacher LLP
440 Stevens Avenue, Suite 100
Solana Beach, CA 92075
Tel.: (858) 380-4683
E-mail:
lroistacher@deangazzo.com
**Attorneys for
Defendant/Appellant City of
Sacramento**

Susana Alcala Wood, City Attorney
(SBN 156366)
Grace L. Pak, Senior Deputy City
Attorney (SBN 263733)
City Of Sacramento
915 I Street, Room 4010
Sacramento, CA 95814-2608
Tel.: (916) 808-5346
E-mail: glpak@cityofsacramento.org
**Attorneys for Defendant/Appellant
City of Sacramento**

**TABLE OF CONTENTS**

INTRODUCTION...........................................................11

STATEMENT OF JURISDICTION................................18

ISSUES PRESENTED.................................................19

STATEMENT OF THE CASE.......................................21

      A.    City's Efforts To Address Homelessness...........21

      B.    City's Critical Infrastructure and Wildfire
            Risk Area Ordinance.....................................29

      C.    2022 District Court Proceedings ....................35

      D.    2023 District Court Proceedings ....................42

STANDARD OF REVIEW..............................................55

SUMMARY OF ARGUMENT.......................................56

ARGUMENT................................................................59

      A.    The District Court Erred Because Plaintiffs
            Didn't Meet Their Burden Of Establishing
            The Right To A Preliminary Injunction............59

            1.    Plaintiffs' Success On The Merits Is
                  Unlikely..............................................60

                  a.    *Monell* Governs City Liability And
                        No Evidence Of A City Policy Or
                        Custom Of Clearing Homeless
                        Encampments During "Extreme
                        Heat" Exists.................................63

        b.    Clearing Homeless Encampments In "Extreme Heat" Is Not Affirmative Conduct Exposing Any Plaintiff To A Particularized Danger.................66

        c.    No Evidence Of Deliberate Indifference Exists.......................71

        d.    Finding A State-Created Danger From Clearing Homeless Encampments During "Extreme Heat" Stretches The Exception Too Far .................77

        e.    Impacts Of Recognizing A State-Created Danger In This Case Are Broad And Far Reaching...............80

    2.    Insufficient Evidence Of Irreparable Harm..................................................82

    3.    Balancing The Interests Weighs Against A Preliminary Injunction......................84

  B.    The District Court Erred When Entering A Class-Wide Injunction Before Class Certification.................................................90

  C.    The District Court Erred When Failing To Exempt All Critical Infrastructure From The Injunction.........................................91

CONCLUSION...........................................................96

CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. 32(A)(7)(C) AND CIRCUIT RULE 32-1 FOR CASE NO. 23-55004.........................................98

STATEMENT OF RELATED CASES UNDER NINTH CIRCUIT RULE 28-2.6…………………………………….…99

CERTIFICATE OF SERVICE……………………………..…100

# TABLE OF AUTHORITIES

## Cases

*All. For The Wild Rockies v. Cottrell*
    632 F.3d 1127 (9th Cir. 2011)…………………………60

*Benavidez v. County of San Diego*
    993 F.3d 1134 (9th Cir. 2021)………………………63, 64

*Bernhardt v. Los Angeles County*
    339 F.3d 920 (9th Cir. 2003)……………………………59

*Berry v. Hennepin County*
    2022 U.S. Dist. LEXIS 148691
    (D. Minn. Aug. 19, 2022)……………………………………67

*Brittain v. Hansen*
    451 F.3d 982 (9th Cir. 2006)……………………………60

*Bryan County v. Brown*
    520 U.S. 397 (1997)………………………………………71

*Burford v. Sun Oil Co.*
    319 U.S. 315 (1943)………………………………………17

*Coal. for Econ. Equity v. Wilson*
    122 F.3d 718 (9th Cir. 1997)……………………………86

*Cobine v. City of Eureka*
    250 F. Supp. 3d 423 (N.D. Cal. 2017)…………68, 75, 82

*Dougherty v. City of Covina*
    654 F.3d 892 (9th Cir. 2011)……………………………63

*Drakes Bay Oyster Co. v. Jewell*
    747 F.3d 1073 (9th Cir. 2014)……………………………60

*Fogel v. Collins*
  531 F.3d 824 (9th Cir. 2008)....................................64

*Henry A. v. Willden*
  678 F.3d 991 (9th Cir. 2012)....................................78

*Hernandez v. City of Phoenix.*
  432 F. Supp. 3d 1049 (D. Ariz. 2020)........................83

*Hernandez v. City of San Jose*
  897 F.3d 1125 (9th Cir. 2018)............................62, 78

*Herrera v. Los Angeles Unified Sch. Dist.*
  18 F.4th 1156 (9th Cir. 2021)...........................61, 76

*Hodgers-Durgin v. De La Vina*
  199 F.3d 1037 (9th Cir. 1999)................................84

*Hutchinson v. Valdosta*
  227 U.S. 303 (1913)...........................................17

*Janosko v. City of Oakland*
  2023 U.S. Dist. LEXIS 6802 (N.D. Cal. Jan. 6, 2023)...16

*Jeremiah v. Sutter County*
  2018 U.S. Dist. LEXIS 43663
  (E.D. Cal. Mar. 16, 2018)......................................16

*Johnson v. City of Grants Pass*
  72 F.4th 868 (9th Cir. 2023)......................*Passim*

*J.P. v. County of Alameda*
  803 F. App'x 106 (9th Cir. 2020)............................78

*Kennedy v. City of Richfield*
  493 F.3d 1053 (9th Cir. 2006)................................78

*LA All. for Human Rights v. County of Los Angeles*
    14 F.4th 947 (9th Cir. 2021)……………………………….56

*Latta v. Otter*
    771 F.3d 496 (9th Cir. 2014)……………………………..86

*Lindsey v. Normet*
    405 U.S. 56 (1972)………………..………………...…...49, 61

*Lopez v. Brewer*
    680 F.3d 1068 (9th Cir. 2012)……………………………59

*Los Angeles County v. Humphries*
    562 U.S. 29 (2010)……………………………………….63

*L.W. v. Grubbs*
    974 F.2d 119 (9th Cir. 1992)…………………………….78

*Martin v. City of Boise*
    920 F.3d 584 (9th Cir. 2019)………………………*Passim*

*Martinez v. City of Clovis*
    943 F.3d 1260 (9th Cir. 2019)……………………….61, 78

*Monell v. Dep't of Soc. Services*
    436 U.S. 658 (1978)…………………………..……*Passim*

*Munger v. City of Glasgow*
    227 F.3d 1082 (9th Cir. 2000)……………………………79

*Murguia v. Langdon*
    61 F.4th 1096 (9th Cir. 2023)………………………*Passim*

*Norbert v. City & County of S.F.*
    10 F.4th 918 (9th Cir. 2021)……………………………..90

*Patel v. Kent Sch. Dist.*
    648 F.3d 965 (9th Cir. 2011)…………………………….61

*Penilla v. City of Huntington Park*
  115 F.3d 707 (9th Cir. 1997)..........................78, 79, 80

*Polanco v. Diaz,*
  76 F.4th 918, 2023 U.S. App. LEXIS 20307
  (9th Cir. Aug. 7, 2023)............................................72

*Reed v. City of Emeryville*
  568 F. Supp. 3d 1029 (N.D. Cal. 2021)..................81, 82

*Richeson v. Helal*
  158 Cal. App. 4th 268 (2007) ................................87

*Sanchez v. City of Fresno*
  914 F. Supp. 2d 1079 (E.D. Cal. 2012)...............16, 75

*Saved Magazine v. Spokane Police Dep't*
  19 F.4th 1193 (9th Cir. 2021)................................65

*Shen v. Albany Unified Sch. Dist.*
  436 F. Supp. 3d 1305 (N.D. Cal. 2020)......................60

*Sinclair v. City of Seattle*
  61 F.4th 674 (9th Cir. (2023) ......................69, 70, 71

*St. Louis v. Praprotnik*
  485 U.S. 112 (1988)............................................64

*Summers v. Earth Island Inst.*
  555 U.S. 488 (2009)......................................82, 83

*Swain v. Junior*
  958 F.3d 1081 (11th Cir. 2020)..............................63

*Tobe v. City of Santa Ana*
  9 Cal. 4th 1069 (1995).......................................87

*Trevino v. Gates*
      99 F.3d 911 (9th Cir. 1996)……………………………….65

*Trump v. Int'l Refugee Assistance Project*
      137 S. Ct. 2080 (2017)……………………………………..91

*Where Do We Go Berkeley v. Cal. DOT*
      32 F.4th 852 (9th Cir. 2022)………………….......*Passim*

*Winter v. NRDC, Inc.*
      555 U.S. 7 (2008)…………………………………….*Passim*

*Wood v. Ostrander*
      879 F.2d 583 (9th Cir. 1989)……………………………78

*Zepeda v. I.N.S.*
      753 F.2d 719 (9th Cir. 1983)……………………………90

**Federal Statutes And Rules**

28 U.S.C. § 1292 ………………………………………………18

28 U.S.C. § 1331…………………………………………………18

42 U.S.C. § 1983 …………………………………….14, 18, 35

Fed. R. App. Proc. 4…………………………………………….18

Fed. R. Civ. Proc. 23……………………………………………20

**Other**

Cal. Const., art. XI, § 7…………………………………………87

Cal. Veh. Code § 22651 ……………………………………….22

Cal. Fire Code, Tit. 24, pt. 9, § 202……………………………….31

Sacramento City Code Chapter 8.16………………………….13

Sacramento City Code Chapter 8.20………………………….13

Sacramento City Code Chapter 8.140………………..*Passim*

Sacramento City Code Chapter 12.24………………..*Passim*

Sacramento City Code (SCC) Chapter 12.52………………...32

## INTRODUCTION

"Homelessness continues to grow in California: nationally, California has topped the list for the state with the largest homeless population for more than a decade. As of 2022, 30% of all people in the United States experiencing homelessness resided in California, including half of all unsheltered people (115,491 in California; 233,832 in the US)."[1]

In 2022, Sacramento County's homeless population ranked near the top of California's list at over 9,000, a nearly 70% increase since 2019 which, in turn, has led to more and larger homeless encampments throughout the County.[2] Over 5000 of the homeless (75%) live in the City of Sacramento.[3]

---

[1] Public Policy Institute of California, *Homeless Populations Are Rising Around California*, https://www.ppic.org/blog/homeless-populations-are-rising-around-california/ (last visited Sept. 13, 2023)

[2] Homelessness In Sacramento County, Results from the 2022 Point-in-Time Count (July 2022), https://sacramentostepsforward.org/wp-content/uploads/2022/06/PIT-Report-2022.pdf [page 1].

[3] *Id.* [page 20].

Homelessness impacts everyone. It is a national problem and is one of the Western United States' greatest issues, which has fallen on local governments to solve. It is currently the City's greatest challenge. And balancing the interests of an entire community is not an easy task.

In the absence of cohesive federal or state resources or protocols needed to address the complex problems homelessness present, the City must honor and balance obligations owed to *all* residents to ensure *all* can safely live and work in the City and safely utilize and enjoy the City's public spaces.

To that end, the City (like many others) adopted ordinances to address ancillary and derivative issues homeless encampments bring by prohibiting sidewalk obstructions (Sacramento City Code (SCC) Chapter 12.24), prohibiting abandoned and dangerous vehicles (SCC

Chapters 8.16 and 8.20), and enacting the Emergency and
Shelter Act of 2022 (SCC Chapter 12.100).[4]

Additionally, the City adopted an ordinance to protect
critical infrastructure and high-risk fire areas, prohibiting
*anyone* from camping or storing personal property in these
areas (SCC Chapter 8.140).[5]

Starting in July 2022, plaintiffs Sacramento Homeless
Union, Betty Rois, Falisha Scott and Donta Williams
successfully enjoined the City "from clearing encampments
belonging to the unhoused" from July 29, 2022 through
September 23, 2022 on the grounds that purported "health
risks" to the homeless during "extreme heat" outweighed the
detriment to the City caused by having to cease remediating
homeless encampments.[6]  1-ER-18-60.

---

[4] All SCCs are accessible at
https://library.qcode.us/lib/sacramento_ca/pub/city_code.

[5] A copy of SCC Chapter 8.140 is found at 2-ER-283-287.

[6] The City disagrees with calling remediation efforts
"clearing."  But the City uses the term here because the
district court did.

For that nearly three-month period, the City was precluded from removing tents, personal property, vehicles, trash, debris, human waste, medical waste, and rodents from sidewalks, on or near critical infrastructure and other public property.

More recently, for the same reasons, the district court issued a TRO on August 3, 2023 and a 15-day preliminary injunction on August 16, 2023 precluding the City from "clearing encampments belonging to the unhoused." 1-ER-3-16.

The district court found clearing "encampments belonging to the unhoused" during "extreme heat" – terms never explicitly defined – exposes the homeless to significant heat-related health risks so plaintiffs would likely prevail on their 42 U.S.C. section 1983 claim under the "state created danger" theory of Fourteenth Amendment liability. *Id.* Although recognizing the injunction's negative consequences to the entire community, the district court believed them "far outweighed" by possible health risks to the homeless. *Id.*

14

Thus, this appeal is not about the constitutionality of any City ordinance or the Eighth Amendment prohibiting penalizing the homeless for sleeping in public. *E.g. Johnson v. City of Grants Pass*, 72 F.4th 868 (9th Cir. 2023); *Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019). Nor is this appeal about the constitutionality of clearing homeless encampments, or the constitutionality of any City ordinance.

This appeal is principally about whether the Fourteenth Amendment precludes the otherwise constitutional process of clearing homeless encampments when temperatures exceed 90 degrees. No appellate court has addressed this issue.

Considering the injunctions issued and likely future injunctions given omnipresent hot Sacramento summer weather, the City was and will likely be in the future enjoined during the summer from clearing homeless encampments.

And the district court's reasoning equally applies to cold weather, which Sacramento also experiences. Indeed,

district courts have already employed the same reasoning to find state-created danger claims in varying weather conditions. *See Janosko v. City of Oakland*, 2023 U.S. Dist. LEXIS 6802, at *7-8 (N.D. Cal. Jan. 6, 2023) ("historic levels of rainfall"); *Jeremiah v. Sutter County*, 2018 U.S. Dist. LEXIS 43663, at *11-12 (E.D. Cal. Mar. 16, 2018) ("wind, rain, and cold weather"); *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1102 (E.D. Cal. 2012) ("cold and freezing temperatures, rain, and other difficult physical conditions").

Thus, the City expects a court-ordered prohibition on clearing homeless encampments for significant periods every year despite the Fourteenth Amendment not providing the constitutional basis for the prohibition.

The injunction causes many problems but, most acutely, it prevents or significantly impairs the City's ability to protect, maintain, and repair its critical infrastructure and to protect all citizens from high-risk fires.

Well-functioning governments cannot stop the daily servicing and repair of critical infrastructures for Mother

Nature and her impact on the homeless without potentially dire consequences to the entire community. Yet that is precisely the impact the injunctions have and will continue to have on the City and *all its residents*. Ensuring a functioning infrastructure is not a homelessness issue but a core government issue.

Ultimately, how the City grapples with the complex and myriad issues surrounding homelessness is a political and legislative issue. Responsible to the entire community, the City has the obligation and right to enact and enforce "such rules and regulations … for the welfare and proper government thereof" and a federal court should not interfere absent a "palpabl[e]" and "arbitrary exercise of the power" – which clearing homeless encampments for public health and safety is not. *Hutchinson v. Valdosta*, 227 U.S. 303, 308 (1913); *see Burford v. Sun Oil Co.*, 319 U.S. 315, 318 (1943) ("for it 'is in the public interest that federal courts equity should exercise their discretionary power with proper regard

for the rightful independence of state governments in carrying out their domestic policy'").

This Court should reverse.

## STATEMENT OF JURISDICTION

The district court has federal question jurisdiction over plaintiffs' section 1983 claim. 28 U.S.C. § 1331.

This Court has jurisdiction over the City's August 21, 2023 appeal of the district court's August 16, 2023 order. 28 U.S.C. § 1292(a)(1); Fed. R. App. Proc. 4.

This Court maintains jurisdiction even though the injunction expired because the issues are "'capable of repetition, yet evading review.'" *Where Do We Go Berkeley v. Cal. DOT*, 32 F.4th 852, 857 (9th Cir. 2022). The short duration of the injunction precludes fully litigating the City's challenges to the injunction. *Id.* at 857-58 ("[t]he six-month preliminary injunction is too brief for an appeal to be fully litigated"). And the potential the City will be subject to future similar injunctions surely exists. *Id.* Indeed, the district court's August 16, 2023 order contemplated

providing further injunctive relief and plaintiffs moved to reinstate the injunction, 1-ER-9; District Court Electronic Case Filing System, Document Nos. 66-73 (Docs. 66-73).[7]

## ISSUES PRESENTED

Whether the district court erred when finding plaintiffs established a likelihood of success on a state-created danger theory of Fourteenth Amendment liability because: (1) the district court applied the incorrect legal standard for section 1983 liability against the City; (2) the district court erroneously concluded clearing homeless encampments during "extreme heat" is affirmative conduct exposing these plaintiffs to a particularized risk harm in the form of heat-

---

[7] On September 13, 2023, the district court denied plaintiffs' motion to extend and enlarge the preliminary injunction issued on August 16, 2023. Doc. 74. One reason was the absence of sufficient evidence of "extreme heat" through September 2023. *Id.*, p. 4. However, finding "[t]he City raises several compelling new arguments" (the City doesn't necessarily agree all the arguments were entirely "new"), the district court also agreed with two arguments the City makes here in challenging the August 16 injunction. *Id.*, pp. 3-4. They are the absence of evidence of imminent harm to the named plaintiffs (*post*, pp. 83-84) and the impropriety of granting class-wide preliminary injunctive relief (*post*, pp. 90-91).

related health risks above those already existing in encampments during "extreme heat"; and (3) the district court erroneously concluded the City was deliberately indifferent to known heat-related adverse health impacts caused by clearing homeless encampments during "extreme heat"?

Whether the district court erred when finding the public interests in clearing homeless encampments to eliminate real health and safety issues to the entire community was "far outweighed" by the speculative heat-related health risks to the homeless?

Whether the district court erred in granting injunctive relief for the benefit of not only plaintiffs but every homeless person before class certification under Federal Rule of Civil Procedure 23?

Whether the district court erred when failing to exempt all the City's critical infrastructure from the injunction given the importance of protecting and maintaining critical

infrastructure and the absence of any evidence justifying the refusal to exempt critical infrastructure?

## STATEMENT OF THE CASE

### A.   City's Efforts To Address Homelessness

The City takes a comprehensive and multi-faceted approach to homelessness.  *See* 2-ER-106-126, 135-136, 241-247, 298-302, 313-347; 3-ER-355-405, 415-450.  The primary goals are to reduce homelessness and provide needed services.  *See Id.*

The City's response to homeless encampments is likewise comprehensive and multi-faceted and seeks to balance the interests of the homeless and the broader community.  *See Id.*

No one disputes homeless encampments impede access and use of public property.  No one disputes the health and safety issues associated with homeless encampments, which include fire hazards (*see* Motion to Transmit Exhibit), disease, crime, trash, biohazards, pollution, environmental damage, and infestations.

The City does not haphazardly approach the complex issues homeless encampments present but rather utilizes a comprehensive and coordinated approach.

In July 2023, to address homeless encampments, the City Manager issued the Citywide Homeless Response Protocol ("Protocol") updating and consolidating prior guidance memorandums into a single policy document. 3-ER-356-357 ¶ 6, 379-394; 3-ER-364-368 (prior guidance memorandums).

The Protocol establishes guidelines for interdepartmental response to homeless encampments, sets objective criteria for identifying encampments that are a priority for outreach and abatement and provides guidance for addressing and obtaining compliance where encampments violate the SCC or the California Vehicle Code (CVC) (e.g., CVC § 22651 (impound and towing)). 3-ER-382-383.

The City's response is coordinated by an Incident Management Team (IMT) that meets daily and weekly to

address small and medium encampments.  3-ER-383.  The
IMT further coordinates responses to larger complex
encampments requiring intensive outreach and engagement
before conducting cleanups and gaining compliance.  *Id.*

The City aims its three prong approach to service calls
regarding homeless encampments at both providing social
services to the homeless and minimizing the encampments'
negative community impacts.  3-ER-384.

The first prong is "outreach," focusing on the needs of
encampment residents and connecting them with social
services.  *Id.*

The second prong is "encampment management,"
focusing on health and safety through cleaning and
removing trash and hazardous materials from the
encampment.  *Id.*

The third prong seeks encampment "compliance" (i.e.,
remediation) for those violating the law, first by seeking
voluntary compliance and then, if unsuccessful, by relocating
residents and personal property (i.e., "clearing").  *Id.*

The Protocol further establishes three response strategies to homeless encampments: general response, rapid response, and coordinated response. 3-ER-385, 386.

A general response applies to lower priority encampments and primarily involves outreach, connection to social services, and encampment management. 3-ER-385.

A rapid response applies to "priority encampments," which are those violating the law. *Id.* Though efforts to connect the homeless to social services continue, a rapid response focuses on ensuring public health and safety by gaining prompt compliance. *Id.*

A coordinated response is reserved for homeless encampments too large and complex for a general or rapid response, or those where the rapid response failed to gain compliance. *Id.* Handled by a City-County Partnership Outreach Team of City Outreach Specialists, County Behavioral Services Staff, and Community Based Organization partners, the Team seeks to first achieve safe and stable living situations by building rapport with the

residents, developing empowerment strategies, and connecting residents with social services. *Id.* Only after outreach-based progress fails is the encampment scheduled for compliance. *Id.*

Large and complex encampments are prioritized and ranked for encampment management and compliance. 3-ER-387.

Rankings incorporate various health and safety considerations like emergency service calls to the encampment (e.g., police, fire, paramedics), complaints, size, unsafe location, biohazards (e.g., human waste, syringes), fire hazards (e.g., propane tanks, gas and oil containers), unsecured or dangerous animals, accumulations of non-life essential personal property, garbage and debris accumulation, and vector hazards (e.g., rodents, bugs). *Id.*

Rankings also incorporate the encampments relationship to "essential locations" such as critical infrastructure and immediately adjacent areas; important community resources (e.g., schools, heath centers, senior

centers); environmentally sensitive areas (e.g., rivers, waterways, wetlands, wildlife concentrations, protected vegetation); wildfire risk areas; public rights of way; and areas that the City must access for maintenance, construction and development. *Id.*

The Protocol assigns three different priority levels to encampments: level 1 (high priority); level 2 (moderate priority); and level 3 (low priority). 3-ER-388.

A level 3 low priority encampment poses no obvious and immediate public health and safety risk and is not near or blocking access to "essential locations." 3-ER-389. Encampments are monitored to ensure resident and community safety. *Id.*

A level 2 moderate priority encampment poses threats to public health and safety but does not require immediate resident relocation. 3-ER-388. These are encampments with excessive trash and debris, needles, drug paraphernalia, feces or other biohazards; encampments creating a significant increase in rodent or insect infestation; and

encampments with excessive accumulation of non-life essential personal property. 3-ER-388-389. These encampments are also monitored to ensure resident and community safety. 3-ER-388.

A level 1 high priority encampment poses an imminent health and safety threat or threat to critical infrastructure necessitating immediate compliance. *Id.* These include encampments violating the law; encampments within 500 feet of a school or a school access route; encampments posing an imminent fire threat or that are adjacent to critical infrastructure; encampments posing a danger to public utilities and transportation infrastructure; encampments blocking or impeding traffic or travel lanes; and encampments involving multiple documented community concerns or complaints. *Id.*

Though level 1-high priority encampments are subject to immediate remediation without conducting outreach or posting a notice, the Protocol nonetheless dictates a response should focus on gaining voluntary compliance. *Id.* And

where more than 6 tents or 10 people will be displaced or where the encampment presents complex logistical issues, a coordinated response strategy involving Outreach Teams is used to connect people to behavioral health services and temporary shelter. *Id.* Once reasonable outreach efforts are exhausted, a plan to clean the encampment and remedy legal violations is scheduled and executed. *Id.*

Before "clearing" any encampment, the Protocol requires considering the sufficiency of notice to the residents, availability of social services, *excessive heat or cold,* and availability and transportation to shelter space. 3-ER-384.

After action reports for remediation of three level 1 high priority encampments done in 2023 demonstrate the City's comprehensive and multi-faceted approach. 2-ER-313-347.

**B.    City's Critical Infrastructure and Wildfire Risk Area Ordinance**

Some City property needs greater protection to ensure public health, safety and welfare.  SCC Chapter 8.140, enacted in 2020, provides that protection.

Citing at least 1,009 fires associated with homeless encampments over a six-month period in 2019 and the ensuing damage to a Department of Utilities (DOU) facility, as well as impeded access to another DOU facility and to a water treatment plant, and damage to levees caused by encampments, the staff report recommending adoption of SCC Chapter 8.140 stated its purpose:

> The purpose of the ordinance is to mitigate the threat of fire and other potential causes of destruction and damage to and interference with critical infrastructure and wildfire risk areas and similarly sensitive areas, in order to protect the health, safety, and welfare of the public, by authorizing the removal of persons and their personal property in, on, or near those areas.

2-ER-290-291.  The adopted ordinance reiterates its purpose:

> The City Council finds as follows: (1) a principal threat to the public health, safety, and welfare is the potential destruction of, damage to, or interference with, infrastructure that is critical to

29

the provision of public services such as law enforcement, fire prevention, transportation, and utilities including communication, water, and waste disposal; (2) destruction of, damage to, or interference with, critical infrastructure is caused by fire, contamination, restricting access, or other causes; and (3) destruction of, damage to, or interference with, critical infrastructure is often caused by persons whose activities are not permitted or authorized in, on, or near critical infrastructure.

The purpose of this chapter to mitigate the threat of fire and other potential causes of destruction and damage to and interference with, critical infrastructure, in order to protect the health, safety, and welfare of the public, by authorizing the removal of persons and their personal property in, on, or near critical infrastructure.

SCC § 8.140.010; 2-ER-283.

Under the ordinance, "critical infrastructure" is defined as:

1. Levees; or

2. Real property or a facility, whether privately or publicly owned, as approved by resolution of the city council, that the city manager designates as being so vital and integral to the operation or functioning of the city that its damage, incapacity, disruption, or destruction would have a debilitating impact on the public health, safety, or welfare.

Critical infrastructure may include, but is not limited to, government buildings, such as fire

> stations, police stations, jails, or courthouses; hospitals; structures, such as antennas, bridges, roads, train tracks, drainage systems, or levees; or systems, such as computer networks, public utilities, electrical wires, natural gas pipes, telecommunication centers, or water sources.

SCC § 8.140.020; 2-ER-284.

"Wildfire risk area" means: "Land that is covered with grass, grain, brush or forest, whether privately or publicly owned, which is so situated or is of such inaccessible location that a fire originating upon it would present an abnormally difficult job of suppression or would result in great or unusual damage through fire or such areas designated by the fire code official." SCC § 8.140.020 (adopting 2022 Cal. Fire Code, Tit. 24, pt. 9, § 202 definition); 2-ER-285.

Though the ordinance applies to problems associated with homeless encampments, it pertains to *everyone* providing in relevant part:

A.     It is unlawful and a public nuisance for *any person* to camp, occupy camp facilities, or use camp paraphernalia at the following locations [8] [emphasis added]:

1.     Critical infrastructure;

2.     Within 25 feet of critical infrastructure;

3.     Within 25 feet of a vehicular or pedestrian entrance or exit of critical infrastructure;

4.     On those portions of a right-of-way that are required by local, state, or federal law to be free of obstruction to first responders, including but not limited to members of law-enforcement, fire-prevention, or emergency-medical-services agencies;

5.     Within a hollow sidewalk; or

6.     Wildfire risk area.

B.     It is unlawful and a public nuisance for *any person* to store personal property, including camp facilities and camp paraphernalia, in the following locations without the written consent of

---

[8] "'Camp' means to place, pitch or occupy camp facilities; to live temporarily in a camp facility or outdoors; to use camp paraphernalia."  SCC § 8.140.020 (referencing SCC Chapter 12.52's definition); 2-ER-283.  "'Camp facilities' include, but are not limited to, tents, huts, vehicles, vehicle camping outfits or temporary shelter."  *Id*.  "'Camp paraphernalia' includes, but is not limited to, bedrolls, tarpaulins, cots, beds, sleeping bags, hammocks or cooking facilities and similar equipment.'"  2-ER-284.

the owner, except as otherwise provided by resolution of the city council [emphasis added]:

1.    Critical infrastructure;

2.    Within 25 feet of critical infrastructure;

3.    Within 25 feet of a vehicular or pedestrian entrance or exit of critical infrastructure;

4.    On those portions of a right-of-way that are required by local, state, or federal law to be free of obstruction to first responders, including but not limited to members of law-enforcement, fire-prevention, or emergency-medical-services agencies;

5.    Within a hollow sidewalk; or

6.    Wildfire risk area.

SCC § 8.140.030; 2-ER-285-286.

The City may abate "[a]ny violation of section 8.140.030 … upon 24 hours of prior notice" but may abate "a violation … immediately … without prior notice, if the violation poses an imminent threat to public health or safety."  SCC § 8.140.040(A); 2-ER-286.  "Abatement ... may include ... removal of camp facilities, camp paraphernalia, personal property, garbage, hazardous waste, infectious waste, junk, or debris; and securing the perimeter of the

property with fencing, gates, or barricades to prevent further occurrences of the nuisance activity." SCC § 8.140.040(B); 2-ER-286.

However, "[t]he ordinance is geographically limited. Possible summary abatement under the ordinance does not apply to the entirety of the City. It is limited to real property upon which the presence of unauthorized personal property poses a heightened threat to the health and safety of residents." 2-ER-292. The staff report specifically stated that "[e]ncampments and associated personal property of unsheltered homeless persons would not be subject to such summary abatement on the remainder of property in the City." *Id.*

After a lengthy evaluation of City property with experts and stakeholders, the City Manager designated and the City Council approved in July 2021 additional parcels and facilities as critical infrastructure, including those housing vulnerable populations, government operations, utilities, healthcare providers, as well as public health and

safety infrastructure, transportation infrastructure, and public gathering spaces. 2-ER-189-190.

Recently the City Manager revised, and the City Council approved on August 1, 2023 an updated designation of critical infrastructure adding, among others, courthouses and government law offices, including those of criminal prosecutors.  3-ER-357 ¶ 6, 401-404; Motion for Judicial Notice, Exh. A (Resolution No. 2023-0252).

## C.    2022 District Court Proceedings

Filed on June 24, 2022, and relevant here, plaintiffs asserted a section 1983 claim alleging a Fourteenth Amendment violation under the "state-created danger" liability theory resulting from "'sweeping existing homeless encampments" during periods of "extreme heat" "forcing those swept into the more dangerous circumstances of uncovered streets, sidewalks and triple-digit, unbearably hot 'Safeground' encampments ..." 5-ER-980, 985-986.

Plaintiffs moved ex parte for a "mandatory injunction and temporary restraining order to prevent life-threatening

heat-related harm to members of the Sacramento homeless community."  Doc. 2, p. 1.

Plaintiffs sought mandatory injunctive relief in the form of formal heat declarations and the opening of "cooling centers." *Id.*, pp. 15-16.  Plaintiffs sought a TRO "prohibiting the clearing of homeless encampments unless and until all those impacted by such actions are provided with non-congregant, accessible, safe, indoor accommodations pursuant to *Martin v. Boise*."  *Id.,* p. 16.

The district court denied ex parte relief and set a briefing schedule. *See* Docs. 5, 17.

In opposition, the City argued plaintiffs were unlikely to prevail because the City had not conducted any "sweeps" for illegal camping since 2018 and, thus, was not exposing the homeless to heat-related dangers.  Doc. 19, p. 5 (referencing 4-ER-819-820 (Heinlein Declaration)).  The City further showed how it protected the homeless from heat through cooling and respite centers.  *Id.* (referencing 4-ER-812-817 (Trimm Declaration)).

36

On July 29, 2022, the district court denied mandatory injunctive relief but imposed a 28-day preliminary injunction "enjoin[ing] the City ... from clearing encampments belonging to the unhoused." 1-ER-60.

The district court found plaintiffs showed a likelihood of success on its state-created danger liability theory:

> …. Plaintiffs' declarations detail heat-related mortality and morbidity deaths and illnesses from heat exposure. (*See* ECF Nos. 2-1, 2-2, 8, 21, 21-1.) In light of the "stress, extreme fatigue and collapse" accompanying these sweeps ..., the Court finds that the City's sweeping or clearing of encampments in extreme heat to be "affirmative conduct" on the part of the City in placing Plaintiffs in danger. [Citation]. Plaintiffs also adequately establish through the ... [Crystal] Sanchez[ ] declaration [(ECF No. 2-1 at 7)] that the City acted with "deliberate indifference" to the "known or obvious danger" of extreme heat. [Citation].

1-ER-50-51.

Regarding irreparable harm, the district court found "potentially severe" harm to plaintiffs. 1-ER-57-58.

On the competing interests, the district court first recognized "the possible harm in temporarily restraining the City from clearing encampments may hamper the City's

ability to promote the public health, safety, and general welfare" but then found "the City's interest in clearing encampments during extreme heat events is far outweighed by Plaintiffs' interest in their own health and welfare." 1-ER-58-59.

With the injunction expiring, plaintiffs moved ex parte on August 24, 2022 to extend the preliminary injunction because of "extreme heat" predicted through September 2022. Doc. 24, p. 2.

The City made three primary arguments in opposition. Doc. 28.

First, the City showed the anticipated weather conditions for September 2022 did not constitute "extreme heat" *detrimental* to the health of the homeless. Doc. 28, pp. 3-5 (referencing 4-ER-663-676 (Null Declaration)).

Second, the City showed detrimental health and safety impacts to *all* City residents if precluded from clearing homeless encampments, including increased human waste and refuse, criminal activity, fire risks, compromised

38

security at transportation sites, and increased flooding risks at creeks, channels, and other waterways. *Id.*, p. 5 (referencing 4-ER-677-748 (Heinlein, Henry, Luther, Lee, and Bullard Declarations)).

Third, the City argued the district court should exempt from the injunction critical infrastructure, wildfire risk areas, and sidewalks so the City could enforce SCC Chapters 8.140 and 12.24. *Id.*, p. 6.

On September 2, 2022, the district court extended the injunction through September 23, 2022 again ordering the "City ... enjoined from clearing encampments belonging to the unhoused." 1-ER-35.

The district court again found plaintiffs would likely succeed on the merits. After referencing its July 29, 2022 findings, the district court stated:

> Although the evidence is much more limited in the instant motion, Plaintiffs' declarations still adequately detail heat-related mortality and morbidity deaths and illnesses from heat exposure. (*See* ECF No. 24-1 at 1–2, 4–6.) In light of the "risk of dehydration, hyperthermia, heat stress, heat stroke and other heat-related conditions that may cause irreversible damage

39

> and possibly death" that could accompany sweeps
> ..., the Court finds that the City's sweeping or
> clearing of encampments in extreme heat to be
> "affirmative conduct" on the part of the City in
> placing Plaintiffs in danger. [Citation] As stated
> in the Court's prior Order, Plaintiffs also
> adequately establish through Union President
> Crystal Sanchez's declarations, as well as
> [Jessica] Gilbert's declaration, that the City acted
> with "deliberate indifference" to the "known or
> obvious danger" of extreme heat. [Citation]; (*see
> also* ECF No. 2-1 at 7; ECF No. 21 at 2, 4; ECF
> No. 24-1 at 1–2.)

1-ER-26.

Regarding irreparable harm and the balancing of

interests, the district court acknowledged the City's evidence

demonstrating *actual harm* resulting from the existing

injunction precluding clearing of homeless encampments –

increased crime, fires, inability to access, evaluate, maintain

and repair critical infrastructure, and increased trash,

human waste and rodent issues, 1-ER-27-31 – but

nevertheless found in plaintiffs' favor:

> The Court does not take the foregoing lightly and
> understands the weight of issuing another
> preliminary injunction. *It is clear from the City's
> declarations that the preliminary injunction to
> prevent the City from clearing encampments has a
> serious impact on public health and safety.*

40

However, for Plaintiffs, protection from the extreme heat *could possibly* be a matter of life or death. Plaintiffs' declarations detail heat-related mortality and morbidity deaths and illnesses from heat exposure (see ECF No. 2-1 at 7; ECF No. 21 at 2, 4; ECF No. 24-1 at 1–2, 4–6), and the Court finds the harm Plaintiffs allege to be *potentially* severe — especially in light of the triple-digit weather predicted for the upcoming week. Therefore, the Court still finds that the City's interest in clearing encampments during extreme heat events is far outweighed by Plaintiffs' interest in their own health and welfare. . .. Accordingly, the Court finds the Plaintiffs have demonstrated irreparable harm, the balance of equities tips in favor of Plaintiffs, and the public interest is served by the issuance of an injunction.

1-ER-31 (emphasis added).

The district court refused to exempt critical infrastructure, wildfire risk areas, and sidewalks from the injunction:

The Court finds that these exclusions … could severely limit the scope of the preliminary injunction. It appears from these ordinances that the City could very easily exempt vast portions of City property "as being so vital and integral to the operation or functioning of the city that its damage, incapacity, disruption, or destruction would have a debilitating impact on the public health, safety, or welfare." If the City were to do so, the preliminary injunction would have a very

limited effect in actually protecting unhoused individuals from the extreme heat.

1-ER-33-34.

## D.    2023 District Court Proceedings

After the injunction expired on September 23, 2022, nothing occurred in the case until August 1, 2023 when plaintiffs moved ex parte for a TRO.  Doc. 36.

Plaintiffs asserted predicted temperatures of 90 degrees or above for most of August, and the City "continues to conduct widespread clearing of homeless encampments, [displacing] … homeless persons … from areas of relative protection from the sun and heat into more exposed areas, primarily heat-retaining sidewalks and paved areas where at the hottest time of the day surface temperatures are reaching 140 degrees Fahrenheit."  *Id.*, p. 5

Plaintiffs sought an injunction precluding the City from "'sweeping' of individuals from public spaces by code enforcement and city police who are ... failing to provide immediately accessible indoor alternative accommodations as required under ... *Martin v. Boise.*"  *Id.*, p. 7.

42

According to plaintiffs, the City is "placing the unsheltered homeless at a greater risk of harm on the unprotected streets, sidewalks and within 'sanctioned' encampments" like Miller Park "where temperatures within city-provided tents placed on heat-absorbing asphalt and fenced away from large, nearby shade-providing trees remain dangerously high." *Id.*

Plaintiffs further criticized the City's designation of critical infrastructure arguing it "banned" the homeless from "41.65% of the of the City's 99.4 square miles." *Id.*, p. 6.

Opposing, the City first explained efforts made to address the homelessness crisis since the summer of 2022:

> [T]he City has taken significant steps to address the homelessness crisis plaguing its community. On August 23, 2022, the City Council adopted Chapter 12.24 to the [SCC] regarding Sidewalk Obstructions and Pedestrian Interference and also adopted Resolution No. 2022-0286 directing the City Manager to issue guidelines for enforcement. Further, on October 18, 2022, the City Council adopted Resolution No. 2022-0322 approving the City Manager's designation of specified locations as critical infrastructure for purposes of [SCC] Chapter 8.140 regarding Protection of Critical Infrastructure and Wildfire Risk Areas. On October 18, 2022, the City

>developed a Citywide Homelessness Response
Protocol to provide structural guidelines for the
City's interdepartmental response to homeless
encampments and also created a policy guidance
memo on November 28, 2022 to address the City's
enforcement of its sidewalk ordinance codified at
Chapter 12.24 of the [SCC]. The City Council has
also held meetings dedicated solely to
homelessness issues on June 27, 2023 and August
1, 2023. Collectively, these efforts seek to balance
the City's obligation to ensure that all residents,
unhoused and housed alike, are able to safely live
and work in the City and enjoy its public spaces.

Doc. 38, pp. 2-3 (referencing 2-ER-298-347; 3-ER-355-450

(Heinlein, Lara, and Golling Declarations)).

The City next rightly observed "plaintiffs [only] focus

on the unhoused and their plight, [but] the City must

consider the health and welfare of all its residents." *Id.,* p. 5.

The City explained:

>The City is addressing its homelessness crisis by
engaging with and dedicating resources as well as
enforcement efforts. As set forth in the
declarations of Captain Bryce Heinlein and
Assistant City Manager Mario Lara, there are
encampments that pose public safety concerns
that necessitate an immediate response. For
example, as set forth in the Declaration of Bryce
Heinlein, the City conducted a joint outreach
operation to seek camp compliance and to offer
safe alternative shelter to approximately 38
encampments and 31 people located at 28th and

C Streets in Sacramento from July 12 – July 21, 2023. (Heinlein Decl. ¶ 11). This particular location was heavily inhabited by both tent encampments and out of compliance vehicles and since early 2023, had been the source of countless calls from the community complaining of criminal activity including narcotic activity, prostitution, theft and vandalism. During this operation, 12,400 pounds of trash and debris and 813 syringes were disposed of. (Heinlein Decl. ¶ 11).

This is a staggering six tons of trash and 800+ syringes for just one site with fewer than 40 people. Syringes pose a public safety health hazard to all, and the City must be able to address encampments like these that contribute to community blight and crime. It cannot be reasonably supported that such conditions are acceptable or should be allowed to persist. Further, contrary to plaintiffs' inflammatory allegations regarding the conditions at Miller Park as set forth in their accompanying declarations, it does not constitute an increased risk of harm as set forth in the Declaration of Nick Golling. The actions of the City to clear encampments where necessary and consistent with its enforcement protocols is essential to protecting the City and all its residents.

*Id.* (referencing 2-ER-298-347; 3-ER-355-450 (Heinlein, Lara, and Golling Declarations)).

Regarding the expansive injunction sought by plaintiffs, the City explained the "request to enjoin the clearing of all encampments within the City" is "a broad

request for relief [that] does not consider the individualized circumstances at stake." *Id.*, p. 6. The City further argued plaintiffs 90 degree threshold cannot be used "to halt the entirety of the City's efforts in addressing public safety concerns posed by certain encampments." *Id.* Regarding the 90-degree threshold, the City explained:

> Contrary to plaintiffs' assertions that the City is disregarding its own homeless response protocols ... 90 degrees is not an upper limit set by the City of Sacramento; rather, given the Court's 2022 Orders enjoining the City from clearing encampments from approximately the end of July 2022 to mid-September 2022, this was included to reflect the possibility that temperature thresholds could be as low as 90 degrees. Further, heat is one factor to consider among many other factors and the City has never utilized heat as the sole consideration when there are immediate public health and safety risks.

*Id.*, p. 6 (referencing 3-ER-356 ¶ 3 (Lara Declaration)).

After disputing the alleged Miller Park conditions, the City showed plaintiffs' claim about the scope of City property designated as critical infrastructure was wrong. *Id.*, pp. 6-7.

The City further explained how the balance of interests heavily weighed against a TRO:

> [T]he balance of harms and public interest
> strongly disfavors the issuance of a TRO. The
> right of local governmental officials to make
> necessary decisions to protect against unsafe and
> unsanitary conditions risking public safety for all
> outweighs plaintiffs' desire to remain where they
> are. In the City's declarations filed concurrently,
> it has presented compelling evidence that
> clearing encampments when necessary and in
> accordance with the City's protocols and
> ordinances and within the discretion of the City's
> legislative function and police powers. Here,
> plaintiffs rely on entirely unsubstantiated "state
> created danger" declarations of lay persons, none
> of which negate the deference afforded to the
> City's public health and safety determinations,
> much less satisfy plaintiffs' heavy burden of proof
> in seeking extraordinary injunctive relief.

*Id.*, p. 8.

On August 3, 2023, the district court issued a 14-day

TRO "enjoin[ing] the City ... from clearing encampments

belonging to the unhoused." 1-ER-15. The district court's

reasoning mirrored its 2022 reasoning and incorporated

those conclusions into its August 3, 2023 order. 1-ER-14-15.

The district court further set a briefing schedule and

directed the parties to address whether *Grants Pass*, 72

F.4th 868 impacted the case. 1-ER-16.

47

Recognizing "the TRO is broad," the district court also ordered the parties to meet and submit a joint statement on agreements "to narrow the scope of any future injunctions to best balance the competing interests at play," including "how to prioritize exceptions for 'critical infrastructure.'" 1-ER-16.

The City opposed, incorporating and building on its TRO opposition arguments. Docs. 43, 45.

After demonstrating *Grants Pass's* inapplicability because it involved the Eighth Amendment and criminalizing sleeping in public, Doc. 45, pp. 11-13, the City pointed out what *Grants Pass* reaffirmed about a government's ability to address homelessness: "'Jurisdictions remain free to address the complex policy issues regarding homelessness in the way those jurisdictions deem fit.'" *Id.*, p. 14 (quoting *Grants Pass*, 72 F.4th at 915 (Silver and Gould, Circuit Judges, joint statement regarding denial of rehearing en banc). The City further observed what the Court itself said about the case:

"[*Grants Pass*] does not establish an unrestrained right for involuntarily homeless persons to sleep anywhere they choose. Nor does it require jurisdictions to cede all public spaces to involuntarily homeless persons. The argued notion that *Martin* and *Grants Pass* work together to guarantee a 'federal constitutional "right" . . . to camp or to sleep on sidewalks and in parks, playgrounds, and other public places' is completely absent from the opinion.'"

*Id.*, pp. 13-14 (quoting *Grants Pass*, 72 F.4th at 914).

The City next reiterated plaintiffs' unlikely success on a state-created danger liability theory. *Id.*, pp. 14-16. After observing there is no constitutional right to housing under *Lindsey v. Normet*, 405 U.S. 56, 74 (1972), the City argued plaintiffs didn't show clearing encampments exposed the homeless to any greater risk of heat-related harm not already faced by being homeless. *Id.*, pp. 16, 18-19.

The City further argued the balancing of interests didn't support an injunction because its right and obligation to "make necessary decisions to protect against unsafe and unsanitary conditions risking public safety for all outweighs" the speculative risks the homeless might face in having to

49

relocate out of homeless encampments during "extreme heat." *Id.*, p. 22.

The City also laid out in detail specific examples of public harm since the August 3, 2022 TRO:

> Prior to the Court's issuance of its Temporary Restraining Order on August 3, 2023, the City had two scheduled clean-ups planned in the City the week of August 7, 2023, the first is located at W Street and Alhambra Blvd. and the second, is located at Ninos Parkway in the Natomas area. As set forth in the Declaration of SPD Captain Daniel Monk and Parks Sgt. Danielle Luther, both encampments pose immediate public safety risks. For example, at W Street and Alhambra Blvd., "[f]rom January 2023 to date, Sacramento Police officers have responded to this location to advise residents of sidewalk obstruction ordinances, conducted probation searches, and investigated several persons at this location in relation to allegations of street narcotic sales." (Monk Decl. ¶ 5.) In fact, on August 6, 2023, SPD received a report of an unhoused female who was attacked with a razor by another unhoused female while she was sleeping inside her tent near the Alhambra/W Street corridor and sustained several non-threatening lacerations during the altercation. SPD conducted a canvass with negative results. The victim advised that the suspect frequents the Alhambra Blvd. corridor. (Monk Decl. ¶ 6.)
>
> In the Declaration of Sgt. Danielle Luther, she states that the biggest concerns at Ninos Parkway in Natomas are "needles, vector issues,

and dry, grassy location. To her knowledge, they have not had a fire yet in this area, but if one were to break out, it would move incredibly quickly given the landscape. Further, given the proximity of this encampment to residences and electrical towers, it poses an extreme fire hazard and a significant public safety risk." (Luther Decl. ¶ 8.)

In addition, in the Declaration of Daniel Bowers, it shows how uncleared encampments give rise to vector issues, such as rodents, which can cause communicable outbreaks of diseases.

*Id.*, pp. 10-11 (referencing 2-ER-127-172 (Bowers, Monk, and Luther Declarations)).

The City additionally showed how the 2022 injunctions harmed the homeless encampments' residents:

In Mr. Worrall's declaration, he explains how DCR[9] actively engages with [the homeless] during extreme weather conditions. He also provides statistics of calls received by DCR and context of how last year's injunction affected the number of self-referral calls received by DCR. "The false sense of security brought by a staying of compliance actions is clearly shown in the number of self-referral calls received by DCR in the two months immediately following last summer's injunction. During the time period of the preliminary injunction last year, DCR received a total of 372 unhoused self-referral calls which are calls made by unhoused community

---

[9] DCR is the City's Department of Community Response.

> members to 311 seeking services for themselves
> from DCR. Immediately following last summer's
> injunction there were 71 more self-referral calls
> (443 total calls), clearly demonstrating an
> increased need and desire for services
> immediately following the previous halt in
> compliance efforts." (Worrall Decl. ¶ 15.)

*Id.,* pp. 8-9 (referencing 2-ER-106-111 (Worrall Declaration)).

Finally, the City again argued any injunction should exclude all critical infrastructure given its importance to the entire community and the City's need and obligation to protect and maintain it. *Id.,* pp. 19-23.

As directed, the parties submitted a joint statement identifying areas of agreement on the injunction's scope. The parties agreed the City could enforce its sidewalk obstruction ordinance (SCC Chapter 12.24) and agreed to limited "camp management" (i.e., trash and debris removal) but could not agree on critical infrastructure exclusions. 2-ER-100-104.

The district court issued a preliminary injunction on August 16, 2023. 1-ER-3-9.

The district court again found plaintiffs likely to succeed "for the same reasons the Court discussed in its prior orders;'" that is, "the City's clearing of encampments constitutes 'affirmative conduct' that places unhoused individuals at an increased risk of the 'known and obvious danger' of exposure to extreme heat." 1-ER-6-7 (citing 1-ER-26, 50-51 (9/2/22 and 7/29/22 Orders)).

The district court found plaintiffs again established irreparable harm:

> The City next argues not all unhoused individuals are similarly situated, and thus, the Court cannot assume that enjoining the City from clearing encampments will necessarily keep unhoused individuals safer from excessive heat. (ECF No. 45 at 18.) ….

> Again, the City's arguments are unpersuasive. For the same reasons discussed in its prior orders, the Court concludes the weather forecast predicting excessive heat for the upcoming weeks and Plaintiffs' evidence detailing the risks of heat-related deaths and illnesses is sufficient to show that irreparable harm will result in the absence of injunctive relief.

1-ER-7 (citing 1-ER-27, 57-58).

Once again, the district found the balance of interests favored plaintiffs:

> Lastly, the City argues the balance of equities and public interest weigh against granting an injunction because the City must be able to designate and protect critical infrastructure to ensure public health and safety. [Citation]. The City also emphasizes that its definition of critical infrastructure is narrower than the federal definition in that the City's definition applies only to government facilities with a history of prior disturbances (such as schools, courthouses) or that provide life-saving services (such as police stations, fire stations, and hospitals). [Citation]. As this Court has repeatedly stated, the City's interest in clearing encampments during extreme heat is far outweighed by Plaintiffs' interest in the health and welfare of unhoused individuals. [Citation].

1-ER-7-8.

Recognizing the "TRO is broad" and given the parties' agreements, the district court "modif[ed] the existing injunction to better balance the equities and serve the public interest." 1-ER-8.

The City remained "enjoined from clearing encampments belonging to the unhoused" subject to exceptions for:

[ ] Camp management, such as trash and debris clean-up, is permitted within the following parameters: (1) items of personal/survival necessity belonging to unhoused individuals cannot be cleared; and (2) the City may clear and manage debris, vector, and safety issues of encampments. These parameters should be interpreted narrowly.

[ ] Enforcement of the City's sidewalk ordinance (Sacramento City Code 12.24) is permitted for all sidewalk obstructions blocking access leaving less than four (4) feet of width. To the extent possible, unhoused individuals should be given an opportunity to comply with the sidewalk ordinance at their given location.

*** 

[ ] The City is permitted to enforce its critical infrastructure ordinance only as to encampments within 500 feet of a school, as the City requested this specific exception and Plaintiffs did not explicitly oppose the exception in their reply. The parties did not prioritize or agree to other exceptions for critical infrastructure, and the Court declines to carve out further exceptions at this time.

1-ER-8-9.

# STANDARD OF REVIEW

This Court vacates a preliminary injunction when "'the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of

fact.'" *Berkeley*, 32 F.4th at 857 (simplified). This Court reviews "legal conclusions de novo, the factual findings underlying its decision for clear error, and the injunction's scope for abuse of discretion." *Id.* "A factual finding constitutes clear error if it is illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Id.* De novo review also applies to "questions of jurisdiction over Plaintiffs' claims." *LA All. for Human Rights v. County of Los Angeles*, 14 F.4th 947, 956 (9th Cir. 2021).

## SUMMARY OF ARGUMENT

The district court erred in finding plaintiffs met the heavy burden necessary for the extraordinary relief of a preliminary injunction.

Plaintiffs' state-created danger theory of Fourteenth Amendment liability failed legally and factually.

Legally, the district court erred by not evaluating the City's section 1983 liability under *Monell v. Dep't of Soc. Services*, 436 U.S. 658 (1978).

Factually, the district court erred because no evidence exists of any City policy or custom to clear homeless encampments during "extreme heat" over other times.

Legally, the district court erred by finding clearing homeless encampments is affirmative conduct exposing plaintiffs to particularized harm because, assuming some heat-related health risks, it is a general harm to which all in homeless encampments are exposed.

Factually, the district court erred in finding plaintiffs were exposed to heat-related health risks in 2023 by relying on evidence over a year old.

The district court further factually erred when finding evidence of deliberate indifference. No evidence showed the City (through its employees) purposefully chose to clear homeless encampments during "extreme heat," as opposed to other times, despite knowing of the heat-related health risks associated with clearing encampments in "extreme heat."

The district court erred in the irreparable harm analysis by not focusing on the actual and imminent harm to

these plaintiffs but instead relied on unsupported

assumptions regarding potential health risks to any

homeless person. There is no evidence of the former and, at

best, speculative evidence of the latter.

The district court erred when balancing the interests.

The *actual* public health and safety risks to the entire

community resulting from the City's inability to clear

homeless encampments outweighs any *purported* and

limited health risks to those cleared from encampments

during "extreme heat."

And the district court improperly minimized the

importance of the City's critical infrastructure and the

injunction's impact on the City's ability to ensure a properly

functioning infrastructure necessary for the health and

safety of all City residents.

The district court erred in granting class-wide

injunctive relief without an existing certified class.

Finally, the district court erred by not exempting all

the City's critical infrastructure from the injunction.

# ARGUMENT

## A.  The District Court Erred Because Plaintiffs Didn't Meet Their Burden Of Establishing The Right To A Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). A "'drastic remedy,'" a preliminary injunction "'should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20; *see Bernhardt v. Los Angeles County*, 339 F.3d 920, 931 (9th Cir. 2003) ("The public interest inquiry primarily addresses impact on non-parties rather than parties."). "When the government is a party, these last

59

two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747

F.3d 1073, 1092 (9th Cir. 2014).

The plaintiff must make "a showing on all four prongs"

of the *Winter* test. *All. For The Wild Rockies v. Cottrell*, 632

F.3d 1127, 1135 (9th Cir. 2011).

## 1. Plaintiffs' Success On The Merits Is Unlikely[10]

The substantive component of the Fourteenth

Amendment's Due Process Clause "protects individuals from

arbitrary deprivation of their liberty by government."

*Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006).

"'The general rule is that a state is not liable for its

omissions' and the Due Process Clause does not 'impose a

---

[10] In a prior injunction order, the district court relied on the substantive due process components of both the Fourteenth Amendment and Article I, section 7 of the California Constitution, 1-ER-26-27, but did not reference the latter in the current order. 1-ER-3-9. For that reason, the City only addresses the Fourteenth Amendment. Moreover, no California authority holds the state-created danger exception applies to Article I, section 7 "and it is emphatically not the role of this federal court to create new doctrines under the California state constitution." *Shen v. Albany Unified Sch. Dist.*, 436 F. Supp. 3d 1305, 1315 (N.D. Cal. 2020) (dismissing state-created danger claim under Article I, section 7).

duty on the state to protect individuals ...."' *Martinez v. City of Clovis*, 943 F.3d 1260, 1270 (9th Cir. 2019); *see also Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011) (The Fourteenth Amendment "generally does not confer any affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests.").

For example, there is no constitutional right to protect the homeless by providing housing. *See Lindsey*, 405 U.S. at 74. And "the government does not have an obligation to provide food, medical care, and safety to those not in its custody." *Herrera v. Los Angeles Unified Sch. Dist.*, 18 F.4th 1156, 1161 (9th Cir. 2021).

The "state-created danger exception" alters the general rule that the Due Process Clause does not obligate governments to protect citizens from harm. *Murguia v. Langdon*, 61 F.4th 1096, 1110-11 (9th Cir. 2023).[11]

---

[11] Not all judges in this Circuit agree the "state-created danger exception" properly exists. *See Murguia v. Langdon*, 73 F.4th 1103 (9th Cir. 2023) (Bumatay, Circuit Judge,

"The state-created danger exception has two requirements." *Murguia*, 61 F.4th at 1111. "First, the exception applies only where there is 'affirmative conduct on the part of the state in placing the plaintiff in danger.'" *Id.*; *Hernandez v. City of San Jose*, 897 F.3d 1125, 1133 (9th Cir. 2018) ("government employees" must "affirmatively place the plaintiff in a position of danger, that is, where their actions create or expose an individual to a danger which he or she would not have otherwise faced.'") (simplified). "The affirmative act must create an actual, particularized danger, and the ultimate injury to the plaintiffs must be foreseeable." *Hernandez*, 897 F.3d at 1133 (citations omitted). "Second, the exception applies only where the state acts with 'deliberate indifference' to a 'known or obvious danger.'" *Murguia*, 61 F.4th at 1111.

---

joined by Callahan, Ikuta and R. Nelson, Circuit Judges, dissenting from the denial of rehearing en banc).

a.   *Monell* **Governs City Liability And No Evidence Of A City Policy Or Custom Of Clearing Homeless Encampments During "Extreme Heat" Exists**

Under *Monell*, section 1983 liability against the City depends on an official City policy or custom being the moving force behind a constitutional violation; no respondent superior liability for an employee's unconstitutional conduct exists.  436 U.S. at 691, 694; *Benavidez v. County of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021); *see Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (elements of *Monell* claim).

Injunctive relief claims under section 1983 are not exempted from this rule.  *Los Angeles County v. Humphries*, 562 U.S. 29, 30-31 (2010); *see also Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020) ("[P]laintiffs must …satisfy the requirements of *Monell* to obtain a preliminary injunction against a municipality.").

A "policy" is a "deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with

respect to the subject matter in question." *Fogel v. Collins*, 531 F.3d 824, 834 (9th Cir. 2008) (simplified). A "custom" is a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

Plaintiffs did not address, and the district court did not analyze the City's liability under *Monell*. Had it done so, the district court would have found no evidence of a City policy or custom establishing a "deliberate choice" to clear encampments in "extreme heat."

There is no evidence of an express City policy to clear encampments during "extreme heat" over other times, nor is there evidence of a City policy maker deciding to do so. *See Benavidez*, 993 F.3d at 1153 ("The custom or policy must be a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.") (simplified).

Indeed, the Protocol – the City policy regarding clearing homeless encampments – requires considering "excessive heat" before clearing an encampment. 3-ER-384. Plaintiffs concede this. *See* 3-ER-457 ¶ 8.

Plaintiffs accordingly needed evidence of a "widespread and longstanding [City] practice" of clearing homeless encampments during "extreme heat" as opposed to other times sufficient to establish doing so was the City's "standard operating procedure." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). That evidence does not exist.

At best, the record contains insufficient evidence of isolated or sporadic clearing of encampments during "extreme heat." *Saved Magazine v. Spokane Police Dep't*, 19 F.4th 1193, 1201 (9th Cir. 2021) ("an 'isolated or sporadic incident []' cannot form the basis of *Monell* liability for an improper custom."); *Trevino*, 99 F.3d at 918 ("Liability for improper custom ... must be founded upon practices of sufficient duration, frequency and consistency that the

65

conduct has become a traditional method of carrying out that policy.").

**b.    Clearing Homeless Encampments In "Extreme Heat" Is Not Affirmative Conduct Exposing Any Plaintiff To A Particularized Danger**

"[A]ffirmative conduct" necessary for the state-created danger exception requires showing "the officers' affirmative actions created or exposed [the plaintiff] to an actual, particularized danger that he would not otherwise have faced." *Murguia,* 61 F.4th at 1111. (simplified).  The Court "examine[s] whether the officers left the person in a situation that was more dangerous than the one in which they found him." *Id.*

The district court found clearing homeless encampments during "extreme heat" was affirmative conduct exposing the homeless to heat-related health risks. Though unclear, the district court seemingly accepted plaintiffs' argument that homeless encampments offer more sun protection (i.e., shaded areas) than all other areas of the City.  Thus, the reasoning apparently goes, clearing

encampments during "extreme heat" exposes the homeless to greater heat-related health risks than those existing in the encampments because they are removed from the shade's protection.

The district court erred.

First, the City does not and cannot control the weather. Thus, the City didn't create whatever heat-related health risks exist in "extreme heat." *See Berry v. Hennepin County*, 2022 U.S. Dist. LEXIS 148691, at *24-25 (D. Minn. Aug. 19, 2022) ("[I]nclement weather … although dangerous [ ] [is] not created by the state. Any claim advanced by Plaintiffs under the federal state-created-danger doctrine, therefore, necessarily fails.").

Second, the City is not moving the homeless from inside an air-conditioned space to the heat outside. The homeless are already outside. And when outside, shade doesn't do much when it is over 90 degrees other than providing protection from the sun. Heat-related health risks to the homeless from "extreme heat" thus exist whether in

67

an encampment or not. *See Cobine v. City of Eureka*, 250 F.
Supp. 3d 423, 433 (N.D. Cal. 2017) ("the generalized dangers
of living on the street preexisted Plaintiffs' relocation from
the Palco Marsh"); English, *Heat Illness Requiring
Emergency Care for People Experiencing Homelessness: A
Case Study Series*, Int J Environ Res Public Health (Dec. 9,
2022).[12]

Notwithstanding this common-sense conclusion, the
record demonstrates it. 4-ER-784 ¶ 7 (Sanchez declaring
people in the encampments are "melting in chairs" "children
[are] showing signs of heat stroke," "seniors in wheelchairs
[have] ulcers and sores from sweating," "people are dying
due to weather related conditions" and that "paramedics
[have been called] for persons in obvious extreme heat
distress"); 2-ER-207-240 (Golling declaration establishing
encampment temperatures higher than Miller Park).

---

[12] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9779309/
(last visited Sep. 13, 2023).

Third, clearing encampments during "extreme heat" poses no "*particularized*" danger to any plaintiff in this case. *Murguia*, 61 F.4th at 1111. The district court's analysis didn't address this requirement.

"A 'particular' danger is a danger 'of, relating to, or being a single person or thing.'" *Sinclair v. City of Seattle*, 61 F.4th 674, 682 (9th Cir. 2023). "A 'particularized' danger, naturally, contrasts with a general one." *Id.* Accordingly, "[a] danger is 'particularized' if it is directed at a specific victim." *Id.*

*Sinclair* demonstrates why plaintiffs' state created danger theory fails.

During the summer 2022 George Floyd protests, Seattle "surrender[ed] an entire [police] precinct and a large area of the surrounding neighborhood to protestors for a month, who declared it the Capitol Hill Occupied Protest ('CHOP')." *Sinclair,* 61 F.4th at 676. Top officials supported and encouraged CHOP "despite growing evidence of its lawlessness and danger—and a mounting body count." *Id.*

69

The mother of a special needs man shot to death within CHOP sued Seattle. *Id.* Among other theories, she asserted a state-created danger theory of liability alleging Seattle "'left all visitors to CHOP in a much more dangerous position than it found them in.'" *Id.* at 679, 679-80.

Although concluding the complaint's allegations sufficiently alleged affirmative conduct exposing the decedent to harm not existing without Seattle encouraging and allowing CHOP to flourish, the Court found the complaint failed to show the "particularized danger" required for a state-created danger. *Id.* at 682.

The Court first observed previous cases confirmed a "particularized danger" is one "directed at a specific victim" rather than a group of people. *Id.* at 682-83.

The Court then concluded "the [Seattle]-created danger was a generalized danger experienced by all those members of the public who chose to visit the CHOP zone" given Seattle "left all visitors to CHOP in a much more dangerous position than it found them in." *Id.* at 683.

70

Thus, "[a]ny danger [Seattle] created or contributed to by enabling the CHOP zone affected all CHOP visitors equally; the danger was not specifically directed at [plaintiff] or [her son]." *Id.* at 682.

Here, any heat-related health impacts caused by clearing homeless encampments constituted a "generalized danger experienced by all those" residing in the encampment. *Id.* at 683. Whatever dangers exist to the homeless "affected [them] equally" and was not directed at any plaintiff in this case, or any specific homeless person. *Id.*

**c.   No Evidence Of Deliberate Indifference Exists**

Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions." *Bryan County v. Brown*, 520 U.S. 397, 410 (1997). "This standard ... requires a culpable mental state." *Murguia,* 61 F.4th at 1111.

71

"For a defendant to act with deliberate indifference, he must recognize the unreasonable risk and actually intend to expose the plaintiff to such risks without regard to the consequences to the plaintiff." *Id.* (simplified). "In other words, the state actor must know that something is going to happen but ignore the risk and expose the plaintiff to it." *Id.; see Polanco v. Diaz*, 76 F.4th 918, 2023 U.S. App. LEXIS 20307, at *15 n.7 (9th Cir. Aug. 7, 2023) ("we have continued to apply a purely subjective test to state-created-danger claims").

Finding "deliberate indifference" to the "known or obvious danger" of clearing homeless encampments in "extreme heat" sufficient to issue a preliminary injunction on August 16, 2023, the district court incorporated its 2022 conclusions and, most problematically, the evidence

plaintiffs submitted in *July and September 2022.*[13]  1-ER-6-7 (citing 1-ER-26, 50-51 (2022 Orders)).

In the July 2022 order, the district court relied on the July 23, 2022 Crystal Sanchez declaration.  1-ER-51; 4-ER-782-786 (Sanchez Declaration).  In the September 2022 order, the district court relied on the same Sanchez declaration and the August 24, 2022 Jessica Gilbert declaration.  1-ER-26; 4-ER-750-751 (Gilbert Declaration).  Neither are plaintiffs.

Two problems exist with what the district court did.

First, evidence from 2022 cannot establish deliberate indifference in August 2023.  Whatever the declarations may have shown about 2022, they say nothing about 2023.

Second, neither the Sanchez nor Gilbert declarations establish deliberate indifference to any named plaintiff (or

---

[13] The district court likewise incorporated the July and September 2022 conclusions and evidence when issuing the August 3, 2023 TRO.  1-ER-15.

anyone else), even assuming the declarations were from 2023.

Gilbert's declaration describes two incidents about a week apart in August where City police officers required Gilbert and her partner to vacate areas where the two were camping. 4-ER-750-751. The declaration does not establish any officer knew requiring Gilbert and her partner to move would expose either to a "risk of dehydration, hyperthermia, heat stress, heat stroke and other heat-related conditions that may cause irreversible damage and possibly death." *See* 1-ER-26 (district court describing the risks of clearing homeless encampments in "extreme heat"). Nor does it establish any officer intended to expose Gilbert or her partner, or any other homeless person, to those risks without regard to the consequences.

The Sanchez declaration is no different. Sanchez discusses the failure of *several government entities* to provide cooling or respite centers during "extreme heat" and the impacts on all homeless, which she said were made worse

clearing homeless encampments. 4-ER-783-784. Nothing in the declaration establishes a City employee cleared homeless encampments during "extreme heat" knowing and intending to expose the homeless to heat-related risks.

There is no evidence establishing any City employee knew of the health risks associated with clearing homeless encampments in "extreme heat" and intentionally targeted days of "extreme heat" for clearing regardless of the risks. *See Cobine*, 250 F. Supp. 3d at 433 (dismissing state-created danger/deliberate indifference claim where there were no "allegations of intentional eviction during precarious weather"); *cf. Sanchez*, 914 F. Supp. 2d at 1102 (cognizable state-created danger claim stated where plaintiff alleged defendants timed demolitions of the plaintiff's shelter and property to occur at the onset of the winter months).

Clearing encampments requires planning and coordination, which starts well before the clearing occurs and clearing occurs at various times of the year. *See* 2-ER-298-302, 313-347; 3-ER-379-394. This demonstrates the

absence of intentional conduct targeting days of "extreme heat" for clearing encampments.

The district court erred for another reason.

"In evaluating deliberate indifference, circumstances are vital in contextualizing a defendant's decisions" to determine whether the plaintiff was "left completely without protection." *Herrera*, 18 F.4th at 1163.

Here, the homeless are not "left completely without protection" from "extreme heat." There is no evidence the City required the homeless to go anywhere, and certainly not some place without shade. There is no evidence establishing the City prevented anyone from going anywhere else in the City where they might find shade. Indeed, Sacramento is the "City of Trees" with more than 1,000,000.[14] The City's buildings and geography also provide plenty of shaded areas.

---

[14] Kae Lani Palmisano, *Here are 6 places where Sacramento lives up to its name 'City of Trees'*, Sacramento Bee (May 27, 2023), https://www.sacbee.com/sacramento-city-guides/get-outside/article273825965.html

The homeless cleared from an encampment are free to find shade wherever they can, just not at the encampment they had to leave.

**d.  Finding A State-Created Danger From Clearing Homeless Encampments During "Extreme Heat" Stretches The Exception Too Far**

The City is unaware of any prior case finding the enforcement of valid laws constituted a state-created danger. It is undisputed that the City's clearing of homeless encampments is done pursuant to validly enacted ordinances (SCC Chapters 8.140 and 12.24), and these ordinances are not constitutionally challenged here.

Nor is the City aware of any case finding a state-created danger can exist when the government is acting to protect the health and safety of the entire community.  It is undisputed that homeless encampments endanger the public health and safety.

Moreover, this Court has clearly said that "'by its very nature, the [state-created danger] doctrine *only applies* in situations where the plaintiff was directly harmed by *a third*

77

party.'" *Martinez*, 943 F.3d at 1271 (first emphasis added) (quoting *Henry A. v. Willden*, 678 F.3d 991, 1002 (9th Cir. 2012); *accord J.P. v. County of Alameda*, 803 F. App'x 106, 108 (9th Cir. 2020).

Indeed, Court's precedents most always involve exposing the plaintiff to a risk of harm *from a third party*. *E.g.*, *Murguia*, 61 F.4th at 1112-13; *Martinez,* 943 F.3d at 1272-74; *Hernandez,* 897 F.3d at 1129-30, 1133; *Kennedy v. City of Richfield*, 493 F.3d 1053, 1057-58 (9th Cir. 2006); *L.W. v. Grubbs*, 974 F.2d 119, 121-22 (9th Cir. 1992); *Wood v. Ostrander*, 879 F.2d 583, 589-90 (9th Cir. 1989).

The risk of harm the district court identified is not from a third party but from "extreme heat."

Despite what this Court has more recently clearly said about requiring third party harm, two of this Court's earlier cases involved harm not inflicted by a third party. But they are materially different from this case.

In *Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997), the Court found a state-created danger

78

where police officers canceled a 911 call for a man on his porch in "grave need of medical care" and then locked him alone inside his house precluding anyone from helping him, including those helping him before officers arrived. *Id.* at 708, 710.

In *Munger v. City of Glasgow*, 227 F.3d 1082 (9th Cir. 2000), the Court found a state-created danger where police officers responding to 911 call at a bar about "a very obviously drunk" man forcibly removed him from the bar, ordered him not to drive his car or go back into the bar where his coat was located, and then left him outside in a t-shirt and jeans in 11 degree weather (with a wind chill factor of minus 20-25 degrees). *Id.* at 1084-85.

Both *Penilla* and *Munger* involved plaintiffs who were found by law enforcement in conditions unable to care for themselves, respectively, because of illness and intoxication. That is not the case here.

Also, the officers in both cases made the men's positions worse through affirmative conduct specifically

directed at them.  In *Penilla*, locking the man inside his house so others could not help him and in *Munger* removing the man from a (presumably) heated indoor bar into sub-zero outside temperatures.  That conduct does not exist here.

### e.     Impacts Of Recognizing A State-Created Danger In This Case Are Broad And Far Reaching

The City believes this Court should consider this case's broader potential impacts because they are significant to every municipality in the Ninth Circuit struggling with the homelessness crisis.

*Martin* and *Grants Pass* already hold the Eighth Amendment precludes the government from penalizing the homeless for sleeping in public if no shelter space is available.

Endorsing the district court's conclusion that clearing homeless encampments during "extreme heat" is a state-created danger would be precedent applying not just to "extreme heat" but to any weather a court finds inclement (e.g., cold, snow, rain, wind) and would preclude those charged with remedying the very real health and safety

issues homeless encampments present from doing so for extended periods of time throughout any given year.

And though the district court did not expressly analyze the impact of shelter space for those removed from encampments during "extreme heat," the district court alluded to the issue, 1-ER-7, and plaintiffs' position has always been *Martin* requires the City to provide shelter space to those removed from encampments, Doc. 2, p. 16 ¶ 2; Doc. 36, p. 7 ¶ 20.

Though neither *Martin* nor *Grants Pass* require available shelter beds before clearing encampments, affirming the district court would impose that requirement because a government could only defeat the state-created danger claim by eliminating the state-created danger by providing shelter or some alternative for each person removed from an encampment. [15]  *See Reed v. City of*

---

[15] This concern is real.  In the district court order earlier discussed in footnote 7, the district court pointed to recent steps the City has taken "to mitigate the danger to unhoused individuals" by setting up "canopies or pop-ups over the

*Emeryville*, 568 F. Supp. 3d 1029, 1039-40 (N.D. Cal. 2021) (finding clearing encampment not a state-created danger because shelter had been offered); *Cobine v. City of Eureka*, 250 F. Supp. 3d 423, 433 (N.D. Cal. 2017) (same).

## 2.     Insufficient Evidence Of Irreparable Harm

"To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

The district court found future harm based on "*predicted* excessive heat" and the "*risks*" of heat-related health issues *if* the City cleared homeless encampments in the "upcoming weeks." 1-ER-7.

---

tents at Miller Park" as a ground for denying further injunctive relief.  Doc.  74, p. 4.

Thus, the district court assumed three things: (1) accurate weather predictions; (2) the City would clear homeless encampments during this period; and (3) someone removed from the encampment would suffer death or illness from the heat.

Three assumptions is too many, and demonstrates the absence of a "concrete and particularized" harm that is "actual and imminent." *Summers*, 555 U.S. at 493.

Second, the district court improperly focused on the possible health-related impacts to *any homeless person* cleared from an encampment. "A plaintiff seeking a preliminary injunction must establish...that *he is likely* to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20 (emphasis added). "'The irreparable harm analysis focuses on the harm to the party seeking injunctive relief, not on potential harm to third parties.'" *Hernandez v. City of Phoenix.*, 432 F. Supp. 3d 1049, 1068 (D. Ariz. 2020).

There is no evidence establishing any named plaintiff suffered an actual and imminent threat of adverse heat-related health issues when the district court issued the injunction in August 2023. Though two named plaintiffs submitted declarations in 2022 (Falisha Scott and Betty Rios), no named plaintiff submitted any declarations in 2023.

And any evidence establishing an actual and imminent threat to homeless other that named plaintiffs is insufficient. Although this case is brought as a class action, no class has been certified. But even assuming a certified class, plaintiffs must still have personally suffered injury to obtain class-wide relief. *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999).

### 3. Balancing The Interests Weighs Against A Preliminary Injunction

Courts "'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24. "In exercising their sound discretion, courts of equity should

84

pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.*

For several reasons, the preliminary injunction imposes irreparable public injury. Indeed, the district court concluded "it is clear" "the preliminary injunction to prevent the City from clearing encampments has a *serious impact* on public health and safety." 1-ER-31 (emphasis added). But the district court erred in finding these serious impacts outweighed by plaintiffs' harm.

The *real* consequences to public health and safety outweigh whatever *possible* harm the "extreme heat" might pose for the plaintiffs (or any homeless person) having to leave encampments.

Preliminarily, the negative impacts are not limited by the short duration of the most recent preliminary injunction. *See Berkeley*, 32 F.4th at 864 ("The district court correctly recognized the public safety risks associated with allowing the campers to stay. But it erred by finding that these risks were mitigated by the injunction's 'limited duration' ....").

The City was prevented from clearing any homeless encampments from August 3, 2023 through August 31, 2023.

Not allowing the City to clear homeless encampments for nearly a month precluded the City from enforcing a validly adopted ordinance – SCC Chapter 8.140.[16]  Though the district court didn't specifically enjoin enforcement of it, the injunction did just that.  Precluding the City from clearing homeless encampments prohibits the City from enforcing SCC Chapter 8.140, which allows for the clearing of homeless encampments endangering critical infrastructure.

"[I]t is clear that a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined." *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997); *see Latta v. Otter*, 771 F.3d 496, 500 (9th Cir. 2014). Moreover, the California Constitution allows and

---

[16] The August 2, 2023 TRO also precluded the City from enforcing its sidewalk obstruction ordinance (SCC Chapter 12.24), but the August 16, 2023 injunction allowed for enforcement of this ordinance.  1-ER-8-9.

requires the City to govern in a manner promoting the health and safety of all residents. *See Richeson v. Helal* 158 Cal. App. 4th 268, 277 (2007) ("The state Constitution gives California cities broad and flexible power to promote the public welfare. (Cal. Const., art. XI, § 7.) The police power is an exercise of the sovereign right of the government to protect the lives, health, morals, comfort, and general welfare of the people.").

To be sure, the preliminary injunction hindered if not outright prevented the City from meeting its legal obligations. *See Tobe v. City of Santa Ana*, 9 Cal. 4th 1069, 1109 (1995) ("city not only has the power to keep its streets and other public property open and available for the purpose to which they are dedicated, it has a duty to do so").

Not allowing the City to clear homeless encampments for nearly one month allowed the safety and health risks endemic in encampments to flourish. No one disputes these risks exist. As a practical matter (like it did in 2022), the inunctions allowed encampments to become more

problematic (e.g., increased crime and fire risk, vector problems, property and habitat damage, interference with critical infrastructure) and further entrenched the longer the preclusion lasted and, accordingly, more difficult for the City to remediate once the injunction expired. *See* 2-ER-135-173; 4-ER-677-679, 688-695, 702-748.

Indeed, the TRO issued on August 3, 2023 precluded the City from scheduled remediation of at least three problematic homeless encampments. 2-ER-136 ¶ 3, 139-145, 148-149 ¶¶ 4-5, 151-172. One of them had generated hundreds of service calls, including 18 fire calls and 10 police calls. 2-ER-136 ¶ 3. At one point, the City removed 304 cubic yards of trash and 502 used needles. *Id.* And very recently, police responded to an incident where one resident slashed another with a razor. 2-ER-136-137 ¶ 6. At another encampment, the City had removed 1.5 tons of debris but problems with newly accumulated trash, needles, soiled textiles and spoiled food existed. 2-ER-149 ¶¶ 6-7, 153-172.

Not allowing the City to clear homeless encampments puts the City's critical infrastructure at risk, which impacts and places everyone in Sacramento at risk. *See* 2-ER-127-129; 4-ER-677-679, 688-690, 730-732. For example, one encampment that was scheduled for clearing is near residences and electrical towers and presents a fire risk. 2-ER-149 ¶ 8, 151-172.

Not allowing the City to clear homeless encampments from high risk fire areas impacts everyone in Sacramento, and likely neighboring communities. *See* 4-ER-730-732. It takes little imagination to see an out-of-control wildfire rapidly eating up acres within the City and beyond. *See* 2-ER-149 ¶ 3.

And it is not just high fire risk areas. Over a two-day period in July 2023, City firefighters responded to three fires emanating from homeless encampments located right next to residential housing.[17] In April 2023, firefighters responded

---

[17] CBS News Sacramento, https://www.cbsnews.com/sacramento/news/sac-fires-land-park-concerns-homeless/ (last visited Sep. 13, 2023); *see also*

to two fires emanating from a homeless encampment located in catacombs underneath a street.[18]

## B. The District Court Erred When Entering A Class-Wide Injunction Before Class Certification

"A federal court may issue an injunction if it has personal jurisdiction over the parties …; it may not attempt to determine the rights of persons not before the court." *Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983). Thus, "[i]t is well-established that 'without a properly certified class, a court cannot grant relief on a class-wide basis.'" *Norbert v. City & County of S.F.*, 10 F.4th 918, 928 (9th Cir. 2021) (quoting *Zepeda*, 753 F.2d at 728 n.1).

Because the district court enjoined the City from clearing all homeless encampments which necessarily includes homeless living in those encampments that aren't

---

KCRA News, https://www.kcra.com/article/sacramento-county-homeless-fires-remain-issue/42932341# (last visited Sep. 13, 2023).

[18] CBS News Sacramento, https://www.cbsnews.com/sacramento/news/two-fires-set-in-abandoned-corridors-underneath-k-street-wednesday/ ((last visited Sep. 13, 2023).

plaintiffs in this case, the district court issued class-wide relief. Though brought as a class action, 5-ER-974, there is no certified class. Class-wide relief is thus improper.

### C. The District Court Erred When Failing To Exempt All Critical Infrastructure From The Injunction

"Crafting a preliminary injunction is 'an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017). "The purpose of such interim equitable relief is …to balance the equities as the litigation moves forward" which includes considering "the overall public interest." *Id.* "[A] court 'need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case.'" *Id.*

A proper exercise of discretion and equity balancing compelled allowing the City to clear homeless encampments where necessary to protect *all* its critical infrastructure.

The City enacted SCC Chapter 8.140 "to mitigate the threat of fire and other potential causes of destruction and damage to and interference with critical infrastructure, in order to protect the health, safety, and welfare of the public, by authorizing the removal of persons and their personal property in, on, or near critical infrastructure." SCC § 8.140.010; 2-ER-283. SCC Chapter 8.140's legitimate purpose is undisputed.

The district court provided one exemption for critical infrastructure – encampments within 500 feet of a school – only because the parties agreed to it. 1-ER-9. Because the parties couldn't agree on other exemptions, the district court "declin[ed] to carve out further exceptions" without making any factual findings justifying its refusal to do so. *Id.* That alone constitutes error. *See Berkeley*, 32 F.4th at 863-64.

Nonetheless, a prior order provides the likely, albeit faulty, reasoning.

After outlining SCC Chapter 8.140, the district court concluded in its September 2, 2022 order that exempting

critical infrastructure "could severely limit the scope of the preliminary injunction" and it "appears from these ordinances that the City could very easily exempt vast portions of City property" such that "the preliminary injunction would have very limited effect in actually protecting unhoused individuals from the extreme heat." 1-ER-32-34.

The district court based its conclusion on two insufficient things. First, plaintiffs' hyperbolic argument regarding the City's critical infrastructure ordinance making "every inch of the City ... off-limits to unsheltered individuals and encampments." 1-ER-32 (citing Doc. 32, p. 4). The is demonstrably untrue. Second, a Sacramento Bee article from 2016 pertaining to "'thousands of miles of underground pipelines" and "seven underground natural gas fields" in the "Sacramento region" – neither the truth of this nor the region's geographical scope being known. *Id.* (citing 4-ER-649-650).

The district court cited nothing supporting that the City could easily, or even would, designate whatever it wants as critical infrastructure as a means to intentionally circumvent the injunction.

Designation of critical infrastructure is not randomly done for no legitimate reason as the district court seemingly assumed, or as plaintiffs infer to preclude areas where the homeless can reside.  No evidence of either exists.

As the City Manager most recently explained in updating the City's designation of critical infrastructure:

> The designation of a parcel or facility as 'critical infrastructure' is a thoughtful and deliberate process. The City Manager designates a location as critical infrastructure, but the location becomes critical infrastructure for the purposes of Chapter 8.140 only after approval by the City Council.

3-ER-400.  The City Manager further explained:

> The City's Director of Emergency Management can receive input from subject-matter experts and stakeholders to recommendation, justification, and validation of key parcels and facilities in the City for designation as critical infrastructure by the City Manager. Each component of potential critical infrastructure was additionally validated, based on guidance from publicly available

94

reference materials of the United States Department of Homeland Security and the Federal Emergency Management Agency regarding federally designated critical infrastructure. The ... Critical Infrastructure List, which was developed over several months as city leaders and subject-matter experts conducted a comprehensive assessment of facilities and property parcels that serve critical purpose to preserve public safety.

.... The locations on the 2023 City of Sacramento Critical Infrastructure List are so vital and integral to the operation or functioning of the City of Sacramento that their damage, incapacity, disruption, or destruction would have a debilitating impact on the public health, safety, or welfare.

3-ER-400, 404 (critical infrastructure list); *see also* 2-ER-188-190 (2021 memorandum and list).

No one disputes the City can deem property critical infrastructure or that a well maintained and functioning infrastructure is critical to the health, safety and survival of all City residents. No one disputes homeless encampments infringe on the City's ability to access and maintain critical infrastructure. And no one disputes the City can lawfully exclude *all persons* from critical infrastructure, which SCC

Chapter 8.140 does.  *See Grants Pass*, 72 F.4th at 914-15;

*Tobbe*, 9 Cal. 4th at 1108.

Nevertheless, the district court precluded the City from meeting obligations owed to all City residents.  No valid justification for the district court's refusal to exempt all critical infrastructure from the injunction exists.

## CONCLUSION

The City recognizes this case involves complex and important social issues affecting the entire local community and the entire Western United States.

However, without federal or state assistance or guidance, the City (or any local government) is forced to make hard decisions best addressing the needs and safety of all residents.  Given this, the City must be allowed to self-govern without federal court interference absent a "palpable" and "arbitrary exercise" of its sovereign powers.  *Hutchinson*, 277 U.S. at 308.  Well thought out and comprehensive efforts to deal with homeless encampments, like those at issue here, are the opposite of arbitrary.

At bottom, the Fourteenth Amendment does not mandate preventing the City from meeting its obligations to all citizens merely because the outdoor temperature reaches 90 degrees and, for that reason, this Court should reverse.

This Court should also reverse based on the district court's conclusion that plaintiffs made a sufficient showing of all four *Winter* factors.

In particular, the district court erred in finding the harm to the health and safety of the community "far outweighed" by the harm to plaintiffs and, at the very least, the district court should have allowed the City to protect its critical infrastructure.

Respectfully Submitted,

Dated: September 18, 2003          Dean Gazzo Roistacher LLP


By: _/s/ Lee H. Roistacher_
Lee H. Roistacher
Attorneys for
Defendant/Appellant
City of Sacramento

# CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. 32(A)(7)(C) AND CIRCUIT RULE 32-1 FOR CASE NO. 23-16123

Pursuant to Federal Rule of Appellate Procedure 32 (a)(7)(C) and Ninth Circuit Rule 32-1, I certify that Appellants' Opening Brief is proportionately spaced, has a typeface of 14 points or more and contains 13,922 words.

Dated: September 18, 2003        Dean Gazzo Roistacher LLP


By:  _/s/ Lee H. Roistacher_____
        Lee H. Roistacher
        Attorneys for
        Defendant/Appellant
        City of Sacramento

## STATEMENT OF RELATED CASES UNDER NINTH CIRCUIT RULE 28-2.6

Defendant/Appellant City of Sacramento is not aware of any related case currently pending in the Ninth Circuit Court of Appeals.

Dated: September 18, 2003     Dean Gazzo Roistacher LLP


By: _/s/ Lee H. Roistacher____
     Lee H. Roistacher
     Attorneys for
     Defendant/Appellant
     City of Sacramento

## <u>CERTIFICATE OF SERVICE</u>

Re:  *Sacramento Homeless Union, et al. v. County of Sacramento, et al.*
United States Court of Appeals for the Ninth Circuit
Case No. 23-16123
USDC Case No. 2:22-cv-01095-TLN-KJN

I, Maria E. Kilcrease, declare:

That I am and was at the time of service of the papers herein referred to, over the age of 18 years, and not a party to the action; and I am employed in the County of San Diego, California. My business address is 440 Stevens Avenue, Suite 100, Solana Beach, California 92075 and my electronic address is mkilcrease@deangazzo.com.

On September 18, 2023, I served the following documents described as:

### APPELLANT'S OPENING BRIEF

on all interested parties in this action addressed as follows:

Susana Alcala Wood, City Attorney
Grace L. Pak, Senior Deputy City Attorney
City Of Sacramento
915 I Street, Room 4010
Sacramento, CA  95814-2608
Tel.:  (916) 808-5346
E-mail: glpak@cityofsacramento.org
**Attorneys for Defendant/Appellant City of Sacramento**

Anthony David Prince
Law Offices of Anthony D. Prince
2425 Prince Street
Suite 100
Berkeley, CA 94705
Email: princelawoffices@yahoo.com
**Attorneys For Plaintiffs/Appellees, Sacramento Homeless Union, a Local of the California Homeless Union/Statewide Organizing Council; et al.**

X        BY ELECTRONIC SERVICE: On the date stated above, I served the documents described above on designated recipients via CM/ECF.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on September 18, 2023, at Solana Beach, California.

*Maria E. Kilcrease*
_____
Maria E. Kilcrease, declarant