**No. 23-16123**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

SACRAMENTO HOMELESS UNION, a local of the California
Homeless Union/Statewide Organizing Council: et. Al.,

*Plaintiffs-Appellees*,

v.

CITY OF SACRAMENTO

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Eastern District of California
No. 2:22cv-01095-TLN-KJN
Before the Honorable Troy Nunley

_____

**APPELLEE'S ANSWERING BRIEF**

_____

Anthony D. Prince (SBN 202892)
General Counsel, California Homeless
Union/Statewide Organizing Council
Law Offices of Anthony Prince
2425 Prince Street, St. 100
Berkeley, CA 94705
Tel: 510-301-1472
Email: princelawoffices@yahoo.com
**Attorney for Plaintiffs/Appellees
Sacramento Homeless Union, a local of
the Homeless Union/Statewide
Organizing Council; et. al.**

## DISCLOSURE STATEMENT

The Sacramento Homeless Union is an unincorporated membership association of over 2,700 homeless, formerly homeless and unstably housed persons along affiliated with the California Homeless Union/Statewide Organizing Council which organizes, advocates for, supports and represents its members and the broader unhoused community of Sacramento. It is not owned by any parent corporation or publicly held corporation.

Date:  October 16, 2023

Anthony D. Prince

*/s/ Anthony D. Prince*
Anthony D. Prince

*Attorney for Plaintiffs/Appellees*
*Sacramento Homeless Union, a local of the*
*Homeless Union/Statewide Organizing*
*Council; et. al.*

i

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ................................................................. i

TABLE OF AUTHORITIES ..................................................................3

INTRODUCTION ................................................................................7

JURISDICTIONAL STATEMENT ......................................................12

ISSUES PRESENTED........................................................................12

STATEMENT OF THE CASE.............................................................13

SUMMARY OF THE ARGUMENT ....................................................16

STANDARD OF REVIEW .................................................................23

STANDARD OF REVIEW FOR PRELIMINARY INJUNCTIONS....................24

ARGUMENT .....................................................................................25

    I.     PLAINTIFFS MET THEIR BURDEN OF ESTABLISHING A RIGHT TO PRELIMINARY INJUCTION .......................................25

          A.    The District Court Correctly Found A Likelihood of Success on the Merits ...............................................................26

                1.    The Sacramento Homeless Union Had Standing to Sue on Behalf of Itself and Its 2,700 Members; Hence a Broad, City-wide Injunction was Necessary and Appropriate. ..................................................................28

                2.    Monell Governs City Liability And Evidence Of A City Policy or Custom of Clearing Homeless Encampments During Periods of "Extreme Heat"................................30

                3.    Clearing of Encampments in Areas of Shade During an Extreme Heatwave Constitutes "Affirmative Conduct"

By The City Exposing Plaintiffs to Known, Particularized Danger ........................................ 33

4. Defendants Cite To Sinclair v. City of Seattle Regarding Particularized Dangers. But the Facts In *Sinclair* Are The Opposite To This Case Before The Court. ...................... 35

5. Court Did Not Abuse Discretion In Finding Defendants Deliberately Indifferent To Dangers of Extreme Heat ... 38

6. The District Court Correctly Found that Plaintiffs Evidence Is Sufficient To Show That Irreparable Harm Will Result in the Absence of Injunctive Relief ............. 41

7. The District Court Narrowly Tailored The Preliminary Injunction Issued on August 16, 2023. ........................... 43

B. The District Court Correctly Found Evidence Of Imminent and Irreparable Harm ........................................................ 47

C. The District Court Did Not Error When It Found The Plaintiffs Interests In Their Health and Welfare Far Outweighed The City's Interests In Clearing Encampments .............................. 50

II. THE DISTRICT COURT DID NOT ERROR BY ISSUING PRE-CERTIFICATION INJUNCTIVE RELIEF ........................................... 53

III. The Amici Brief ........................................................................ 55

CONCLUSION ........................................................................................ 58

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A-1 Ambulance Serv., Inc. v. Monterey*,
    90 F.3d 333, 339 (9th Cir. 1996).......................................................25

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011)................................................ 21, 26, 27

*Blain v. Cal. Dep't of Tranp.*,
    616 F. Supp. 3d 952 (N.D. Cal. 2022) ........................................ 47, 52

*Bolker v. C.I.R.*,
    760 F.2d 1039 (9th Cir. 1985)...........................................................25

*Bowers v. Hardwick*,
    U.S. 186 (1986) .................................................................................51

*Bresgal v. Brock*,
    843 F.2d 1163 (9th Cir. 1987).................................................... 53, 54

*Easyriders Freedom F.I.G.H.T. v. Hannigan*,
    92 F.3d 1486 (9th Cir.1996)....................................................... 53, 54

*Edmo v. Corizon, Inc.*,
    935 F.3d 757 (9th Cir. 2019).............................................................24

*City of Canton, Ohio v. Harris*,
    489 U.S. 378 (1989) ................................................................ 31, 32, 33

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ............................................................................49

*City of St. Louis v. Praprotnik*,
    485 U.S. 112 (1988) ..........................................................................33

*Coal. For Econ. Equity v Wilson*,
    122 F3.d 718 (9th Cir. 1997)............................................................51

*Cobine v. City of Eureka*,
    No. C 16-02239 JSW (N.D. Cal. Apr. 25, 2017) ....... 43, 44, 46, 56, 57

*Cuviello v. City of Vallejo*,
 944 F.3d 816 (9th Cir. 2019)...............................................47

*Flynt Distrib. Co. v. Harvey*,
 734 F.2d 1389 (9th Cir. 1984)..........................................56

*Fogel v. Collins*,
 531 F.3d 824 (9th Cir. 2008)............................................33

*Fortyune v. Am. Multi-Cinema, Inc.*,
 364 F.3d 1075 (9th Cir. 2004)..........................................24

*Garcia v. City of Los Angeles D.C.*,
 No 2:19-cv-06182-DSF-PLA (9th Cir. 2021)............................ 50, 51

*Garcia v. City of L. A.*,
 481 F. Supp. 3d 1031 (C.D. Cal. 2020)...............................47

*Gieg v. DDR, Inc.*,
 407 F.3d 1038, 1046 n.10 (9th Cir. 2005)...........................25

*Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*,
 512 F.3d 1112, 1116 (9th Cir. 2008)..................................25

*Hernandez v. City of San Jose*,
 No. 17-15576 (9th Cir. 2018)............................................36

*Hodger-Durgin v De La Vina*,
 199 F 3d 1037 1045 (9th Cir. 1999)................................ 48, 49

*Hunt v. Wash. State Apple Adver. Comm'n*,
 432 U.S. 333 (1977) ......................................................29

*Hunters Capital LLC v. City of Seattle*,
 499 F. Supp. 3d 888 (W.D. Wash. 2020)...........................37

*Indep. Living Ctr. of S. California, Inc. v. Shewry*,
 543 F.3d 1047 (9th Cir. 2008)..........................................26

*Janosko v City of Oakland*,
 2023 U.S. Dist. LEXIS 6802 (N.D. Cal. Jan. 6, 2023) ......... 28, 47, 52

*Johnson v. City of Grants Pass*,
 50 F.4th 787 (9th Cir. 2022)...................................... passim

*Justin v. City of Los Angeles*,
    No. CV-00-12352 LGB (AIJx) (C.D. Cal. Dec. 5, 2000) ........... 51, 54

*Kennedy v. City of Ridgefield*,
    439 F.3d 1055 (9th Cir. 2006) .......................................... 36, 38, 39, 40

*Kneipp v. Tedder*,
    95 F.3d 1199 (3d Cir. 1996) ................................................. 43

*Lamb-Weston Inc. v. McCain Foods Inc.*,
    941 F.2d 970 (9th Cir. 1991) ............................................... 24

*Latta v. Otter*,
    771 F.3d 456 (9th Cir. 2014) ............................................... 51

*Lawrence v. Texas*,
    539 U.S. 558 (2003) .................................................... 36, 51

*Logan v. U.S. Bank Nat'l Ass'n*,
    722 F.3d 1163 (9th Cir. 2013) .............................................. 23

*L.W. v. Grubbs*,
    974 F.2d 119 (9th Cir. 1992) .......................................... 35, 42

*Monell v. New York City Dept. of Social Services*,
    436 U.S. 658 (1978) .................................... 17, 30, 31, 32, 33

*Munger v. City of Glasgow Police*,
    227 F.3d 1082 (9th Cir. 2000) ........................................ 11, 33, 42, 44

*Murguia v. Langdon*,
    61 F.4th 1096 (9th Cir. 2023) .............................................. 42

*Nader v. Brewer*,
    386 F.3d 1168 (9th Cir. 2004) .............................................. 24

*Northwest Environmental Def. Ctr. v. Brown*,
    640 F.3d 1063 (9th Cir. 2011) .............................................. 23

*Obrey v. Johnson*,
    400 F.3d 691 (9th Cir. 2005) ............................................... 23

*Oviatt by and Through Waugh v. Pearce*,
    954 F.2d 1470 (9th Cir. 1992) .............................................. 31

*Parke v. Raley*,
    506 US 20 (1992) ......................................................... 23

5

*Pembaur v. City of Cincinnati,*
    475 U.S. 469 (1986) ......................................................................30

*Penilla v. City of Huntington Park,*
    115 F.3d 707 (9th Cir. 1997)....................................................... 41, 42

*Pottinger v. City of Miami,*
    810 F.Supp. 1551 (S.D. Fla. 1992) ...................................................51

*Purcell v. Gonzalez,*
    549 US 1 (2006) ............................................................................23

*Reed v. City of Emeryville,*
    568 F. Supp. 3d 1029 (N.D. Cal. 2021) ................................. 43, 44, 46

*Sacramento Homeless Union v. City of Sacramento,*
    (Aug. 16, 2023) ............................................................................38

*Sanchez v. City of Fresno,*
    914 F. Supp. 2d 1079 .......................................................................46

*Shell Offshore, Inc. v. Greenpeace, Inc.,*
    709 F.3d 1281 (9th Cir. 2013)............................................................26

*Sierra Club v. Morton,*
    405 U. S. 727 (1972) .................................................................. 29, 48

*Sinclair v. City of Seattle,*
    61 F. 4th 674 (9th Cir 2023).......................................................... 35, 36

*Summer v Earth Island Inst.,*
    555 U.S. 488 (2009) .................................................................. 48, 49

*Tassey v. Cal. Dep't of Transp. Caltrans,*
    23-cv-05041-AMO (N.D. Cal. Oct. 4, 2023)............................... 47, 52

*Trump v. Int'l Refugee Assistance Project,*
    582 U.S 137 (2017) ........................................................................25

*Ulrich v. City County of San Francisco,*
    308 F.3d 968, 985 (9th Cir. 2002)......................................................33

*Walczak v. EPL Prolong, Inc.,*
    198 F.3d 725 (9th Cir. 1999)............................................................24

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7, 20 (2008) .................................................... 27, 28, 48, 49

6

*Wood v. Ostrander,*
    879 F.2d 583 (9th Cir. 1989)...............................................................42

*Younger v. Harris*,
    401 U.S. 37, 91 S. Ct. 746 (1971) ......................................................23

*Zepeda v. U.S. I.N.S.*,
    753 F.2d 719, 724 (9th Cir. 1983)............................................... 24, 53


**Federal Statute And Rules**

    28 U.S.C. § 2111.............................................................................25

**Rules**

    FRCP 54(b) ............................................................................ 21, 58

    FRCP 65(d) ........................................................................................23

**Other Authorities**

    Homelessness in Sacramento, Results From The 2022 Homeless Point In
        Time County. https://sacramentostepsforward.org/wp-
        content/uploads/2022/06/PIT-Report-2022.pdf .................................22

## INTRODUCTION

On August 16, 2023, as record-high temperatures continued unabated in California's Sacramento Valley, Judge Troy L. Nunley of the Eastern District of California extended, modified and narrowed his prior order of August 3, 2023 enjoining the City of Sacramento from clearing homeless encampments, thousands of which were located in areas of shade provided by trees, the shadows of

buildings, under bridges and freeway overpasses that served as their refuge from the relentless sun and heat. 1-ER-3-16.

Here the unhoused had sought shelter and taken other rudimentary precautions including reinforcing the encampments with more durable tents, coverings, tarpaulins, umbrellas, and whatever else was at hand to defend against conditions that could be, to use Judge Nunley's words, "a matter of life and death." 1-ER-31.

The August 16 Order, the subject of Defendant's appeal to this Court, had been preceded by the broader August 3, 2023 injunction as well as by two essentially identical orders successively issued on July 29, 2022 1-ER-38-60 and September 2nd, 2022 1-ER-18-37 in the midst of the similarly brutal, record-setting Sacramento heatwaves of the summer of 2022.

The distinction between the district court's prior orders and the modified injunction of August 16, 2023 – a distinction that the City of Sacramento assiduously avoid drawing in its brief -is critical this case. That is because the August 16 order **expressly authorized** and permitted the City <u>to manage and clean encampments, abate hazards, remove debris, perform routine maintenance and make needed repairs</u> in areas where encampments were located including those designated by the city as "critical infrastructure." 1-ER-8.

By way of the August 16 order, which expired on its own terms on August 30, 2023, the City was enjoined only from clearing encampments, i.e., dismantling and closing them down with the resulting physical ejectment of the homeless residents into the unshaded, unprotected, sweltering streets and sidewalks of the City. *Id.*

The Order otherwise did not interfere with, unreasonably impede or rob the City of its police power. It did not enjoin the City from implementing its "City Wide Response to Homelessness" which "primarily include clean up and removal of trash. and other hazardous material" 3-ER-384. and managing camps encampments in a way that "would not be removing camps or life essential properties." 2-ER-148.

The August 16 injunction lasted no more than two weeks and was, as Judge Nunley stated in his Order, essentially based on a Joint Statement of the parties who he had instructed, pursuant to the Order of August 3, 2023, to meet and confer on the terms of a narrower injunction that would better balance the parties' respective interests. 2-ER-99-104.

Notwithstanding this highly relevant procedural history, Defendant's Opening Brief is replete with representations to the effect that the district court's orders made it "impossible" or "greatly impeded" the City's ability to abate

hazards, clean encampments, perform maintenance, and otherwise remediate conditions related to homeless encampments and surrounding areas.

The City's brief repeatedly conflates the district court's prior, arguably broader and more restrictive orders with the far narrower, less restrictive modified injunction of August 16, 2023. In so doing, the City muddies the waters to support its false narrative of a city with its hands tied and prevented from protecting the public at large under its police powers.

With regard to the district court's determinations on the balance of equities, the record in this case contains the unrebutted expert declarations of two public health professionals and numerous homeless Sacramentans attesting to the deleterious physical and physiological impact of the City's policy of forcibly removing the unhoused from areas of shade where they had obtained rudimentary but no less significant protection from the direct sun and heat while encamped in a location where there was shade. 3-ER-454-465; 466-525; 526-568; 569-626; 4-ER-628-650; 749-780; 781-810; 821-835; 836-849; 850 -903; 904-917; 5-ER-919-972.

In its brief, Defendant discounts the significance of shade as a refuge from extreme temperatures. Yet studies, which included the participation of Sacramento city officials and which were posted on the City's website, stressed the importance of shade and cooler temperatures, particularly that provided by trees and other vegetation, as an important element in combatting the "urban heat island"

phenomenon and the city's own official protocols required that temperatures at or above 90 degrees Fahrenheit had 'to be taken into consideration when clearing homeless encampments. 2-ER-124; 3-ER 384.

From a legal standpoint, the evidence upon which the district court based its ruling showed that seeking and remaining in shade during a record-setting heatwave is no less a biological imperative than retention of the blankets and bedding that this court described most recently in *Johnson v. Grants Pass* as "the right to take rudimentary precautions" from the elements.

Similarly, in *Munger v. City of Glasgow Police*, 227 F.3d 1082 (9th Cir. 2000), this court found that while the harsh Montana winter was the physical "cause in fact" of Lance Munger's demise, it was the affirmative acts of the police who ejected him from an indoor retail establishment knowing that he was inebriated, took his car keys and sent him away in a thin jacket in disregard of the obvious and known risk posed by the extreme weather conditions that constituted the state-created danger.

The core of the state-created danger exception is whether the defendant acted affirmatively to place someone in a worse position than that in which the defendant found him. By continuing its policy, practice and custom of clearing encampments, without taking into consideration the excessive temperature conditions as required by the City's own Homelessness Protocols, the City of

11

Sacramento showed deliberate indifference to dangers of which it was well-aware as it engaged in conduct that increased the risk of harm to thousands of unsheltered Sacramentans. For this reason, plaintiffs pray this court will affirm the district court's determination that plaintiffs met their burden to obtain injunctive relief.

## JURISDICTIONAL STATEMENT

Appellees agree with Appellant's statement of jurisdiction.

## ISSUES PRESENTED

Whether the District Court was correct in finding that Plaintiffs raised serious questions going to the merits and the balance of equities tipped sharply towards Plaintiffs so as to justify the issuance of the extended, modified injunction of August 16, 2023.

Whether the District Court was correct in finding that in the midst of a record-setting heat wave that the City's policy of clearing homeless encampments located in areas of shade and other protection from direct sun and heat constituted a state-created danger under the 14th Amendment to the Constitution.

Whether the District Court was correct in finding that the City showed deliberate indifference to the known dangers to the homeless posed by unprotected exposure to excessive temperatures and disregarded its own protocols that required that temperatures at or greater than 90 degrees Fahrenheit be taken into consideration before clearing a homeless encampment. 2-ER-124; 3-ER-384.

Nevertheless, defendants cleared encampments and thereby increased the risk of harm to them by such affirmative acts as a normal course of conduct. 1-ER-48-50.

Whether the District Court was correct in issuing its Order of August 16, 2023 modifying and narrowing the Order of August 3, 2023 to prohibit the clearing of homeless encampments while expressly permitting the City to manage, clean and abate hazards at encampments so long as the encampments themselves were not dismantled and the residents so displaced.

## STATEMENT OF THE CASE

Defendant's "Statement of the Case," which devotes some 13 pages to verbatim recitations of its "Citywide Homeless Response Protocol," various ordinances and code sections, is essentially bereft - with one critical exception - of the central facts that go to the principal issue in this case. That exception is the requirement sent forth in the Protocol that "Before relocation of an encampment... staff should consider the following factors...excessive heat or cold at the time of relocation." 2-ER 124; 3-ER-384.

Those facts are:

1) The City of Sacramento was implementing its City-Wide Response To Homelessness. 2-ER-121-125. The city was implementing this policy during an excessive heat warning issued by the National Weather Service for the Sacramento Region. 2-ER-63-77; 79-95; 97-98; 3-ER-477-482; 352-353; 4-ER-846-849.

13

2) The result of the policy was that unhoused people across the city were being regularly were being forced to be displaced and labor during any excessive heat warning; 2-ER-63-77; 79-95; 97-98; 4-ER-532-539; 541-549;551-552; 554-556; 558-559; 561-565; 567-568; 569-626.

3) that authoritative medical evidence showed that the affirmative acts of the city to displace unhoused people during the heatwave would cause irreparable injury or death to many unhoused people; 3-ER-526-568; 4-ER-749-780;850-903; 5-ER-919-972.

4) that Sacramento Homeless Union had standing to sue for injunctive relief because it was a membership organization constituted of around 2500 members. 4-ER-910. Constituting a third of Sacramento's unhoused population of 9,678 which had increased from 2020 to 2022 by 67%, with the most recent point in time ("PIT") count showing that at the time of the heat wave there were 9,678 unsheltered persons in the Sacramento area;[1]

5) that the proliferation of homeless encampments in areas where shade provided by the canopies of trees and other sources of shade and cooler

---

[1] Homelessness in Sacramento, Results From The 2022 Homeless Point In Time County. https://sacramentostepsforward.org/wp-content/uploads/2022/06/PIT-Report-2022.pdf

temperatures offered modest, but critical protection from direct exposure to the intense sun and heat;

6) that a significant percentage of homeless persons with underlying chronic medical conditions and various disabilities faced potentially lethal consequences if forced out of the shade and into the direct sun and heat; 4-ER-532-539; 541-549;551-552; 554-556; 558-559; 561-565; 567-568; 569-626; 3-ER-526-568; 4-ER-749-780;850-903; 5-ER-919-972; 4-ER-801-804; 4-805-807;809-810; 4-ER-795-796; 4-ER-791-793; 4-ER-837-839; 841-844.

7) That whether or not homeless persons were afflicted with underlying medical vulnerabilities, they nevertheless faced potentially lethal physiological impacts if directly exposed to temperatures defined by the City, itself as "excessive" if at or above 90 degrees Fahrenheit;" 3-ER-526-568; 4-ER-749-780;850-903; 846-849; 5-ER-919-972.

8) that in carrying out its policy, practice and custom of clearing encampments the City's own protocol expressly required that "Before clearing an encampment consideration of excessive, etc.;" 2-ER-124.

9) that the City continued to pursue its policy, practice and custom of clearing encampments without regard and with deliberate indifference to the conditions of excessive heat in violation of its own protocols; 2-ER-124;3-ER-532-

15

539; 541-549;551-552; 554-556; 558-559; 561-565; 567-568; 569-626; ER-526-568; 4-ER-801-804; 809-810; 795-796; 791-793.

10) that the clearing of encampments located in areas of shade and where campers were utilizing other barriers to heat and sun such as tents, tarpaulins and umbrellas deprived them of said protections and, in most cases, compelled the ejected homeless to perform the strenuous labor of "breaking camp" under conditions of excessive heat; 4-ER-532-539; 541-549;551-552; 554-556; 558-559; 561-565; 567-568; 569-626; 3-ER-526-568; 4-ER-749-780;850-903; 5-ER-919-972; 4-ER-801-804; 4-805-807;809-810.

11) that the City admitted that it was under intense pressure from the presiding judge of the superior court and the Sacramento County District Attorney to continue and even intensify the enforcement of anti-camping and other ordinances. 3-ER-570-626.

## SUMMARY OF THE ARGUMENT

The district court did not err in issuing its Order of August 16, 2023 extending and modifying its prior order of August 3, 2023 which, in turn, on both the facts and the law, essentially mirrored its two successive orders for injunctive relief– orders which the City of Sacramento did not appeal – that the District Court issued in the summer of 2022. 1-ER-3-16.

16

Defendant begins by erroneously asserting as a ground for reversal that the district court failed to evaluate the City's Section 1983 liability under *Monell v. Dep't of Soc. Services*, 436 U.S. 658 (1978). Whether or not Judge Nunley or plaintiffs expressly used the word *Monell* in its analysis, it is clear that the court addressed the substantive issue of whether the state-created danger flowed derived from a policy, practice or custom of clearing homeless encampments and correctly found that it was precisely the City's pursuit of those policies, under the specific circumstances and in disregard of excessive heat that constitutes a state created danger.

The court correctly found that a foreseeable consequence of the policy - which, in practice, was carried out in violation of its own excessive heat protocols 2-ER-124,3-ER-384 - was to increase of the risk of heat-related harm to the ejected homeless, deprived as they now were of shade and other rudimentary measures of protection from the elements.

Defendants assert error because "no evidence exists of any City policy or custom to clear homeless encampments during 'extreme heat' over other times." (Appellant's Opening Brief at P.57, Emphasis added.) This assertion is a red herring and a straw man: plaintiffs need not show the existence of a specific policy favoring or prioritizing the removal of camps during extreme heat "over" clearing of encampments "at other times"; Plaintiffs need only show, and the district court

17

was correct in finding, that it was the implementation of its already-existing, comprehensive policies, practices, and customs on clearing homeless encampments, without regard to the specific circumstances of carrying out that policy in conditions of extreme heat that constituted affirmative conduct and creation of danger.

The City's assertion that this particularized harm was really "a general harm to which all in homeless encampments are exposed" is an equally flawed attempt at misdirection. The issue was not the clearing of homeless encampments as a general proposition or practice, but the specific, affirmative act of doing so under specific circumstances that did not necessarily apply to "all in homeless encampments."

Where an encampment was located in a non-shaded area, taking down the encampment would likely have increased the risk of harm to the homeless so removed, at least as far as exposure to the sun and heat is concerned. But in clearing encampments that were located in shaded, more protected areas, the City's affirmative act of closing the camp, depriving them of such protection and dispersing the residents into the direct sun and heat was a specific, distinct, particularized, state-created danger that left the homeless so impacted in a worse position than that in which the City found them.

The City asserts that the district court erred in relying on "unsupported assumptions" regarding "potential health" to "any homeless person" as opposed to "these plaintiffs."

First, there is no doubt that extreme temperatures do pose a risk to all unsheltered homeless persons whether or not they are in an encampment located in a shady area as shown by plaintiffs' expert declarations and the official government documents and scientific articles attached thereto. 3-ER-526-568; 4-ER-850-903; 749-780; 5-ER-919-972.

However, a person in an encampment under the shade of the canopy of a bank of trees is not "any" homeless person: he or she is in an encampment, unlike those in other encampments not in such areas, where there is a modicum of existing protection from the ravages of extreme heat. As such, being displaced from that area, forced to perform the strenuous labor in the heat, most likely deprived of items used as protection from the sun and heat, or made to pack up and carry them along, would constitute an increase in the risks associated with direct exposure to the sun and heat that not "any" homeless person or "all" homeless would necessarily face.

Second, as to the City's drawing of a distinction between "any" homeless person and "these plaintiffs," as they do throughout their Argument, the City tries to focus attention exclusively on the individual named plaintiffs. As to these

plaintiffs, the City asserts that there is "no evidence" that they faced "potential health risks. To begin with, however, "these plaintiffs" includes organizational plaintiff Sacramento Homeless Union, which, as set preliminarily set forth in the declarations and supplemental declarations of Union President Crystal Sanchez, has 2,500 members, constituting almost 4-ER-910 around a third of Sacramento's 9,278 homeless residents.

As discussed in detail in the Argument section of this brief, the Union has standing to sue on behalf of its members and those it represents as well as its own. Here, the Union's work of supporting the homeless was seriously compromised by the City's affirmative acts of clearing encampments during the heat wave.

The City's asserts that the district court minimized the importance of the City's critical infrastructure and its ability to its "properly" function for the health and safety of all City residents. Their argument shatters on the solid rock of the Courts Order of August 16, 2023 which extended, modified and narrowed its prior order to expressly provide:

"Camp management, such as trash and debris clean-up, is permitted within the following parameters: (1) items of personal/survival necessity belonging to unhoused individuals cannot be cleared; and (2) the City may clear and manage debris, vector, and safety issues of encampments." 1-ER-8.

20

Finally, Defendant's assertion that the district court erred in granting "class-wide" injunctive relief without "an existing certified class" represents yet another of the City's red herring efforts at misdirection of attention. The Sacramento Homeless Union has over 2500 members 4-ER-910, and has standing to sue on their behalf. Courts can provide broad relief for unconstitutional policies of government entities as well. This case "arises from Defendants' alleged failure to discharge their duties during Sacramento's triple-digit heat wave to protect the unhoused, one of society's most vulnerable populations." 1-ER-12. The court's relief was tailored to enjoin unconstitutional policies and provide relief to the over 2500 members of the Sacramento Homeless Union.

In short, plaintiffs argue that at the time they were issued, based upon the evidence required at that stage of the proceedings proffered by plaintiffs, all of the Judge Nunley's orders were squarely within the district court's discretion having met the elements set forth in *Cottrell*. The City appeals the last order granting the relief sought by plaintiff, i.e. the August 16, 2023 order extending for two weeks, but modifying and narrowing the court's prior order to protect plaintiffs while at the same time addressing the City's primary concerns with language expressly permitting the management, clean-up, removal of trash, vector and debris, abatement of hazards and necessary repairs and maintenance of areas where encampments were located and of the encampments, themselves including --

21

despite contrary and false assertion otherwise, at all areas where "critical infrastructure" is located. 1-ER-8.

"The City is permitted to enforce its critical infrastructure ordinance only as to encampments within 500 feet of a school, as the City requested this specific exception." 1-ER-9.

Under Federal Rule 54(b), a district court has discretion whether to adhere to its own earlier rulings but it is also true that the doctrine is generally less applicable to disposition of motions for temporary restraining orders and preliminary injunctions.

Here, at all times leading up to and including the August 16, 2023 Order, the district court weighed the competing interests of the parties, properly recognized the risk of heat stress, heat stroke, hyperthermia and death entailed in depriving the homeless of the protection of encampments in areas of shade and given the impracticability of an order limited to only those encampments found at any particular time of day to be in the shade - understood the need for a city-wide order. It was what the 2500 members of the Sacramento Homeless Union needed to obtain relief. 4-ER-910.

At the same time, the district court considered the City's concerns and the public interest in allowing the City to keep public spaces, including those deemed "critical infrastructure" clean, free of hazards and able to function.

## STANDARD OF REVIEW

Generally, the Ninth Circuit presumes district court decisions are correct. Appellant has the burden of overcoming this presumption. [*Parke v. Raley*, 506 US 20, 29, 113 S.Ct. 517, 523 (1992); *see also Purcell v. Gonzalez*, 549 US 1, 5, 127 S.Ct. 5, 7 (2006)].

Judicial error alone does not mandate reversal. By statute, the court of appeals must disregard district court "errors or defects which do not affect the substantial rights of the parties." 28 USC § 2111; *Obrey v. Johnson*, 400 F3d 691, 699 (9th Cir. 2005).

In reviewing district court decisions, the court of appeals may affirm on any ground that has support in the record, whether or not the district court decision relied on the same grounds or reasoning adopted by the appellate court. *Logan v. U.S. Bank Nat'l Ass'n*, 722 F3d 1163, 1169 (9th Cir. 2013) (disagreeing with district court's abstention-based dismissal under *Younger v. Harris*, 401 US 37, 91 S.Ct. 746 (1971), but affirming dismissal because plaintiffs failed to plead proper claim); *Northwest Environmental Defense Ctr. v. Brown*, 640 F3d 1063, 1080 (9th Cir. 2011), rev'd on other grounds 568 US 597, 133 S.Ct. 1326 (2013)—noting its discretion to "affirm on any ground," Ninth Circuit analyzed issue of law not addressed by district court.

23

## STANDARD OF REVIEW FOR PRELIMINARY INJUNCTIONS

A district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction. *Lamb-Weston Inc. v. McCain Foods Inc.*, 941 F.2d 970, 974 (9th Cir. 1991). This Court "will not set aside injunctions under Rule 65(d) unless they are so vague that they have no reasonably specific meaning." *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1087 (9th Cir. 2004). "[A] district court's order regarding preliminary injunctive relief" is also subjected to uniquely "limited review." *Nader v. Brewer*, 386 F.3d 1168, 1169 (9th Cir. 2004), citing *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 730 (9th Cir. 1999) (appellate review is "much more limited than review of an order involving a permanent injunction"). Preliminary injunctions are reviewed for abuse of discretion, "which occurs only if the district court based its decision on either an erroneous legal standard or clearly erroneous factual findings." *Nader*, 386 F.3d at 1169. The Ninth Circuit must accept the district court's factual findings unless they are "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 784-85 (9th Cir. 2019) (internal quotations and citations omitted). A district court's preliminary injunction granted on the facts will not be disturbed unless the order "rests on an erroneous legal premise and, thus, constitutes an abuse of discretion." *Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 724 (9th Cir. 1983). This Court does not

24

entertain mixed questions of fact and law raised for the first time on appeal and never presented to or preserved in the district court. *A-1 Ambulance Serv., Inc. v. Monterey*, 90 F.3d 333, 339 (9th Cir. 1996) (unpreserved issue can only be considered if the issue "is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed") (quoting *Bolker v. C.I.R.*, 760 F.2d 1039, 1042 (9th Cir. 1985)); see also *Gieg v. `DDR, Inc.*, 407 F.3d 1038, 1046 n.10 (9th Cir. 2005) ("Appellees did not make this argument in the District Court, which treated the issue as undisputed. An appellate court will not consider arguments not first raised before the district court unless there are exceptional circumstances").

## ARGUMENT

## I.    PLAINTIFFS MET THEIR BURDEN OF ESTABLISHING A RIGHT TO PRELIMINARY INJUNCTION

The purpose of a preliminary injunction is "to prevent irreparable injury so as to preserve [a] court's ability to render a meaningful decision on the merits." *Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112, 1116 (9th Cir. 2008) (citation omitted). Interim relief is not meant "to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. __, 137 S. Ct. 2080, 2087 (2017) (citation omitted).

Under this Court's precedent, "serious questions going to the merits and a hardship balance that tips sharply towards the plaintiff can support issuance of an injunction," so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest. *Cottrell*, 632 F.3d at 1132 (internal quotation marks omitted). The "serious questions" standard "permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." Id. at 1133 (emphasis added) (citation omitted).

This standard requires a "lesser showing than likelihood of success on the merits." *Shell Offshore, Inc. v. Greenpeace, Inc*., 709 F.3d 1281, 1291 (9th Cir. 2013). A question is serious enough to support issuance of an injunction if there is at least "some support" on the record the underlying claims. *Indep. Living Ctr. of S. California, Inc. v. Shewry*, 543 F.3d 1047, 1050 (9th Cir. 2008) (emphasis added).

### A.    The District Court Correctly Found A Likelihood of Success on the Merits

To obtain a preliminary injunction, the plaintiff has the burden to "establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer

irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under the sliding-scale approach adopted by the Ninth Circuit in *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127(9th Cir. 2011), Courts must weigh these factors using a "sliding scale" approach such that where there are "serious questions going to the merits," a preliminary injunction may still be issued so long as "the balance of hardships tips sharply in the plaintiff's favor and the other two factors are satisfied." *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

Here, in its August 16, 2023 Order, the Court incorporated by reference its past orders. The Court September 2nd order discussed the likelihood of merits: "Plaintiffs' declarations still adequately detail heat-related mortality and morbidity deaths and illnesses from heat exposure. In light of the "risk of dehydration, hyperthermia, heat stress, heat stroke and other heat-related conditions that may cause irreversible damage and possibly death" that could accompany sweeps as detailed above, the Court finds that the City's sweeping or clearing of encampments in extreme heat to be "affirmative conduct" on the part of the City in placing Plaintiffs in danger. Patel, 648 F.3d at 974. As stated in the Court's prior Order, Plaintiffs also adequately establish through Union President Crystal

Sanchez's declarations, as well as Gilbert's declaration, that the City acted with "deliberate indifference" to the "known or obvious danger" of extreme heat. *Id*.; (see also 2-ER-7; 21-ER-2, 4; 24-ER-1–2). Based on the foregoing, the Court finds that Plaintiffs are likely to succeed on the merits with respect to clearing encampments. See *Winter*, 555 U.S. at 20." 1-ER-26.

The Court incorporated by reference its 2022 decisions by reference into its August 16th order saying that "The City's arguments are unpersuasive. For the same reasons the Court discussed in its prior orders, Plaintiffs have presented sufficient evidence, at this stage, to demonstrate the City's clearing of encampments constitutes "affirmative conduct" that places unhoused individuals at an increased risk of the "known and obvious danger" of exposure to extreme heat. 1-ER-6-7.

The Courts findings were lockstep with other District Courts injunctions *Janosko v. City of Oakland*, 2023 WL 187499; (Injunction preventing eviction of encampment during torrential rains) *Hughes et al v. Hess et al* 4:23-cv-01063-YGR Dkt No. 19 (TRO issued stopping camp eviction during cyclone). The order was focused, temporary, and not an abuse of discretion.

**1. The Sacramento Homeless Union Had Standing to Sue on Behalf of Itself and Its 2,700 Members; Hence a Broad, City-wide Injunction was Necessary and Appropriate.**

The U.S. Supreme Court has held that an association has standing to sue on behalf of its members only if the following conditions are met: (1) the association's members would otherwise have standing in their own right, (2) the interest the association is seeking to protect is germane to the association's purpose, and (3) neither the claim asserted, nor the relief requested, requires participation of individual members in the lawsuit. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977).

Here, as the Declaration of Union President Crystal Sanchez states, the Sacramento Homeless Union has some 2,500 members in hundreds of encampments across the City. 4-ER-910.

"It is common ground that the respondent organizations can assert the standing of their members. To establish the concrete and particularized injury that standing requires, respondents point to their members' recreational interests in the National Forests. While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice. *Sierra Club* v. *Morton*, 405 U. S. 727, 734–736 (1972)."

Here, at stake is not the recreational or esthetic interest of the unhoused, but affirmative conduct by the City that if not enjoined could have had lethal consequences.

29

## 2. Monell Governs City Liability And Evidence Of A City Policy or Custom of Clearing Homeless Encampments During Periods of "Extreme Heat"

The City has created a red herring contending that Plaintiffs cannot satisfy *Monell* because, it asserts, no City policy exists that expressly calls for and prioritizes "clear[ing] encampments during 'extreme heat' *over other times*[.]" Appellant's Opening Brief at P.64, Emphasis added.

However, Plaintiffs need not show that such a policy existed; Plaintiffs need only show that the City had an existing policy, practice or custom of clearing homeless encampments and, in this case, it carried out that policy without regard and with deliberate indifference to the known and obvious danger that clearing encampments located in shaded areas and otherwise protected from the extreme heat would increase the risk of harm to the former residents of the cleared, shaded encampments by placing them in circumstances more dangerous than those in which they were found.

"For purposes of liability under *Monell*, a "policy" is "a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986). A policy can be one of action (*Monell v. Department of Soc. Svcs.*, 436 U.S. 658

(1978) (Forcing women to take early maternity leave), or inaction *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989); (Failure to train police officers to offer medical assistance to detainee gave rise to *Monell Claim); See also Oviatt by and Through Waugh v. Pearce*, 954 F.2d 1470 (9th Cir. 1992) (failure of Sheriff to train prison guards on consistent intake procedures resulted in *Monell Claims)*.

Here, it is undisputed that the City of Sacramento cleared encampments on the basis of its "City Wide Homelessness Protocol," a policy that has been approved by its City Manager. 2-ER-121-125. Level 1 and Level 2 encampment must be cleared. 2-ER-124. Before doing so, the City protocol instructs its staff to consider "excessive heat or cold at the time of relocation (90 degrees or above in summer and 32 degrees or below in winter)[2]; availability or lack of shelter; transportation challenges to a shelter" *Id.*

Defendants admit that these policies were implemented with regularity and produced formal reports memorializing encampment evictions pursuant to their

_____

[2] The City also misstates the origin of their own protocol cautioning against the closure of encampment in excessive heat. In his Declaration City Manager Mario Lara claims that the Protocol was issued per a memo dated October 18, 2022. However, the protocol was in existence before that date and was cited by Plaintiffs two months before in their motion to reinstate the Court's injunction. 3-ER-354-413.

policies. 2-ER-330-347. The only concrete "service" related to alternative shelter offered to those facing ejectment from shaded encampments was sending them to the Miller Park "Safeground" 2-ER-342 where according to the City's own evidence showed temperatures reaching to 135 degrees Fahrenheit. 2-ER 219; 225; 234.

To conclude, Defendant's own evidence shows (1) they possessed a 2-ER-121-125, policy that resulted in the affirmative conduct of clearing encampments during days excessive heat 2-ER-330-347; (2) Defendants were aware of the dangers of excessive heat on days with over 90 degrees 2-ER-124; (3) the only concrete service provided to people was to send them to the sweltering Miller Park "Safeground" where temperatures could reach up 135 degrees.

The third prong meets the stringent standard of fault for deliberate indifference. The implementation of the city's policy of clearing homeless encampments, notwithstanding the systematic disregard of the requirement of first taking into consideration temperatures at or above 90 degrees F. resulted in state-created dangers. Indeed, even if the failure to abide by the excessive heat protocol was attributable to a failure to adequately train police and other city employees which seems in this case to fall into the category of *res ipsa loquitor*, *Monell* can be affirmed under *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989) where that city "failed to train their officers regarding the duty that arises when, through an

32

officer's affirmative conduct, he or she exposes a person to potential danger from the elements" quoting from *Munger v. City of Glasgow Police*, 227 F.3d 1082 (9th Cir. 2000).

In any event, as the Supreme Court has made clear, "policies can include written policies [as well as] **unwritten** customs and practices[.]" *City of Canton v. Harris*, 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

Defendants also misquote *Fogel* which is inapplicable to this case. In *Fogel* the circuit found "[Plaintiff] also has not established that any of the officers involved with his arrest were official policymakers with final decision making authority for Grass Valley, or that any official policymaker "either delegated that authority to, or ratified the decision of, a subordinate." *See Ulrich v. City County of San Francisco*, 308 F.3d 968, 985 (9th Cir. 2002); see also *Monell*, 436 U.S. at 694, 98 S.Ct. 2018; *City of St. Louis v. Praprotnik,* 485 U.S. 112, 126-127 (1988). His municipal liability claim therefore fails."

Here the City does not dispute their encampment closure protocols are based on ratified interdepartmental policies. Accordingly, that aspect of *Monell* liability is satisfied.

> **3. Clearing of Encampments in Areas of Shade During an Extreme Heatwave Constitutes "Affirmative Conduct" By The City Exposing Plaintiffs to Known, Particularized Danger**

33

Declarations filed in support of Plaintiffs' motion for preliminary injunction are replete with descriptions of the particularized dangers of unprotected exposure to heat and the absence of any alternative, accessible shelter except the Miller Park "Safeground" which, as the Court found, was sufficiently lacking in shade such that going there would leave a person evicted from an area of shade worse off than they would have been if left alone. 3-ER 454-465; 466-525; 526-568; 569-626; 4-ER-628-650; 749-780; 781-810; 821 -835;  836-849; 850 -903; 904-917; 5-ER-919-972.

With regard to the question In a confounded, self-contradicting statement that appears designed to minimize the impact of clearing encampments located under tree canopies, other overhanging vegetation, under bridges and freeway overpasses, the City, with no reference to record evidence, declares "Shade doesn't do much when it's over 90 degrees other than providing protection from the sun" (Defendants Opening Brief at P.67). The evidence that is in the record includes the City's own temperature measurements show a 30-degree difference between shaded and unshaded areas [2-ER-225-226] In addition while denigrating the importance of shade, the City posits that Miller Park was a "safe alternative" in part because it offered shade. In any event, to the extent that the City offers the Miller Park site as an alternative to encampments already located in shade, the

district court's August 16 order specifically found that whatever shade may have been provided at Miller Park was insufficient.

Defendant argues that Sacramento is the "City of Trees". It offers this municipal moniker to suggest that the residents evicted from encampments could find plenty of other locations where shade was provided. The City can't have it both ways: either shade offers protection or it doesn't.

### 4. Defendants Cite To Sinclair v. City of Seattle Regarding Particularized Dangers. But the Facts In *Sinclair* Are The Opposite To This Case Before The Court.

The City relies on *Sinclair v. City of Seattle*, 61 F. 4th 674 (9th Cir 2023) to argue that Plaintiffs' state-created danger claim fails because they are not faced with a "particularized danger." In *Sinclair*, a mother sued because her son had been shot by another young man in an area of the city that had been surrendered to protesters. The Ninth Circuit reiterated that "members of the public have no constitutional right to sue [state actors] who fail to protect them against harm inflicted by third parties." *L. W. v. Grubbs* (Grubs I), 974 F.2d 119, 121 (9th Cir. 1992) (Quoting from *Sinclair*). The Court found in *Sinclair* that the "Plaintiff fails to allege any contact between Mr. Anderson and any City police officer or, indeed, any representative of the City prior to the incident in question. In fact, it appears

that Mr. Anderson entered CHOP (Capitol Hill Occupied Protest) on his own accord days after the creation of CHOP."

The case at bar is the opposite of *Sinclair*. Here, there is no third-party question, and the particularized danger is caused by the City itself via evictions carried out by City police against unhoused people during extreme heat. Therefore, Sinclair is inapplicable, as the dangers are particularized for any unhoused person endangered by those eviction orders.

In addition, Defendant's position is inconsistent with *Hernandez v. City of San Jose*, No. 17-15576 (9th Cir. 2018) which was cited to in *Sinclair*. In Hernandez, the Ninth Circuit denied qualified immunity to police officers who blocked escape routes for Pro-Trump demonstrators - forcing them to leave the rally through a group of Anti-Trump Protesters who then attacked them causing great bodily harm. There, even though the Court found the danger in question was one faced by all of the pro-Trump demonstrators, it nonetheless found that "[t]he danger that the anti-Trump protesters would hurt them was both "actual" and "particularized," *Kennedy*, 439 F.3d at 1063, as well as "foreseeable," Lawrence, 340 F.3d". quoting from *Hernandez v. City of San Jose*, No. 17-15576 (9th Cir. 2018).

Finally, in a case also arising from the CHOP situation, *Hunters Capital LLC v. City of Seattle*, 499 F. Supp. 3d 888 (W.D. Wash. 2020) property owners within the CHOP zone brought suit during the George Floyd protests. In Hunter, the property owners Fourteenth Amendment state-created danger claims were sustained by the district court, holding: "The Court concludes that these allegations are sufficient to state a substantive due process claim under the state-created danger exception. Plaintiffs plausibly allege that the City's actions—encouraging CHOP participants to wall off the area and agreeing to a "no response" zone within and near CHOP's borders—foreseeably placed Plaintiffs in a worse position than they would have been in absent any City intervention whatsoever." *Hunters Capital LLC v. City of Seattle*, 499 F. Supp. 3d 888 (W.D. Wash. 2020).

In the case at bar, the dangers are even more particularized than in Hunter because the affirmative actions are of police officers against individual homeless people, ejected from areas of relative protection from the sun and heat, are acts of the City, itself, that the unhoused so removed would not otherwise face but for the city's policy and practice of clearing encampments without regard to the extreme weather and in violation of the City's own Homelessness Protocol. This particular danger did not affect all homeless equally; it affected with particularity those who having lost the minimal protection of shade and shelter were placed at increased risk of harm by the affirmative acts of Defendant.

37

### 5. Court Did Not Abuse Discretion In Finding Defendants Deliberately Indifferent To Dangers of Extreme Heat.

The District Court correctly found that the Plaintiffs presented "sufficient evidence of state created danger." *Sacramento Homeless Union v. City of Sacramento* (Aug. 16, 2023).

Under the holding of *Kennedy v. City of Ridgefield*, 439 E 3d 1055 (9th Cir. 2006), the Ninth Circuit recognizes liability under the substantive due process state created danger doctrine when a state actors (1) " affirmative actions created or exposed h[im] to actual, particularized danger that []he would not otherwise have faced"; (2) "the injury was foreseeable"; and (3) "the officers were deliberately indifferent to the known danger." *Id*.

At the case at bar all of these factors were met.

(1) Defendants possessed a policy 2-ER-121-125 that resulted in the affirmative conduct of its staff to clear encampments across the city on an ongoing basis, including days with excessive heat. See 2-ER-330-347.

(2) Defendants were aware of the dangers of excessive heat on days with over 90 degrees. 2-ER-124. An authoritative medical evidence showed that evicting encampment residents and depriving them of shade, water, and their

survival gear would foreseeably result injury or death. 3-ER-526-568; 4-ER-749-780;850-903; 5-ER-919-972.

(3) Defendants met a stringent standard of deliberative indifference. The record shows the only concrete service Defendants would provide to displaced people was to move them to the sweltering asphalt at the Miller Safe Ground that had a ground temperature regularly reaching up to 135 degrees Fahrenheit. 2-ER-225,226.

Applying the two prong test of *Kennedy*, the Court correctly found that there was enough evidence to show that the plaintiffs would have been left in a situation of much more danger if their homeless encampment was moved during extreme heat.

The Court in found that plaintiffs "demonstrate the City's clearing of encampments constitutes "affirmative conduct" that places unhoused individuals at an increased risk of the 'known and obvious danger' of exposure to extreme heat. "Put simply, Plaintiffs have presented sufficient evidence, at this stage, to demonstrate the City's clearing of encampments constitutes "affirmative conduct" that places unhoused individuals at an increased risk of the "known and obvious danger" of exposure to extreme heat" 1-ER-15.

The Court also found that while "the City indicates in the parties' joint statement that it agrees to provide more shade structures and tents that may provide more heat protection . . . the available evidence suggests, that . . . current structures and tents . . .do no offer sufficient protection from the heat." 1-ER-7

To establish the second prong of a state created danger claim a court "must decide the related issues of whether the danger to which" the defendant exposed plaintiff "was known or obvious, and whether [defendant] acted with deliberate indifference to it." *Id.* at 1064.

Here, the Court based its decision on the factual background of the case involving the clearing of residents of homeless encampments during "Sacramento's triple-digit heat wave" 1-ER-4.

The Court also took "judicial notice of National Weather Service data, which state that the monthly highest maximum temperatures for the Sacramento Area have historically occurred during the months of June, July, August and September." 1-ER-60.

Finally, the Court met the second prong of the Kennedy test by concluding " Plaintiffs also adequately establish through Union President Crystal Sanchez's declarations, as well as Gilbert's declaration, that the City acted with "deliberate

indifference" to the "known or obvious danger" of extreme heat. Id.; (see also ECF No. 2-1 at 7; ECF No. 21 at 2, 4; ECF No. 24-1 at 1–2.) 1-ER-26.

### 6. The District Court Correctly Found that Plaintiffs Evidence Is Sufficient To Show That Irreparable Harm Will Result in the Absence of Injunctive Relief

The Court further found "weather forecast predicting excessive heat for the upcoming weeks and Plaintiffs' evidence detailing the risks of heat-related deaths and illnesses is sufficient to show that irreparable harm will result in the absence of injunctive relief." 1-ER-7.

Defendants use *Penilla v. City of Huntington Park*, 115 F.3d 707 and to make the argument that State Created Danger Doctrine primarily implicates the rights of people unable to care for themselves. This interpretation contradicts what the Ninth Circuit held in both cases.

The Ninth Circuit made it clear that the ability of someone to take care of themselves is not the deciding factor in a State Created Danger claim; holding that "in examining whether an officer affirmatively places an individual in danger, "we do not look solely to the agency of the individual, nor do we rest our opinion on what options may or may not have been available to the individual. Instead, we examine whether the officers left the person in a situation that was more dangerous

41

than the one in which they found him." *Munger v. City of Glasgow Police Department*, 227 F.3d 1082 (9th Cir. 2000).

This decision in *Munger* was an extension of *Penilla*. In *Penilla*, the Ninth Circuit rejected "indeterminate" tests for determining a claim for state create danger holding that "The critical distinction is not, as appellants allege, an indeterminate line between danger creation and enhancement, but rather the stark one between state action and inaction in placing an individual at risk. "*Grubbs*, 974 F.2d at 121; see also *Wood v. Ostrander*, 879 F.2d 583, 588 (9th Cir. 1989)." Id.

Defendants are suggesting that this court should reinvent the State Created Danger jurisprudence by establishing a new indeterminate test for determining what creates a claim under the doctrine. There is no reason on this record to upend all of the Ninth Circuits jurisprudence for their purposes.

Another citation defendants rely on to their detriment is *Murguia v Langdon* 61 F.4th 1096 (9th Cir. 2023). *Murguia* reaffirmed the Ninth Circuit's rejection of indeterminate tests for regarding agency "Rather than ask whether Langdon had custody of the twins prior to and after the intervention of each Individual Defendant, the district court should have asked more broadly "whether the officers left the [twins] in a situation that was more dangerous than the one in which they found [them]." *Munger*, 227 F.3d at 1086." Quoting *id*.

42

*Murguia* also cited heavily to *Kneipp v. Tedder*, 95 F.3d 1199, 1208–09 (3d Cir. 1996). *Kneipp* was a weather related state created danger case upheld in the Third Circuit. In *Kneipp*, officers increased the risk of harm to a severely intoxicated woman who was struggling to walk home with the assistance of her husband when the officers detained the plaintiff, let her husband leave, then sent the plaintiff to walk home unescorted in near-freezing conditions. This affirmative act of the officers resulted in her succumbing to hypothermia and brain damage. By transference, *Murguia* recognizes the importance of weath within the state created danger doctrine.

In some, defendants are citing to case that support the district courts use of discretion and have failed to meet their burden to prove otherwise.

### 7. The District Court Narrowly Tailored The Preliminary Injunction Issued on August 16, 2023.

Defendants cite to the precedent of *Johnson v Grants Pass* and *Martin v Boise* as well as two district court decision in *Cobine v City of Eureka* and *Reed v City of Emeryville*.

Johnson held that "anti- camping ordinances against homeless persons for the mere act of sleeping outside with rudimentary protection from the elements". *id*

This is a conservative restraint on City governments from constructively killing homeless people by depriving them the necessities for survival. The Ninth Circuit knows the severity of these dangers, such as was apparent in the man who died in *Munger v. City of Glasglow*.

The Court found the same issues here, agreeing with Dr. Cofer's findings that "Removed from shaded, relatively sun and heat-protected areas, unhoused, unsheltered persons are at extreme risk of dehydration, hyperthermia, heat stress, heat stroke and other heat related conditions that may cause irreversible damage and possibly death ." 1-ER-25.

Judge Nunley's order were lock step with general practice of District Courts to issue short injunctions to protect unhoused people from specific dangers. Two such orders where short injunctions were issued to protect unhoused people were *Reed v City of Emeryville* and *Cobine v City of Eureka*, which defendants miscite to support their argument.

In *Reed*, the court issued a restraining order of similar duration as that issued by the district court here. In that case, the court found the eviction of the homeless residents constituted a state-created danger, but one that was mitigated by universal offers of shelter to all of the members of the camp. "Defendants contend and I agree," wrote Judge William Orrick, that the state-created danger claims – require

44

"plausible allegations that plaintiffs were placed in a more dangerous situation by the defendants – cannot be alleged [here] as a matter of law given that a shelter bed is safer than an encampment abutting an active construction site." *Id*.

Here, in contrast distinction, there is no evidence that people evicted from encampments were offered shelter beds. See ER 330-347. The one "alternative" that was offered was the Miller Park "Safeground" where conditions including tents in direct sun on superheated asphalt and absent any cover from the sun and heat other than thin, city-provided tents, were worse than in the shaded encampments. *Id*.

These conditions were known by the homeless, themselves, who cited them as the basis for their refusal to go to Miller Park, as shown in the declarations of Betty Rios. 4-ER-791. Falisha Scott 4-ER-801.. Both declarations were corroborated by the City's own evidence .2-ER-207-239; 225-226. More important, the district court, in its order of August 16, 2023, specially found that conditions at Miller Park were unacceptable and, accordingly, ordered the City to permit an inspection by the Homeless Union and to take a number of remedial measures to improve the site. "The City shall allow a representative from the Sacramento Homeless Union, City staff, and other attendees as agreed to and approved by both parties to tour Miller Park and its facilities" 1-ER-9.

In short, Defendant's reliance on Reed is unavailing inasmuch as there the encampments were located dangerously close to an active construction site whereas here, encampments cleared by the City of Sacramento were areas of safety, at least insofar as they offered protection from the sun and heat. And, as discussed above, in Reed the City offered demonstrably indoor shelter to the displaced homeless that was demonstrably safer than where they were originally camped whereas here, the Court, relying on evidence sufficient for purposes of preliminary injunction analysis, found Sacramento's Miller Park to be less safe than shaded encampments. It follows that the City's attempt to use the offer of its Miller Park "Safeground" as an affirmative defense against the charge of state-created danger must fail.

*Cobine v City of Eureka* also issued a temporary restraining that lasted several weeks. The court allowed the restraining order to expire in large part because the unhoused people had obtained much of their relief through the TRO. *Cobine* affirmed the decision in *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079 that clearing encampments during inclement weather constituted a state created danger. Cobine found that "Without allegations of intentional eviction during precarious weather or other facts indicating deliberate indifference to the safety and welfare of the population, the Court must dismiss the claim. See Sanchez, 914 F. Supp. 2d at 1102. *Id*.

In short, the district court used discretion is lock step with other district courts. Short lived TRO's and injunctions serve. "a stopgap to prevent a particular violation of constitutional rights that results from the combination of lack of notice and failure to provide alternative shelter." See *Blaine v. California Department of Transportation* ]616 F. Supp. 3d. at 654; *Janosko v City of Oakland*, 2023 WL 187499, at *4 ("[A] short, defined delay in the planned evictions is in the public interest."). Quoting from *Tassey v California Department of Transportation* 3:23-cv-05041-AMO Docket No 11.

The balance of equities in this short lived stop-gap measures to preserve life is something that is in the public interest "See Blain, 616 F. Supp. 3d at 958 ("The balance of equities sharply tilts in the plaintiffs' favor for a period long enough to give them adequate notice of the action, time to make alternative plans, and time for the relevant governmental entities to help locate shelter (as they have committed to trying)." *Id*.

## B. The District Court Correctly Found Evidence Of Imminent and Irreparable Harm

The Ninth Circuit does "not require a strong showing of irreparable harm for constitutional injuries." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019). (quoting from *Garcia v. City of L. A.*, 481 F. Supp. 3d 1031 (C.D. Cal. 2020).

47

Defendants argue that Plaintiffs have not met their burden for irreparable harm for a preliminary injunction under *Summer v Earth Island Inst.,* 555 U.S. 488, 493 (2009). But Defendants citation is misplaced because *Summer* sets a low bar for concrete and particularized injuries that satisfy the *Winter* test. "To establish the concrete and particularized injury that standing requires, respondents point to their members' recreational interests in the National Forests. While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice. *Sierra Club v. Morton*, 405 U. S. 727, 734–736 (1972)."*id*

Defendants cite to *Hodger-Durgin v. De La Vina, 199 F 3d 1037 1045* (9th Cir. 1999) to claim plaintiffs could not establish irreparable injury. Defendants reliance on *Hodger-Durgin* contradicts their citation to *Summer v. Earth island Inst.* This is because of the court in *Summer v. Earth Island Inst* relied on *Sierra Club v. Morton*, the case actually supports the standing of the City of Sacramento to bring a lawsuit on behalf of its homeless constituency because its based on the broad rights the Supreme Court has given to membership organizations to litigate on behalf of its members and establishing irreparable harm as an organization.

Defendants' reliance on *Hodger-Durgin* is also misplaced because the decision supports prospective relief against unconstitutional city policies like the

48

City of Sacramentos. The *Hodger-Durgin* court was based on *City of Los Angeles v. Lyons, 461 U.S. 95 (1983). Lyons* established that a case-or-controversy for injunctive could be asserted against unconstitutional city policies if the plaintiff could show "that the City ordered or authorized police officers to act in such manner". Here it is undisputed that the clearing of encampments flowed from city policies, and therefore a controversy and threat of harm was well founded.

Defendants also cite to *Hernandez v. City of Phoenix* to claim Plaintiffs did not prove their injuries were unlikely. *Hernandez* is not applicable. The Court had found the plaintiff in that case unable to prove irreparable harm because "if he is wrongfully disciplined, he can be made whole by money damages in the form of back wages." *Id* . The City of Sacramento here, is not offering any wages, medical care, or shelter to the people they are displacing.

did not meet their burden of proving irreparable injury under the *Winter's* test for a preliminary injunction. But *Summer* does not address irreparable injury – it is only concerned with standing for cases and controversies.

### C. The District Court Did Not Error When It Found The Plaintiffs Interests In Their Health and Welfare Far Outweighed The City's Interests In Clearing Encampments

The scope of the preliminary injunction was based on a joint statement by the parties which narrowed the injunction to allow management of encampments, abatement of hazards, and exempted critical infrastructure.

Defendants contradict themselves in challenging the courts order regarding public interest. In discussing the issues of irreparable harm they claim that there was no evidence that city intended to evict any campsites. However here they admit that they planned on evicting people from several different encampments 2-ER-136 ¶ 139-145. 148-149 ¶¶4-5, 151-172 and were delayed from doing so because of the court's order.

Defendants further contradict themselves because they claim  trash clean up efforts were restrained. But nothing in the order restrained the city from continuing with their clean up efforts so long as people were not displaced." "The City and all of its officers.. are enjoined from clearing encampments…the City may clear and manage debris, vector, and safety issues of encampment.

The Ninth Circuit set the standard for these types injunctions in *Garcia v Los Angeles*  ("[T]he public interest is served by issuance of a TRO in that the City will

still be able to lawfully seize and detain property, as opposed to unlawfully seizing and immediately destroying property (Internal citation omitted)" *id*.

The *Garcia* court similarly noted that ("[T]he City's interest in having clean parks is outweighed by the more immediate interest of the plaintiffs in not having their personal belongings destroyed." (quoting Pottinger v. City of Miami, 810 F.Supp. 1551, 1573 (S.D. Fla. 1992) )); Justin, 2000 WL 1808426, at *11 (risk of violation of constitutional rights outweighs risk that injunction may slow city's efforts to keep the city clean and safe and may disturb the city's "new initiative to revitalize and uplift communities, to improve the streets and sidewalks, and to diminish the crime rate").

In Defendants in contrast cite to and *Latta v. Otter*, 771 F.3d 456 (9th Cir. 2014).  And *Coal. For Econ. Equity v. Wilson*, 122 F3.d 718,719 (9th Cir. 1997)

In *Latta* the court did not weigh the public interest at all in affirming a permanent injunction against. The court simply held "neither history nor tradition [can] save [the laws] from constitutional attack." Lawrence, 539 U.S. at 577–78, 123 S.Ct. 2472 (quoting *Bowers v. Hardwick*, 478 U.S. 186, 216, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (Stevens, J., dissenting)).*id*.

Defendants reliance on *Coal* is also misplaced because the court in that case was talking about irreparable harms caused by acts of Congress overriding legislative acts of the state. The court in that case was dealing with whether Title

VII of the Civil Rights Act preempted a voter approved ballot measure limiting affirmative action. But at the case at bar, there is no tension between Congress or the State. Plaintiffs are only seeking to vindicate the rights of homeless people under the US and California State Constitution which are already the law of the land.

This Ninth Circuit precedent is lockstep with district court application. For example in Judge Orricks widely cited order in Blain and Janosko. See Blain, 616 F. Supp. 3d at 958 ("The balance of equities sharply tilts in the plaintiffs' favor for a period long enough to give them adequate notice of the action, time to make alternative plans, and time for the relevant governmental entities to help locate shelter (as they have committed to trying)."). The Court also finds that the public interest weighs in favor of granting Tassey's application, as doing so provides a "a stopgap to prevent a particular violation of constitutional rights that results from the combination of lack of notice and failure to provide alternative shelter." See id. at 654; Janosko, 2023 WL 187499, at *4 ("[A] short, defined delay in the planned evictions is in the public interest.")

In short, the city's vital functions were not greatly burdened. The lives of unhoused people were saved from likely injury and death. The injunction has now been extinguished, and the publics interest has been served.

52

## II.    THE DISTRICT COURT DID NOT ERROR BY ISSUING PRE-CERTIFICATION INJUCTIVE RELIEF

Defendant cites to *Zepeda v. I.N.S.*, 753 F2d 719 (9th Cir. 1983) for the proposition that until a class has been certified, an injunction in a putative class action applies only to the named plaintiffs." In order to rely on *Zepeda*, the City resorts to characterizing Plaintiffs' suit as a "class action" so that it can conveniently argue that the district court erred in granting city-wide relief.

However, Plaintiffs - which includes the 2,700-member Sacramento Homeless Union - which, it is well-settled, has standing to sue on behalf of its members -  did not file a class action but a multi-party suit on behalf of Union members, the named individual plaintiffs and "all those similarly situated."

Thirteen years after deciding *Zepeda*, this Court decided *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486,1501-02 (9th Cir.1996), which held, "While injunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification, see generally *Zepeda*, 753 F.2d at 727-28 n. 1, an injunction is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit — even if it is not a class action — if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987) (emphasis in original).

In *Easyrider*, the court held, "While there are only fourteen named plaintiffs in this case, spread among San Diego, Orange, Los Angeles, and Ventura counties, and an unknown number of members of Easyriders, an injunction against the CHP statewide is appropriate." *Easyrider*, in turn cited to *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987):

"There is no general requirement that an injunction affect only the parties in the suit." In *Bresgal*, a labor dispute, the Secretary of Labor argued that unless a suit is a class action, the injunction can cover only the named plaintiffs, "contend[ing] that these requirements [] affect a much larger group than just the plaintiffs." In rejecting the secretary's argument, the Court held, "There is no general requirement that an injunction affect only the parties in the suit." [] "The fact that forestry labor contractors are not among the parties here does not prevent the district court, or this court, from issuing an injunction directed to the Secretary requiring him to enforce the act against forestry labor contractors."

Finally, in *Justin v. City of Los Angeles* No. CV-00-12352 LGB, United States District Court, C.D. California (2000), a case in which homeless persons sought a TRO against enforcement of an anti-loitering ordinance, the Court found "For the purpose of resolving this application for a TRO, the Ninth Circuit holding in *Easyriders Freedom F.I.G.H.T. v. Hannigan* is directly applicable." Accordingly, the Court held "the Plaintiffs in this case will not receive the

complete relief to which they are entitled if the applicability of the injunction is narrowed to the named Plaintiffs. Contrary to Defendants' request, the Court refuses to narrow the scope of this injunction to the named Plaintiffs." *Id*.

Here, Defendants have conceded that Plaintiff Sacramento Homeless Union has standing to sue in its own interest as well as on behalf of its membership which, according to Sacramento Homeless Union President Crystal Sanchez, is upwards of 2,700 and includes residents of hundreds of homeless encampments.

Here, where the named plaintiffs are suing on their own behalf and "all those similarly situated," the case law is clear that Defendants are wrong when they assert that without class certification, relief should be limited only to the individual named plaintiffs.

## III. The Amici Brief

The Amici brief makes the same diversionary argument as does Defendant City of Sacramento. The state-created danger at issue in this case is not the weather, itself, which amici, citing to a non-Ninth Circuit case in Minnesota, declare is something that the City can't control. What is at issue and what can be controlled and what constituted a state-created danger was the affirmative conduct of the City of Sacramento in worsening the position of the homeless by way of tearing down encampments located in areas of shade and where other rudimentary measures had been taken by camp residents to avoid the direct sun and heat.

According to amici, "lack of shade is not a state-created danger." But state action that affirmatively deprives persons of shade and physically ejects them into the direct sun during a record-breaking, life-threatening heat wave? That is a "lack of shade" that would not be occurring but for the deliberate indifference of the City.

Amici complain that there "was no trial on the merits" and that the district court relied on declarations in ruling on plaintiffs' motion. The point of a preliminary injunction is to avoid irreparable harm and maintain the status quo – here, that homeless people were in areas where shade offered protection from the sun and heat – so that the case can go forward to trial. As for relying on declarations, it is well settled that "In evaluating the evidence presented in conjunction with this motion, the Court notes that the evidentiary rules are somewhat relaxed." See, e.g. , *Flynt Distrib. Co. v. Harvey* , 734 F.2d 1389, 1394 (9th Cir. 1984) (noting that "[t]he urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial[;] [thus], [t]he trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm.")

Amici cite to *Cobine v. City of Eureka* where the district court found that the clearing of encampments where alternative shelter was available did not constitute

a state-created danger. However, in their lengthy excerpt from the case, they do not include the court's observation that dismissal was proper because there were "no allegations of intentional eviction during precarious weather." See, *Cobine*, 250 F.Supp. 3d at 433. "Intentional eviction during precarious weather" is precisely the issue and was most definitely alleged by Plaintiffs against the City of Sacramento. Amici can cherry pick Cobine, but the legal logic is inescapable: had there been "an intentional eviction during precarious weather" perpetrated by the City of Eureka, the court would have reached a very different result.

The homeless need the courts to protect their health and safety when the tyranny of the majority wants to place them in an even worse situation than they are already in. The City of Phoenix and the Amici wrote their brief because they are in the same situation as Sacramento, restrained from clearing encampment during record-breaking heat, and the homeless in those cities are in the same situation as those in Sacramento – suffering from heat-related illness and death. Despite the temperatures in Phoenix hitting high of 114 – 118 degrees, news reports confirm that the police are still evicting the homeless in that city. In 2021, out of 339 individuals who suffered heat-related deaths in Maricopa County, which includes the City of Phoenix, more than one-third of those who perished –130 human beings - were homeless.

There is no Hippocratic Oath in the law, but maybe there ought to be. "Primum non nocere": First, do no harm. This case is about a City that did harm, that took homeless people as they found them -- in shade, sheltering from a blazing sun and deadly heat – and made their situation worse—until a district court judge ordered the City of Sacramento to stop.

Amicus City of Phoenix may protest that court intervention is obstructing the City's efforts to address homelessness and allegedly protect the homeless. But if the Maricopa County death toll is any indication of how well their doing, then curbing the ability of judges to intervene and slamming the courthouse door on the most vulnerable, the most in need of legal protection, will exact a very high price indeed from those least able to pay.

## CONCLUSION

The Order of August 16, 2023, that is the object of the City's appeal is a textbook example of the dynamic process involved when the Court is faced with a motion for injunctive relief. Under the doctrine of the "law of the case." rulings made in the course of a proceeding generally govern subsequent decisions and rulings. But Under Rule 54(b), a district court has discretion whether or not to adhere to its earlier rulings and the "law of the case" doctrine does not generally cover preliminary injunctions.

There is a good reason for that, given that the circumstances that necessitate injunctive relief can be fluid and changing and often need to be revisited, modified, enlarged or narrowed. Accordingly, in the absence of a clear showing of abuse of discretion, clear error in determination of critical facts or the misapplication of the law, deference to the trial court judge is appropriate.

Date: October 16, 2023

Anthony D. Prince

*/s/ Anthony D. Prince*
Anthony D. Prince

*Attorney for Plaintiffs/Appellees*
*Sacramento Homeless Union, a local of the*
*Homeless Union/Statewide Organizing*
*Council; et. al.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** 23-16123

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[X]    I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** /s/ Anthony D. Prince                    **Date** 10/16/2023
*(use "*s/[typed name]*" to sign electronically filed documents)*

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-16123

I am the attorney or self-represented party.

**This brief contains 11,295 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
[ ] it is a joint brief submitted by separately represented parties;
[ ] a party or parties are filing a single brief in response to multiple briefs; or
[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Anthony D. Prince **Date 10/16/2023**
*(use "s/[typed name]" to sign electronically filed documents)*