No. 23-16123
# IN THE UNITED STATES COURT OF APPEAL
## FOR THE NINTH CIRCUIT

_____

SACRAMENTO HOMELESS UNION, a local of the California Homeless Union/Statewide Organizing Council; et al.,
*Plaintiffs-Appellees,*

vs.

CITY OF SACRAMENTO,
*Defendant/Appellant.*

_____

On Appeal from the United States District Court for the Eastern District of California
Case No. 2:22-cv-01095-TLN-KJN
Judge: Hon. Troy L. Nunley

_____

## APPELLANT'S REPLY BRIEF
_____

*Lee H. Roistacher, Esq.
(SBN 179619)
Dean Gazzo Roistacher LLP
440 Stevens Avenue, Suite 100
Solana Beach, CA 92075
Tel.: (858) 380-4683
E-mail:
lroistacher@deangazzo.com
**Attorneys for
Defendant/Appellant City of
Sacramento**

Susana Alcala Wood, City Attorney
(SBN 156366)
Gökalp Gürer, Senior Deputy City
Attorney (SBN 311919)
City Of Sacramento
915 I Street, Room 4010
Sacramento, CA 95814-2608
Tel.: (916) 808-5346
E-mail: ggurer@cityosacramento.org
**Attorneys for Defendant/Appellant
City of Sacramento**

# TABLE OF CONTENTS

INTRODUCTION............................................................9

ARGUMENT..........................................................…..15

    A.    The Union Distorts The Scope Of The District Court's Injunction Regarding Critical Infrastructure.............. ....................…...15

    B.    The Union Maintains A Class Action, The Union Does Not Explain Why Class-Wide Relief Is Appropriate Before Class Certification, And The Organizational Standing Argument Is Irrelevant To The Issue Of Class-Wide Relief Before Class Certification.............................16

    C.    Success On The Merits Is Unlikely.................21

        1.    The validity of the lesser "serious questions test" for establishing likely success on the merits advocated by the Union is unclear and likely did not survive *Winter*............21

        2.    There exists no evidence supporting a City custom of "clearing" homeless encampments during periods of "extreme heat" necessary for *Monell* liability..........28

        3.    "Clearing" homeless encampments during "extreme heat" is not the type of affirmative conduct exposing any plaintiff to a "particularized" danger necessary for the state created danger theory of Fourteenth Amendment liability.................................................31

4. Absence of evidence of deliberate indifference…………………………………..43

D. Insufficient Evidence Of Irreparable Harm……46

E. Balancing Of The Equities And Public Interest Favors The City…………………………..48

F. A Proper Exercise Of Discretion Compelled The District Court To Exempt All Critical Infrastructure From The Injunction……………49

CONCLUSION………………………………………………50

CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. 32(A)(7)(C) AND CIRCUIT RULE 32-1 FOR CASE NO. 23-16123…………………………………53

CERTIFICATE OF SERVICE………………………………54

# TABLE OF AUTHORITIES

## Cases

*Alliance for the Wild Rockies v. Cottrell*
 632 F.3d 1127 (9th Cir. 2011)………………….22, 25, 27

*American Trucking Associations v. City of Los Angeles*
 559 F.3d 1046 (9th Cir. 2009)……………….…..*Passim*

*A Woman's Friend Pregnancy Res. Clinic v. Becerra*
 901 F.3d 1166 (9th Cir. 2018)……………………………26

*Boyd v. City of San Rafael*
 2023 U.S. Dist. LEXIS 188335
 (N.D. Cal. Oct. 19, 2023)……………………………20, 21

*Bresgal v. Brock*
 843 F.2d 1163 (9th Cir. 1987)………………………….18

*California v. Azar*
 950 F.3d 1067 (9th Cir. 2020)………………….26, 27, 28

*Center for Food Safety v. Vilsack*
 636 F.3d 1166 (9th Cir. 2011)……………………..46, 47

*Close v. Sotheby's, Inc.*
 894 F.3d 1061 (9th Cir. 2018)……………………………27

*County of Sacramento v. Lewis*
 523 U.S. 833 (1998)………………………….13, 50, 51

*Daniels v. Williams*
 474 U.S. 327 (1986)…………………………………….50

*Dobbs v. Jackson Women's Health Org.*
 142 S. Ct. 2228 (2022)…………………………………12

*East Bay Sanctuary Covenant v. Trump*
    932 F.3d 742 (9th Cir. 2018)....................................19

*Easyriders Freedom F.I.G.H.T. v. Hannigan*
    92 F.3d 1486 (9th Cir. 1996)....................................18

*Edge v. City of Everett*
    929 F.3d 657 (9th Cir. 2019)...................................26

*Envtl. Prot. Info. Ctr. v. Carlson*
    968 F.3d 985 (9th Cir. 2020)...................................26

*Flores v. County of Los Angeles*
    758 F.3d 1154 (9th Cir. 2014).................................30

*Garcia v. Google, Inc.*
    786 F.3d 733 (9th Cir. 2015).......................26, 27, 28

*Hecox v. Little*
    79 F.4th 1009 (9th Cir. 2023)................................26

*Hernandez v. City of San Jose*
    897 F.3d 1125 (9th Cir. 2018).........................*Passim*

*Herrera v. Los Angeles Unified Sch. Dist.*
    18 F.4th 1156 (9th Cir. 2021)................................45

*Hill v. Colorado*
    530 U.S. 703 (2000)..............................................50

*Independent Towers of Wash. v. Washington*
    350 F.3d 925 (9th Cir. 2003)...................................18

*Janosko v. City of Oakland,*
    2023 U.S. Dist. LEXIS 6802
    (N.D. Cal. Jan. 6, 2023).......................................13

*Johnson v. City of Seattle*
     474 F.3d 634 (9th Cir. 2007)..................................41

*Kennedy v. Ridgefield City*
     439 F.3d 1055 (9th Cir. 2006).......................40, 42, 43

*Kennedy v. Warren*
     66 F.4th 1199 (9th Cir. 2023)..................................25

*Lands Council v. Martin*
     479 F.3d 636 (9th Cir. 2007).............................23, 24

*L.W. v. Grubbs*
     92 F.3d 894 (9th Cir. 1996)...................................45

*Meehan v. Los Angeles County*
     856 F.2d 102 (9th Cir. 1988)..................................30

*Miller v. Gammie*
     335 F.3d 889 (9th Cir. 2003)..............................11, 27

*Monell v. Department of Social Services*
     436 U.S. 658 (1978)...........................................28

*Murguia v. Langdon*
     73 F.4th 1103 (9th Cir. 2023).........................*Passim*

*National Center for Immigrants Rights, Inc. v. I.N.S.*
     743 F.2d 1365 (9th Cir. 1984)............................19, 20

*National Council of La Raza v. Cegavske*
     800 F.3d 1032 (9th Cir. 2015)................................19

*Norbert v. City & County of San Fransisco*
     10 F.4th 918 (9th Cir. 2021).................................16

*Overstreet v. Gunderson Rail Servs., LLC*
     587 F. App'x 379 (9th Cir. 2014)............................48

*Oyenik v. Corizon Health Inc.*
    696 F. App'x 792 (9th Cir. 2017)…………………………..30

*Pauluk v. Savage*
    836 F.3d 1117 (9th Cir. 2016)………………………..42, 43

*Polanco v. Diaz*
    76 F.4th 918 (9th Cir. 2023)………………………*Passim*

*Sakamoto v. Duty Free Shoppers, Ltd.*
    764 F.2d 1285 (9th Cir. 1985)……………………..…40

*Shell Offshore, Inc. v. Greenpeace, Inc.*
    709 F.3d 1281 (9th Cir. 2013)………………………22, 24

*Sinclair v. City of Seattle*
    61 F.4th 674 (9th Cir. 2023) ………………………*Passim*

*St. Louis v. Praprotnik*
    485 U.S. 112 (1988)…………………………….....28, 29

*Summers v. Earth Island Inst.*
    555 U.S. 488 (2009)……………………………………47

*Swan v. Peterson*
    6 F.3d 1373 (9th Cir. 1993)………………………………11

*Tobe v. City of Santa Ana*
    9 Cal. 4th 1069 (1995)…………………………………51

*Trevino v. Gates*
    99 F.3d 911 (9th Cir. 1996)…………………………29, 30

*Where Do We Go Berkeley v. Cal. DOT*
    32 F.4th 852 (9th Cir. 2022)…………………25, 26, 48

*Winter v. NRDC, Inc.*
     555 U.S. 7 (2008)…………………………………………*Passim*

*Zango, Inc. v. Kaspersky Lab, Inc.*
     568 F.3d 1169 (9th Cir.2009)……………………………11

*Zepeda v. I.N.S.*
     753 F.2d 719 (9th Cir. 1983)………………….........*Passim*

**Other**

Cal. Const., art. XI, § 7……………………………………………51

Cal. Gov't Code § 820……………………………………………12

Fed. R. Civ. P. 23(b)(2)……………………….........................17

## INTRODUCTION

Much of this appeal is undisputed.

Neither the Union[1] nor its amici dispute: (1) those inhabiting homeless encampments are doing so illegally; (2) the City has the legal right and obligation to dismantle encampments; (3) serious negative impacts to public health and safety are caused by homeless encampments to encampment residents and the entire community; and (4) the district court should have exempted all City critical infrastructure from the injunction.

Regarding the latter two, it is telling that no one contests the district court's conclusion that "the preliminary injunction to prevent the City from clearing encampments has a *serious impact on public health and safety*." 1-ER- 31 (emphasis added).

Further, neither the Union nor its amici dispute it is constitutionally permissible to "clear" homeless

---

[1] "Union" means all named plaintiffs.

encampments on a sunny 80-degree day.  But, according to the district court, the Union and its amici, should temperatures the next day exceed 90 degrees constitutionally permissible conduct the day before transforms into unconstitutional conduct under the state created danger theory of Fourteenth Amendment liability because of *potential* and *speculative* adverse heat-related health impacts to those leaving the encampments.[2]

Although other issues exist, the central issue is: Whether a federal court can preclude the City from implementing the difficult and uniquely local policy-based

---

[2] "Damned if you do, and damned if you don't."  Here the City is sued for "clearing" homeless encampments.  Yet the City has been sued six times for not "clearing" them.  *See Aldon Bolanos v. City of Sacramento*, Superior Court of California, Case No. 23cv010017; *People v. City of Sacramento*, Superior Court of California, Case No. 23CV008658; *Prime Auctions, LLC.*, et al., Superior Court of California, Case No. 23CV008662; *Susan Hood, et al. v. City of Sacramento, et al.*, Eastern District of California, Case No. 2:23-cv-00232-KJM-CKD *CMS Lathrop Way, LLC, et al. v. City of Sacramento*, Eastern District of California, Case No. 2:22-cv-01804-TLN-AC; *Railroad 1900, LLC v. City of Sacramento*, Eastern District of California, Case No. 2:21-cv-01673-WBS-DB.

decisions on how to best balance the competing interests of the homeless and the broader community amid a homelessness crisis because of the weather (hot, cold, snowy, rainy or windy) under this Court's state created danger theory of Fourteenth Amendment liability?[3]

This Court – as a three judge panel – is bound by Circuit precedent recognizing the state created danger theory of liability, *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003), despite its shaky constitutional foundation, *see Murguia v. Langdon*, 73 F.4th 1103, 1104 (9th Cir. 2023) (Bumatay, J., joined by Callahan, Ikuta and R. Nelson, JJ., dissenting from denial of rehearing en banc) ("[T]he state-created danger exception finds no support in the text of the Constitution, the historical understanding of the 'due process of law,' or even Supreme Court precedent. And as the

---

[3] Amici ACLU raises issues not in this case regarding the City's obligations under the ADA. ACLU Brief, pp. 23-28. With limited exception not applicable here, this Court does not consider new issues raised by amicus. *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1177 n.8 (9th Cir. 2009); *Swan v. Peterson*, 6 F.3d 1373, 1383 (9th Cir. 1993).

Court recently emphasized, we should be reluctant to recognize rights not mentioned in the Constitution to 'guard against the natural human tendency to confuse what [the Fourteenth] Amendment protects with our own ardent views about the liberty that Americans should enjoy.' *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2247, [ ] (2022).").

This Court, however, is not compelled to *expand* the state created danger theory and should not do so here.[4] *See Murguia*, 73 F.4th at 1112 (Bumatay, C.J., dissenting) ("[W]e should recognize that each expansion is a step farther away from our Constitution's text and the Supreme Court's instructions. And with each extension we intrude further on States' rights to regulate the torts of their own officials."); *see*

---

[4] Not doing so does not preclude a potential remedy. As Judge Bumatay observed, "the Constitution generally leaves the regulation of torts committed by public officials to the States. Indeed, many States—including the one in this case—provide relief to plaintiffs for injuries caused by State officials' tortious conduct. *See, e.g.*, Cal. Gov't Code § 820." *Murguia*, 73 F.4th at 1108 (Bumatay, J., dissenting).

*also County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998)

("[T]he due process guarantee does not entail a body of

constitutional law imposing liability whenever someone

cloaked with state authority causes harm.").

Holding the state created danger theory applicable to

"clearing" encampments during "extreme heat" easily

extends to whatever weather a district court views as

sufficiently inclement to potentially impact the health of the

homeless.  District courts are indeed already applying the

state created danger theory to various types of weather.

*E.g., Janosko v. City of Oakland*, 2023 U.S. Dist. LEXIS

6802 (N.D. Cal. Jan. 6, 2023) (cold and severe rainstorms).

Even more, holding the state created danger theory

applicable here creates a "slippery slope" this Court should

not go down by exposing government officials to myriad

liability for other actions done during inclement weather.

Consider this scenario.  The homeless often use facilities and

amenities in public buildings.  For example, using a public

library for shelter when it is hot, cold, rainy or snowy. But,
as with most public buildings, the library must close.
Requiring the homeless to leave at closing time (just like
everyone else) could expose the government to Fourteenth
Amendment liability if it is hot, cold, rainy or snowy. Here is
another example. Prison officials could face liability for
requiring a released prisoner to vacate the property in
inclement weather. There is no functional "constitutional"
difference between the conduct in those two examples and
the conduct here.

Because the district court found "clearing"
encampments during "extreme heat" exposes the homeless to
serious heat-related health risks by exposing them to
"extreme heat" through the physical exertion required in
vacating the encampments and without providing adequate
alternative shelter, the City will, absent reversal, be
precluded from "clearing" encampments next summer, the
summer after that, and so on – all at the expense of public
health and safety unless: (a) the City provides adequate

alternative housing; (b) the City dismantles and gathers each resident's shelter and belongs; and (c) the City transports every person to alternative housing along with all their property.

That untenable result exceeds the parameters of what the Fourteenth Amendment covers.

## ARGUMENT

### A. The Union Distorts The Scope Of The District Court's Injunction Regarding Critical Infrastructure

Reading the Union's brief, one might think the district court issued a narrowly tailored preliminary injunction allowing the City to access, maintain and protect all its critical infrastructure. *See, e.g.*, Answering Brief, p. 20. Not so.

The injunction allowed limited cleaning at homeless encampments, but removing trash from the ground is unrelated to critical infrastructure access, maintenance and protection that the encampments' existence directly impedes and impacts.

Although the City asked the district court to exclude all critical infrastructure from the injunction, Doc. 45, pp. 19-23, the district court only exempted one very limited area - within 500 feet of a school - because the parties could not reach an agreement, as the district court sought, 1-ER-16, on exempting critical infrastructure. 1-ER-8-9.

The Union's attempt to falsely cast the injunction as exempting all critical infrastructure reveals its concern that the district court did not.

**B.   The Union Maintains A Class Action, The Union Does Not Explain Why Class-Wide Relief Is Appropriate Before Class Certification, And The Organizational Standing Argument Is Irrelevant To The Issue Of Class-Wide Relief Before Class Certification**

Under *Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983), "[i]t is well-established that 'without a properly certified class, a court cannot grant relief on a class-wide basis.'" *Norbert v. City & County of San Fransisco*, 10 F.4th 918, 928 (9th Cir. 2021) (quoting *Zepeda*, 753 F.2d at 728 n.1).

16

"This limitation is consistent with the traditional rule that injunctive relief should be narrowly tailored to remedy the specific harms shown by plaintiffs, 'rather than to "enjoin all possible breaches of the law.'"" *Zepeda*, 753 F.2d at 728 n.1. "The district court must, therefore, tailor the injunction to affect only those persons over which it has power." *Id.* "This is particularly true when, as here, a preliminary injunction is involved." *Id.*

Seeking distance from this well-established rule, the Union says the City mischaracterizes this case as a class action. Answering Brief, p. 55 ("In order to rely on *Zepeda*, the City resorts to characterizing Plaintiffs' suit as a "class action" so that it can conveniently argue that the district court erred in granting city-wide relief.").

The Union's argument is troubling because the complaint states "[t]his is an action for injunctive relief pursuant to ... F.R.Civ.P. [sic] 23(b)(2)." 7-ER-977 ¶ 11. Of course, Federal Rule of Civil Procedure 23 governs class actions, and a Rule 23(b)(2) class is an injunctive relief class.

17

The Union next relies on *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486 (9th Cir. 1996) to justify the "city wide" injunction without a certified class.

*Easyriders* observed *Zepeda* generally requires limiting injunctive relief to the named plaintiffs but found a permanent injunction providing "state-wide" relief appropriate because "'an injunction is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit - even if it is not a class action - *if such breadth is necessary to give prevailing parties the relief to which they are entitled.*'" *Id.* at 1501-02 (quoting *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987)) (emphasis in *Bresgal*).

"The art of advocacy is not one of mystery. Our adversarial system relies on the advocates to inform the discussion and raise the issues to the court." *Independent Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003). Other than citing and quoting *Easyriders* and *Bresgal*, the Union neither explains why the *Zepeda* rule

does not apply here nor why class-wide relief is necessary to ensure plaintiffs obtain relief. The argument is thus forfeited.[5] *Id.* at 930 ("We require contentions to be accompanied by reasons.").

The Union and its amici also argue class certification is unnecessary for a class-wide injunction because the Union has organizational standing to maintain claims for the Union's unnamed members.[6] Organizational standing is irrelevant.

Organizational standing may establish Article III standing. *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 765 (9th Cir. 2018); *National Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015).

The *Zepeda* rule is unaffected by organizational standing. To be sure, *Zepeda* cited to *National Center for*

---

[5] The Union's amici fill many of the Union's briefing holes, but not this one.

[6] The Union has about 2800 members, far less than the number of homeless in Sacramento. 5-ER-822 ¶ 2.

*Immigrants Rights, Inc. v. I.N.S.*, 743 F.2d 1365, 1371 (9th Cir. 1984) for the proposition that "the injunction must be limited to apply only to the individual plaintiffs unless the district judge certifies a class of plaintiffs." *Zepeda*, 753 F.2d at 727. The plaintiff's standing in *National Center* was certainly organizational, yet this Court held "the preliminary injunction may properly cover only the named plaintiffs." *National Center*, 743 F.2d at 1371.

Amici argues *Boyd v. City of San Rafael*, 2023 U.S. Dist. LEXIS 188335 (N.D. Cal. Oct. 19, 2023) is "instructive." National Coalition Brief, p. 25. Perhaps it is, but not for the reason amici believe.

The district court in *Boyd* was concerned about an overbroad injunction and accordingly limited the injunction to the named plaintiffs and members of the San Rafeal Homeless Union residing in a specific encampment. 2023 U.S. Dist. LEXIS 188335, at *89-92.

In contrast, the injunction here applied to every homeless person living in any of the nearly 400 homeless

encampments in Sacramento, 5-ER-822 ¶ 2, whether a named plaintiff or even a Sacramento Homeless Union member. The Union's membership of 2800 is far less than the number of homeless in Sacramento. *Id.*

## C. Success On The Merits Is Unlikely

The City addresses a preliminary issue then the four preliminary injunction factors established in *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).

### 1. The validity of the lesser "serious questions test" for establishing likely success on the merits advocated by the Union is unclear and likely did not survive *Winter*

*Winter* unambiguously articulated what a plaintiff must show for a preliminary injunction: "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." 555 U.S. at 20.

The Union seemingly concedes it can only show a "likelihood of success" under the "lesser" "serious questions

test." Answering Brief, pp. 26-28; *see Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ("This circuit has adopted and applied a version of the sliding scale approach under which a preliminary injunction could issue where the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor. That test was described in this circuit as one alternative on a continuum. The test at issue here has often been referred to as the 'serious questions' test.") (simplified); *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) ("'serious questions going to the merits'" is "a lesser showing than likelihood of success on the merits").

Prior to *Winter*, this Court's preliminary injunction standard was this: "A preliminary injunction is appropriate when a plaintiff demonstrates 'either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that *serious questions going to the merits were raised and the balance of hardships tips sharply in [the*

*plaintiff's] favor.'" Lands Council v. Martin*, 479 F.3d 636, 639 (9th Cir. 2007) (citations omitted) (emphasis added). "These two options represent extremes on a single continuum: 'the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor.'" *Id.* (citation omitted).

Winter expressly repudiated this Court's "possibility of irreparable injury" part of the preliminary injunction standard, 555 U.S. at 21-22, but whether *Winter* repudiated the "serious questions test" is unclear under this Court's precedents. The City believes it did, as seemingly recognized by en banc opinions issued after *Winter*.

This Court first addressed *Winter*'s alteration of this Court's preliminary injunction standard in *American Trucking Associations v. City of Los Angeles*:

> In *Winter*, the Court reversed one of our
> decisions, which, it determined, upheld a grant of
> a preliminary injunction by use of a standard
> that was much too lenient. [Citation]. As the

Court explained, an injunction cannot issue merely because it is possible that there will be an irreparable injury to the plaintiff; it must be likely that there will be.  [Citation]. It drove that point home when it said: 'Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'  [Citation].  The Court succinctly stated the rule to be as follows: [¶] *A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits*, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. [¶] [Citation]. [¶] *To the extent that our cases have suggested a lesser standard, [fn] [See, e.g., Lands Council, 479 F.3d at 639] they are no longer controlling, or even viable*.

559 F.3d 1046, 1052 (9th Cir. 2009) (emphasis added).

"'[S]erious questions going to the merits'" is "a lesser showing than likelihood of success on the merits." *Shell Offshore,* 709 F.3d at 1291.

A "lesser standard" than the *Winter* standard is "no longer controlling, or even viable" after *Winter*.  *American Trucking*, 599 F.3d at 1052.

After *American Trucking*, this Court next addressed the *Winter* standard in *Alliance for the Wild Rockies*, 632 F.3d 1127.

Rather than following *American Trucking*, *Alliance for the Wild Rockies* distinguished *American Trucking* because it "did not discuss whether some version of the sliding scale test survived." 632 F.3d at 1132. *Alliance for the Wild Rockies* ultimately held "the 'serious questions' approach survives *Winter* when applied as part of the four-element *Winter* test." *Id.* at 1135.

Relying on *Alliance for the Wild Rockies*, this Court has articulated the preliminary injunction standard with the lesser "serious questions test" for showing likely success on the merits. *See, e.g., Kennedy v. Warren*, 66 F.4th 1199, 1206 (9th Cir. 2023) ("A plaintiff alternatively can meet his burden under the first element by raising 'serious questions going to the merits' if 'the balance of hardships tips sharply in [his] favor.'"); *Where Do We Go Berkeley v. Cal. DOT*, 32

F.4th 852, 859 (9th Cir. 2022); *A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018).

But this Court does not always articulate the "serious questions test." *See, e.g., Hecox v. Little*, 79 F.4th 1009, 1021 (9th Cir. 2023) ("'A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" (quoting *Winter*, 555 U.S. at 20); *Envtl. Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020); *Edge v. City of Everett*, 929 F.3d 657, 663 (9th Cir. 2019).

Indeed, this Court sitting en banc twice articulated *Winter's* injunctive relief standard while affirming "likelihood of success" is "the most important factor" without mentioning the alternative lesser "serious questions test." *California v. Azar*, 950 F.3d 1067, 1082-83 (9th Cir. 2020) (en banc); *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). If "likelihood of success" is the most

important factor it seems unlikely it could be satisfied with the lesser "serious questions test."

Even assuming *Alliance for the Wild Rockies* did not have to follow *American Trucking*, the en banc decisions issued in *Azar* and *Garcia* after *Alliance for the Wild Rockies* bind this Court. *Miller*, 335 F.3d at 900.

*Alliance for the Wild Rockies*' conclusion that the "serious questions test" survived *Winter* has been effectively overruled by *Azar* and *Garcia* because *Alliance for the Wild Rockies* is "clearly irreconcilable" with *Winter's* preliminary injunction standard adopted in *Azar* and *Garcia*. *See Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1073 (9th Cir. 2018) ("A prior decision is effectively overruled if intervening higher authority has so undercut the theory or reasoning underlying the prior circuit precedent as to make the precedent clearly irreconcilable with the intervening authority.") (simplified).

To be sure, it is improper to even consider the equity and public interest factors which are central to the "serious

questions test" unless a plaintiff *first shows a likelihood of success on the merits.* *Azar*, 950 F.3d at 1083 ("If a movant fails to establish likelihood of success on the merits, we need not consider the other [*Winter*] factors."); *Garcia*, 786 F.3d at 740 ("Because it is a threshold inquiry, when 'a plaintiff has failed to show the likelihood of success on the merits, we "need not consider the remaining three [*Winter* elements].""").

## 2. There exists no evidence supporting a City custom of "clearing" homeless encampments during periods of "extreme heat" necessary for *Monell* liability[7]

Neither the Union nor its amici contest the absence of a City policy directing the "clearing" of encampments during "extreme heat."

Both, however, erroneously argue sufficient evidence exists to show a "custom" or "widespread practice" to clear encampments during "extreme heat." *See St. Louis v.*

---

[7] *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

28

*Praprotnik*, 485 U.S. 112, 127 (1988) (defining "custom" as a "widespread practice that ... is so permanent and well-settled as to constitute a custom or usage with the force of law").

As this Court explained nearly 30 years ago in *Trevino v. Gates*:

> Absent a formal governmental policy, [a plaintiff] must show a longstanding practice or custom which constitutes the standard operating procedure of the local government entity. The custom must be so persistent and widespread that it constitutes a permanent and well settled city policy. Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy.

99 F.3d 911, 918 (9th Cir. 1996) (simplified).

Attempting to show a "widespread practice" of "clearing" encampments during "extreme heat," the Union points to the evidence at 2-ER-330-347. Answering Brief, pp. 31-32.

That evidence establishes the "clearing" of two homeless encampments in June and July 2023, but nothing establishes "extreme heat" during those months and,

regardless, two incidents over a two-month period is insufficient to establish a custom. *Trevino*, 99 F.3d at 918 ("two incidents insufficient for custom") (citing *Meehan v. Los Angeles County*, 856 F.2d 102 (9th Cir. 1988)); *see also Flores v. County of Los Angeles*, 758 F.3d 1154, 1157, 1159 (9th Cir. 2014) (three incidents insufficient); *Oyenik v. Corizon Health Inc.*, 696 F. App'x 792, 794 (9th Cir. 2017) ("[O]ne or two incidents are insufficient to establish a custom or policy[.]").

Attempting to show a policy of clearing homeless encampments during "extreme heat," the Union's amici cite the district court's July 29, 2022 preliminary injunction order and the evidence the district court cited. ACLU Brief, p. 7; *see* 1-ER-38-60. Specifically, the Crystal Sanchez declaration dated June 23, 2022 and her statement that she "personally observed hundreds of . . . sweeps, including those carried out in hot weather." ACLU Brief, p. 7 (citing ECF 2-1); *see also* 5-ER-782-786. "Hundreds of sweeps" is clearly hyperbole. And Sanchez does not define "hot weather,"

never says how many "sweeps" she personally observed during "hot weather" over what period and does not clearly state what entity did the "sweeps" during "hot weather." ECF 2-1; 5-ER-782-786. Indeed, Sanchez refers to several different entities performing sweeps. *Id.* Further, Sanchez refers to incidents occurring sometime *before June 23, 2022,* so at least 14 months before the district court's *August 16, 2023* preliminary injunction. *Id.*

Amici also refer to the Rios Declaration dated July 23, 2022 which suffers from the same infirmities as the Sanchez declaration. *See* 5-ER-790-793. It is unclear, non-specific, outdated, and does not establish the City doing any sweeps during "extreme heat." *Id.*

**3.  "Clearing" homeless encampments during "extreme heat" is not the type of affirmative conduct exposing any plaintiff to a "particularized" danger necessary for the state created danger theory of Fourteenth Amendment liability**

The Union and its amici take issue with the City's position that "clearing" encampments in "extreme heat" exposes the homeless to no greater risks than those existing

31

in the encampments during "extreme heat," but they totally ignore the evidence establishing heat-related health problems suffered by those residing in the encampments during "extreme heat." Opening Brief, pp. 67-68 (citing evidence). For that matter, the research cited by amici in their briefs discusses the health impacts heat has *on everyone*. *See* National Coalition Brief, pp. 16-21; ACLU Brief, pp. 23-25.

The Union and amici also try to analogize this case to *Polanco v. Diaz*, 76 F.4th 918 (9th Cir. 2023) and *Hernandez v. City of San Jose*, 897 F.3d 1125 (9th Cir. 2018) to argue the City's "clearing" of encampments during "extreme heat" is affirmative conduct exposing the homeless to greater heat-related health risks than those existing in the encampments during "extreme heat" (risks neither the Union nor its amici dispute).

But neither the Union nor its amici examine the facts in either *Polanco* or *Hernandez*. The heat-related health risks existing within the encampments during "extreme

heat" and the limited City conduct materially distinguishes this case from *Polanco* and *Hernandez.*

In *Polanco*, the defendant prison officials transferred 122 inmates from a prison experiencing a COVID-19 crisis to San Quentin, a prison with no reported COVID-19 cases. 76 F.3d at 923. The defendants did not test the 122 inmates before transferring them and took no measures to quarantine them from inmates and staff at San Quentin. *Id.* at 923-24. Two days after the transfer, 25 of the transferred inmates tested positive for COVID-19 and it rapidly took over. *Id.* at 925. San Quentin went from no confirmed COVID-19 cases to over 500 in three weeks. *Id.*

A court appointed medical monitor investigated the outbreak and found San Quentin officials failed to provide personal protective equipment to staff and inmates despite being readily available and further failed to ensure masks were properly worn when provided. *Id.* The monitor also found San Quentin employed an inadequate testing protocol plagued with "'completely unacceptable' delays." *Id.*

Despite receiving the monitor's findings and
recommendations, and warnings of a "'full-blown local
epidemic and health care crisis in the prison and
surrounding communities,'" San Quentin officials did not
adopt the recommendations and refused offers by outside
research labs to provide testing despite one of the labs
offering to test for free. *Id.*

Unsurprisingly, COVID-19 rapidly swept through San
Quentin. *Id.* Two months after the inmate transfer, 1,300
inmates and 184 staff contracted COVID-19. *Id.* Two
months later, more than 2,100 inmates and 270 staff
contracted COVID-19 with twenty-six inmates and one
guard dying from COVID-19. *Id.*

The deceased guard was responsible for driving
COVID-19 positive inmates to the hospital, but defendants
refused to provide him or the inmates with personal
protective equipment. *Id.*

Analyzing the Fourteenth Amendment state created
danger claim brought by the guard's family, this Court found

34

affirmative conduct by defendants put the guard in a worse
position because "San Quentin had managed to keep COVID-
19 out, but Defendants brought it in." *Id.* at 927. Moving
"inmates … to San Quentin was plainly affirmative conduct,
as was the decision to house the transferred inmates in
open-air cells and have them share facilities with the general
San Quentin population." *Id.* "And the transfer placed [the
guard] in a much more dangerous position than he was in
before. Prior to the transfer, there were no known cases of
COVID-19 at San Quentin; after the transfer, there were
many." *Id.* at 926.

In *Hernandez*, 19 plaintiffs had attended a 2016 rally
supporting then-Presidential candidate Trump where they
were attacked by anti-Trump protestors. 897 F.3d at 1128-
30. The complaint alleged the "Officers directed [plaintiffs]
into the mob of violent protesters waiting outside the
Convention Center" despite being aware of violence by anti-
Trump protestors against the Trump supporters. *Id.* at 1129
(simplified).

Moreover, "[a]s part of their crowd-control plan, the Officers only allowed the [plaintiffs] to leave from the east-northeast exit of the Convention Center and actively prevented them from leaving through alternative exits." *Id.* (simplified). "Upon exiting the Convention Center, the [plaintiffs] were met with a police skirmish line, composed of and/or controlled by the Officers." *Id.* (simplified). "The Officers in this line required the [plaintiffs] to turn north as they left the Convention Center, and to proceed along Market Street, into the crowd of violent anti-Trump protesters." *Id.* (simplified). "The Officers actively prevented the [plaintiffs] from proceeding south, away from the anti-Trump protesters, or from leaving the Convention through alternative exits." *Id.* (simplified).

"The Officers instructed other police officers to direct the [plaintiffs] in the same manner. Many of the [plaintiffs'] were beaten, victimized by theft, and/or had objects such as bottles and eggs thrown at them as a result." *Id.* (simplified).

36

Two plaintiffs alleged officers "directed them to walk through the anti-Trump protesters, rather than allowing them to turn south, in the direction of safety. Soon after following these directions, they were struck repeatedly in their faces and heads by anti-Trump protester[s]." *Id.* at 1130 (simplified).

Another plaintiff "exited the east-northeast exit of the Convention Center, where a line of police officers prevented him from turning right, to safety and instead directed him to turn left, into the anti-Trump protesters" where he "was struck in the back of his head by one protester and tackled to the ground by another." *Id.* (simplified).

This Court had no trouble finding plaintiffs sufficiently alleged affirmative conduct exposing them to risks greater than those existing at the rally because the officers: "(1) actively prevented the [plaintiffs] from leaving safely through alternative exits, (2) directed [plaintiffs] to leave from a single exit, and (3) required [plaintiffs] to turn north

into the crowd of violent anti-Trump protesters." *Id.* at 1133 (simplified).

It is plainly evident from comparing the City's conduct and the defendants' conduct in *Polanco* and *Hernandez,* and the existing and subsequent risks, that this case is nothing like those cases regarding affirmative conduct.[8]

---

[8] The facts in *Sinclair v. City of Seattle* are also readily distinguishable on the affirmative conduct aspect of the state created danger theory. 61 F.4th 674, 681 (9th Cir. 2023) ("Sinclair's allegations support the strong inference that the City acted with deliberate indifference toward the dangers of permitting and encouraging establishment of the CHOP zone. It is self-evident that the SPD's wholesale abandonment of its East Precinct, combined with Mayor Durkan's promotion of CHOP's supposedly festival-like atmosphere, would create a toxic brew of criminality that would endanger City residents. In particular, Sinclair's allegations that 'City Council Member Kshama Sawant publicly and recklessly framed CHOP as a "peaceful" occupation even after it became violent,' and that Police Chief Carmen Best wondered aloud after a second homicide in CHOP 'why we could continue to allow this to happen,' all support the inference that City officials knowingly exposed the public to a danger against which the officials did almost nothing to protect against. Freedom to assemble and to speak are constitutionally protected; violence is not.").

The Union and its amici rely also rely on *Polanco* and *Hernandez* to refute the City's position that "clearing" encampments did not expose the plaintiffs to any "particularized" danger.  Both, however, support the City's position.

In *Polanco*, this Court cited to *Sinclair,* 61 F.4th at 676, 683 – the case on which the City heavily relies – for the proposition that "[a]ffirmative state action that exposes a broad swath of the public to 'generalized dangers' cannot support a state-created-danger claim."  *Polanco*, 76 F.4th at 927.  However, a danger is "particularized" if directed at a "'discrete and identifiable group.'"  *Id.* (quoting *Sinclair*, 61 F.4th at 683).

Unlike *Sinclair* where the danger was not "directed at a specific victim" but a "broad swath of the public" (i.e., those voluntarily entering an area of the city), *Sinclair*, 61 F.4th at 682-83, *Polanco* found the prison guards working at San Quentin a "discrete and identifiable group."  76 F.4th at 927.

While *Polanco* did not explain why the prison guards were a "discrete and identifiable group" one can surmise the court reached this conclusion because the defendants' conduct was specifically directed at the plaintiffs who were not unidentified members of the public, but a specific and limited number of *known* prison guards located in a singular place of employment (San Quentin prison).

*Hernandez* did not analyze the issue of whether the danger to the 19 plaintiffs was "particularized."  The Court simply stated it was, citing *Kennedy,* 439 F.3d at 1063 (a case involving a single plaintiff).  *Hernandez*, 897 F.3d at 1133; *Kennedy*, 439 F.3d at 1057; *see Sakamoto v. Duty Free Shoppers, Ltd.*, 764 F.2d 1285, 1288 (9th Cir. 1985) ("unstated assumptions on non-litigated issues" are not binding).  Surmising once again, *Hernandez* involved only 19 plaintiffs who were all located in one place and the defendants' conduct was specifically directed at them.

When the City "clears" an encampment, the conduct authorized under the City's laws is not directed at any

particular homeless person living in the encampment but rather the encampment itself. *See Sinclair*, 61 F.4th at 682 ("A danger is 'particularized' if it is directed at a specific victim.") And it is no secret that encampments are subject to "clearing" and what that means for those living in encampments. Those residing in a homeless encampment have thus knowingly exposed themselves to being "cleared." *See Johnson v. City of Seattle*, 474 F.3d 634, 640 (9th Cir. 2007) ("The Pioneer Square Plaintiffs voluntarily placed themselves in the midst of the crowd that subsequently became unruly.").

Moreover, the homeless population in Sacramento exceeds 5000. And there are nearly 400 encampments in Sacramento. 5-ER-822 ¶ 2. It is unknown how many homeless reside in encampments disbursed throughout Sacramento, but it is probably safe to presume the number exceeds several thousand and is ever-changing as people come and go and encampment locations change.

The unidentifiable people living in encampments are more like the "swath of the public" in *Sinclair* than the "discrete and identifiable group[s]" in *Polanco* and *Hernandez*.

Amici also take issue with the City's discussion of this Court most often applying the state created danger liability theory to third party caused harm. *See* Opening Brief, pp. 77-80; ACLU Brief, pp. 21-22. Amici claim the City's "attempt to distinguish *Munger* and *Penilla* as outliers conveniently omits [ ] other cases." ACLU Brief, p. 22. The "other cases" from this Court identified by amici are *Kennedy v. Ridgefield City*, 439 F.3d 1055 (9th Cir. 2006), *Pauluk v. Savage*, 836 F.3d 1117 (9th Cir. 2016), and *Polanco,* 76 F.4th 918. *Id.* at p. 22. *Kennedy* involved third party conduct, 439 F.3d at 1057, but the City concedes *Polanco* and *Pauluk* involved COVID-19 and toxic mold. *Polcano*, 76 F.4th at 923-24; *Pauluk*, 836 F.3d at 1119. However, deadly diseases and toxins are much different than the heat. Pathogens are controllable, the weather is not.

**4. Absence of evidence of deliberate indifference**

"In the context of a state-created-danger claim, deliberate indifference is a subjective standard" requiring evidence that a government official "'recognized an unreasonable risk and actually intended to expose the plaintiff to such risk,'" *Polanco*, 76 F.4th at 928, "without regard to the consequences to the plaintiff," *Murguia v. Langdon*, 61 F.4th 1096, 1111 (9th Cir. 2023).

"Deliberate indifference is 'a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'"[9] *Id.* "Ultimately, a state actor needs to know that something is going to happen but ignore the risk and expose the plaintiff to it." *Sinclair*, 61 F.4th at 681.

The City's opening brief demonstrates how the district court improperly relied on evidence from 2022 to find

---

[9] Amici say this standard is "higher than mere negligence." ACLU Brief, p. 17. True, but not true enough. The standard is "higher than *gross* negligence." *Murguia*, 61 F.4th at 1111 (emphasis added).

deliberate indifference in 2023, a proposition neither the Union nor its amici dispute. Opening Brief, pp. 72-75. This concession alone should end the inquiry.

Nonetheless, the Union wrongly argues sufficient evidence of deliberate indifference because the City's policy for "clearing" encampments requires consideration of temperatures exceeding 90 degrees and "authoritative medical evidence" existed outlining the risks. Answering Brief, p. 38-39.

No evidence exists that any City employee knew about the "authoritative medical evidence." Indeed, the "authoritative medial evidence" to which the Union refers are expert declarations *from this case* – three from the same expert. Answering Brief, p. 39 (citing 3-ER-526-568; 4-ER-749-780, 850-903; 5-ER-919-972).

Notably, none of the exhibits attached to these declarations are themselves "authoritative medical evidence" and none detail any distinct risks associated with "clearing" encampments during "extreme heat."

Second, the policy to consider temperatures exceeding 90 degrees does not establish a known "*unreasonable risk*" of harm if encampments are "cleared" in those temperatures. *Herrera v. Los Angeles Unified Sch. Dist.*, 18 F.4th 1156, 1158 (9th Cir. 2021) (emphasis added).

No evidence shows any City employee *knew* clearing homeless encampments in temperatures exceeding 90 degrees would create and *unreasonable risk* of death or other serious injury and intentionally proceeded anyway. *See L.W. v. Grubbs*, 92 F.3d 894, 899 (9th Cir. 1996) ("There is a significant difference between acting unreasonably with regard to a known risk and thereby exposing someone to that risk, and intentionally exposing someone to a known risk.").

Even generalized knowledge of heat-related health risks is insufficient to establish deliberate indifference. *See id.* at 900 (defendant must "know[] that something *is* going to happen but ignores the risk and exposes someone to it") (original emphasis); *Sinclair*, 61 F.4th at 681.

45

The Union's amici asserts "the City knew that evicting unsheltered individuals from shaded encampments during extreme heat 'posed a serious risk of physical harm' but proceeded anyway" and the "the lower court correctly found that the City acted with deliberate indifference to this known and obvious danger based on the evidence before it showing, among other things, that the City continued to conduct sweeps even while under a state court order to cease them due to health risks they posed." ACLU Brief, p. 17.

The argument is specious. Assuming the district court based its decision on some violation of a prior state court order (it did not), the order precluded the City from clearing homeless encampments during the COVID-19 pandemic because of the health risks from COVID-19. *See* 5-ER-843 ¶ 6. It had nothing to do with "extreme heat."

## D. Insufficient Evidence Of Irreparable Harm

A preliminary injunction is proper only if evidence of an "actual and imminent" risk of "concrete and particularized" harm to the plaintiffs exists. *Center for Food*

*Safety v. Vilsack*, 636 F.3d 1166, 1171 (9th Cir. 2011) ("To

obtain injunctive relief, Plaintiffs must show themselves to

be 'under threat of suffering "injury in fact" that is concrete

and particularized; the threat must be actual and imminent,

not conjectural or hypothetical; it must be fairly traceable to

the challenged action of the defendant; and it must be likely

that a favorable judicial decision will prevent or redress the

injury.'") (quoting *Summers v. Earth Island Inst.*, 555 U.S.

488, 493 (2009)).

Neither the Union nor its amici dispute the absence of

evidence establishing any named plaintiff (or even any

Sacramento Homeless Union member) was exposed in

August 2023 to an actual, imminent, concrete and

particularized risk of serious and adverse heat-related

health risks. *See* Opening Brief, p. 84. There is accordingly

no evidence supporting the district court's finding of

irreparable harm.

### E.   Balancing Of The Equities And Public Interest Favors The City

Neither the Union nor its amici dispute the "public consequences" of the injunction, *Winter*, 555 U.S. at 25, caused by what the district court described as the injunction's "serious impact on public health and safety," 1-ER- 31.

That the district court found the risks to the homeless outweighed the public consequences and serious impacts on public health and safety does not mean this Court is precluded from reaching the opposite conclusion, particularly given the district court recognized the injunction seriously compromised public health and safety. *See Where Do We Go Berkeley*, 32 F.4th at 859 ("We hold that the district court erred ... in balancing the equities."); *Overstreet v. Gunderson Rail Servs., LLC*, 587 F. App'x 379, 381 (9th Cir. 2014) ("Because the district court erred in concluding that the balance of equities tipped in favor of the Director, the court abused its discretion in issuing a preliminary injunction ....").

48

**F.    A Proper Exercise Of Discretion Compelled The District Court To Exempt All Critical Infrastructure From The Injunction**

"Critical infrastructure" is, by definition, infrastructure critical to a properly functioning city.

Neither the Union nor its amici dispute the City's assertion of district court abuse of discretion when failing to exempt from the injunction all City critical infrastructure simply because the parties could not agree on the issue. Opening Brief, pp. 91-96.

Whether the parties could agree or not does not relieve the district court of its obligation to properly balance the equities and *public interest* in crafting the injunction.

The evidence clearly demonstrates a proper exercise of discretion compelled exempting all City critical infrastructure to ensure the protection of public health and safety, *see* Opening Brief, pp. 84-90, 91-96, given the district court recognized the injunction's "serious impact on public health and safety."  1-ER- 31.

**CONCLUSION**

The Fourteenth Amendment is "intended to secure the individual from the arbitrary exercise of the powers of government." *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (simplified); *see Lewis*, 523 U.S. at 845 ("We have emphasized time and again that 'the touchstone of due process is protection of the individual against arbitrary action of government ….'"). Stated another way, "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Lewis*, 523 U.S. at 846.

No one disputes "clearing" homeless encampments protects public health and safety and "the preliminary injunction" thus "has a *serious impact* on public health and safety." 1-ER- 31 (emphasis added).

Eliminating public health and safety risks is a core government function. *Hill v. Colorado*, 530 U.S. 703, 715 (2000) ("[it] is a traditional exercise of the States' 'police powers to protect the health and safety of their citizens'").

Indeed, the right is enshrined in California's Constitution. *Tobe v. City of Santa Ana*, 9 Cal. 4th 1069, 1109 (1995); Cal. Const., art. XI, § 7.

The City's ability to exercise its sovereign right and obligation to protect public health and safety cannot be stopped by a federal court for several months year after year based on the unchanging reality of "extreme heat."

This Court should not expand the state created danger theory of Fourteenth Amendment liability to "clearing" encampments in "extreme heat" and should reverse the district court for this reason and the other valid reasons articulated by the City.

Absent complete reversal, this Court should, at the very least, reverse the district court's decision not to exempt all City critical infrastructure from the injunction.

Respectfully Submitted,

Dated: November 13, 2003        Dean Gazzo Roistacher LLP


By: */s/ Lee H. Roistacher*
   Lee H. Roistacher
   Attorneys for
   Defendant/Appellant
   City of Sacramento

## CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. 32(A)(7)(C) AND CIRCUIT RULE 32-1 FOR CASE NO. 23-16123

Pursuant to Federal Rule of Appellate Procedure 32 (a)(7)(C) and Ninth Circuit Rule 32-1, I certify that Appellants' Reply Brief is proportionately spaced, has a typeface of 14 points or more and contains 6,985 words.

Dated: November 13, 2003        Dean Gazzo Roistacher LLP

By:  */s/ Lee H. Roistacher*
     Lee H. Roistacher
     Attorneys for
     Defendant/Appellant
     City of Sacramento

## CERTIFICATE OF SERVICE

Re:  *Sacramento Homeless Union, et al. v. County of*
     *Sacramento, et al.*
     United States Court of Appeals for the Ninth Circuit
     Case No. 23-16123
     USDC Case No. 2:22-cv-01095-TLN-KJN

I, Maria E. Kilcrease, declare:

That I am and was at the time of service of the papers

herein referred to, over the age of 18 years, and not a party

to the action; and I am employed in the County of San Diego,

California. My business address is 440 Stevens Avenue,

Suite 100, Solana Beach, California 92075 and my electronic

address is mkilcrease@deangazzo.com.

On November 13, 2023, I served the following

documents described as: **APPELLANTS' REPLY BRIEF**

on all interested parties in this action addressed as follows:

> Gökalp Gürer
> Sacramento City Attorney's Office
> 915 I Street, Room 4010
> Sacramento, CA 95814-2608
> Email: ggurer@cityofsacramento.org
> Attorneys for Appellant City of Sacramento

Andrea M. Henson
Law Offices of Andrea M. Henson
5716 Folsom Boulevard
Suite 223
Sacramento, CA 95819
Email: andrea@ahensonlaw.com

Mark E. Merin
LAW OFFICE OF MARK E. MERIN
1010 F Street
Suite 300
Sacramento, CA 95814
Email: mark@markmerin.com

Anthony David Prince
Law Offices of Anthony D. Prince
2425 Prince St.
Berkeley, CA 94705
Attorneys for Appellees, Sacramento Homeless Union,
Betty Rios, Donta Williams and Falisha Scott
Email: princelawoffices@yahoo.com

Ellen Marie Van Riper
Ellen M. Van Riper, Attorney at Law
1109 East Braeburn Drive
Phoenix, AZ 85022
Attorneys for Amici Curia, The City of Phoenix, The
International Municipal Lawyers Association, The
League of California Cities, The League of Arizona
Cities and Towns, and The California State Association
of Counties
Email: ellen@evrlaw.com

Grayce Zelphin
ACLU Foundation of Northern California
39 Drumm Street
San Francisco, CA 94111
Email: gzelphin@aclunc.org

X        BY ELECTRONIC SERVICE: On the date stated above, I served the documents described above on designated recipients via CM/ECF.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on November 13, 2023, at Solana Beach, California.

*Maria E. Kilcrease*
_____
Maria E. Kilcrease, declarant