

**ACLU**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Southern California

March 6, 2024

Molly Dwyer, Clerk of Court
Office of the Clerk, U.S. Court of Appeals for the Ninth Circuit
P.O. Box 193939
San Francisco, CA 94119-3939

**Re:    Letter Pursuant to Rule 28(j) concerning *Sacramento Homeless Union, et al. v. City of Sacramento, et al.* No. 23-16123 (9th Cir.) – to be heard March 14, 2023, Before: Circuit Court Judges McKeown and Christen, and District Court Judge Ezra (Hawaii)**

Dear Ms. Dwyer:

Amicus, the ACLU of Southern California, writes to advise the Court of new pertinent and significant Ninth Circuit authority, as well as related docket items in the District Court record in *Sacramento Homeless Union, et al. v. City of Sacramento* (2:22-cv-01095-TLN-KJN), which are relevant to the upcoming oral argument before this Court (No. 23-16123).

On January 11, 2024, this Court decided *Coalition on Homelessness v. City & County of San Francisco*, 90 F.4th 975, 980 (9th Cir. 2024).  There, the Court declined to review arguments raised by Appellants for the first time on appeal,[1] noting that arguments "deserve[] the benefit of full factual development at the trial court level, which [this] court lacks as a direct result of the City's decision not to raise this argument below." *Id.*

This authority relates to Defendant/Appellant's failure to raise various arguments before the District Court prior to asking for this Court's review. *See e.g.* ACLU Br., Dkt. 25 at 4-5.  To make this Court aware of which arguments were raised below, we attach District Court Docket #38 (August 2, 2023, Defendant's Opposition to Plaintiffs Motion for Temporary Restraining Order, at Exhibit A) and Docket #45 (August 8, 2023, Defendant's Amended Opposition, at Exhibit B).

We bring this authority to the Court's attention as it relates to judicial efficiency, waiver, and this Court's discretion to grant review.

Sincerely,

Catherine Ellen Rogers
ACLU of Southern California

---

[1] This decision is also relevant to *amici*'s argument about the proper standard of review. *See* Dkt. 25 at 3.

**EXECUTIVE DIRECTOR** Hector O. Villagra

**CHAIR** Stacy Horth-Neubert  **VICE CHAIR** Rob Hennig
**CHAIRS EMERITI** Michele Goodwin  Marla Stone  Shari Leinwand  Stephen Rohde  Danny Goldberg  Allan K. Jonas*  Burt Lancaster*  Irving Lichtenstein, MD*  Jarl Mohn  Laurie Ostrow*  Stanley K. Sheinbaum*
*deceased

1313 WEST EIGHTH STREET • SUITE 200 • LOS ANGELES, CA 90017 • T 213.977.9500 • F 213.915.0220 • ACLUSOCAL.ORG

U.S. Court of Appeals for the Ninth Circuit
Page 2

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF SOUTHERN CALIFORNIA**

---

## <u>CERTIFICATE OF SERVICE</u>

      I certify that pursuant that on March 6, 2024, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

March 6, 2024

*s/ Catherine Rogers*
Catherine Ellen Rogers

EXHIBIT A

SUSANA ALCALA WOOD, City Attorney (SBN 156366)
**GRACE L. PAK, Senior Deputy City Attorney (SBN 263733)**
glpak@cityofsacramento.org
CITY OF SACRAMENTO
915 I Street, Room 4010
Sacramento, CA  95814-2608
Telephone:  (916) 808-5346
Facsimile:   (916) 808-7455

Attorneys for the CITY OF SACRAMENTO

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SACRAMENTO HOMELESS UNION, a local of the CALIFORNIA HOMELESS UNION/STATEWIDE ORGANIZING COUNCIL, on behalf of itself and those it represents; BETTY RIOS; DONTA WILLIAMS; FALISHA SCOTT and all those similarly situated,<br><br>             Plaintiffs,<br><br>  vs.<br><br>COUNTY OF SACRAMENTO, a political subdivision of the State of California; CITY OF SACRAMENTO, a municipal corporation; and DOES 1 – 100,<br><br>          Defendants. | Case No.:  2:22-cv-01095-TLN-KJN<br><br>**CITY OF SACRAMENTO'S OPPOSITION TO PLAINTIFFS EX-PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND RE-INSTATEMENT OF PRIOR PRELIMINARY INJUNCTION OR FOR NEW PRELIMINARY INJUNCTION**<br><br>Complaint Filed: June 24, 2022 |

I.    **INTRODUCTION**

    Defendant CITY OF SACRAMENTO ("City") respectfully submits the following

Opposition to Plaintiffs' Ex Parte Motion for Temporary Restraining Order ("TRO") and

Re-Instatement of Prior Preliminary Injunction filed on August 1, 2023 at 4:00 p.m.

Plaintiffs seek the immediate issuance of a TRO until August 10, 2023, the date set by

plaintiffs for hearing on the preliminary injunction, enjoining the City from clearing

CITY OF SACRAMENTO'S OPPOSITION TO PLAINTIFFS' EX PARTE PARTE MOTION FOR TRO
1310277

encampments belonging to the unhoused or people experiencing homelessness ("PEH") citing to triple-digit temperatures and the risk for great bodily harm or death to the unhoused. (ECF No. 36, ¶ 45.)  The City files this Opposition to plaintiffs' request for a TRO within 24 hours after plaintiffs' August 1st filing to address the misstatements proffered by plaintiffs' in support of their Motion.  Further, plaintiffs' request for a TRO is not timely pursuant to Local Rule 231(b) as plaintiffs "could have sought relief by motion for a preliminary injunction at an earlier date without the necessity for seeking last-minute relief by motion for temporary restraining order" because they were aware that summer would once again result in heat and delayed in filing a motion at an earlier date.  To date, Sacramento has already had multiple 100+ degree days of heat.  Plaintiffs fail to show *immediate* and irreparable injury now as required by Federal Rule of Civil Procedure 65.  Thus, the Court should deny plaintiffs' motion for TRO and set a full briefing schedule and hearing to enable the City to address the arguments raised by plaintiffs.  To that end, the City intends to file a more comprehensive opposition to the preliminary injunction once the briefing schedule has been set forth by the Court.

## II.   BACKGROUND

### A.   FACTUAL BACKGROUND

Since the Summer of 2022, the City has taken significant steps to address the homelessness crisis plaguing its community.  On August 23, 2022, the City Council adopted Chapter 12.24 to the Sacramento City Code regarding Sidewalk Obstructions and Pedestrian Interference and also adopted Resolution No. 2022-0286 directing the City Manager to issue guidelines for enforcement.  Further, on October 18, 2022, the City Council adopted Resolution No. 2022-0322 approving the City Manager's designation of specified locations as critical infrastructure for purposes of Sacramento City Code Chapter 8.140 regarding Protection of Critical Infrastructure and Wildfire Risk Areas.  On October 18, 2022, the City developed a Citywide Homelessness Response Protocol to provide structural guidelines for the City's interdepartmental response to homeless encampments and also created a policy guidance memo on November 28, 2022 to address the City's enforcement of its sidewalk

2

ordinance codified at Chapter 12.24 of the Sacramento City Code.  The City Council has also held meetings dedicated solely to homelessness issues on June 27, 2023 and August 1, 2023.  Collectively, these efforts seek to balance the City's obligation to ensure that all residents, unhoused and housed alike, are able to safely live and work in the City and enjoy its public spaces.

The City submits the Declarations of Assistant City Manager Mario Lara, Captain Bryce Heinlein of the Sacramento Police Department, Homeless Services Manager Nick Golling, and Meteorologist Jan Null in support of its Opposition to plaintiffs' motion for a TRO.

**B.    PROCEDURAL BACKGROUND**

On June 24, 2022, plaintiffs filed their Complaint and Ex Parte Application for Mandatory Injunction and Temporary Restraining Order naming the City and County of Sacramento as defendants.  (ECF Nos. 1-2.)  As to the City, plaintiffs asserted four claims: (1) state-created danger in violation of due process guaranteed by the Fourteenth Amendment to the U.S. Constitution under 42 U.S.C. § 1983; (2) state-created danger in violation of due process guaranteed under Article I, § 7 of the California Constitution; (3) violation of Article I, § 1 of the California Constitution; and (4) violation of California Health and Safety Code section 101025.

On July 20, 2022, the City opposed plaintiffs' Emergency Application for Mandatory Injunction and Temporary Restraining Order. (ECF No. 19.)  Plaintiffs filed their reply on July 25, 2022 (ECF No. 20) and on July 29, 2022, the Court issued its Order.  (ECF No. 22.)  As to the City, the Court granted plaintiffs' "request to temporarily enjoin the City and all of its officers, agents, servants, employees, attorneys, and all persons under their direction and control, from clearing encampments belonging to the unhoused."  (ECF No. 22; 23:6-8.)  The Court ordered the preliminary injunction to remain in effect for 28 days.  (ECF No. 22; 23:16.)

On August 24, 2022, plaintiffs filed their Motion to Extend or Reinstate Preliminary Injunction Against the City and requested sanctions.  (ECF No. 24.)  The City once again opposed plaintiffs' motion.  (ECF No. 28.)  While the Court denied plaintiffs' request for

1  sanctions in its September 2, 2022 Order, it granted plaintiffs' request for extension of the

2  preliminary injunction to enjoin the City from clearing homeless encampments until

3  September 23, 2022.  (ECF No. 33; 18:25-19:7.)

4       Plaintiffs now seek issuance of a TRO until August 10, 2023, the date selected by

5  plaintiffs for a hearing on the preliminary injunction contending that the same conditions

6  articulated in 2022 exist this year to warrant issuance of an order enjoining the City from

7  moving or clearing homeless encampments.

8  **III. LAW**

9       A preliminary injunction is an "an extraordinary remedy never awarded as of right."

10 *Winter v. NRDC*, 555 U.S. 7, 24 (2008).  To obtain preliminary injunctive relief, including a

11 TRO, plaintiffs must show that: a) they are likely to succeed on the merits; b) plaintiffs are

12 likely to suffer irreparable harm in the absence of relief; c) the balance of equities tips in

13 plaintiffs' favor; and d) an injunction is in the public interest.  *Id.* at 20.  *Winter v. NRDC*

14 affirmed that irreparable harm has to be "likely" as opposed to just "possible."  *Id.* at 22; *see*

15 *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) (in light of *Winter*,

16 without a showing of irreparable harm in the first instance, no balancing of remaining factors

17 is permitted).  Injunctions must be "narrowly tailored … to remedy only the specific harms

18 shown by the plaintiffs."  *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004).

19 **IV. ARGUMENT**

20      **A.    PLAINTIFFS' EX PARTE MOTION FOR A TRO SHOULD BE DENIED.**

21      Plaintiffs' TRO should be denied as they have not demonstrated such relief is

22 appropriate.  Although the United States Supreme Court has recognized that there is no

23 fundamental right to housing, the Ninth Circuit recognizes liability under substantive due

24 process where a state or local official acts to place a person in a situation of a known danger

25 with deliberate indifference to their personal or physical safety.  *Kennedy v. City of Ridgefield*,

26 439 F.3d 1055, 1061-62 (9th Cir. 2006).  "'[D]eliberate indifference' is a stringent standard of

27 fault, requiring proof that a municipal actor disregarded a known or obvious consequence of

28 his action." *Board of County Com'rs of Bryan County*, *Okl. v. Brown*, 520 U.S. 397, 410 (1997).

4

1  "In examining whether [the city] affirmatively places an individual in danger, [a court does]

2  not look solely to the agency of the individual, nor [does it rest its] opinion on what options

3  may or may not have been available to the individual. Instead, [the court must] examine

4  whether [the city] left the person in a situation that was more dangerous than the one in

5  which they found him." *Kennedy*, 439 F.3d at 1062 (citation omitted).

6      Here, while plaintiffs focus on the unhoused and their plight, the City must consider the

7  health and welfare of *all* its residents.  The City is addressing its homelessness crisis by

8  engaging with and dedicating resources to PEH as well as enforcement efforts.  As set forth

9  in the declarations of Captain Bryce Heinlein and Assistant City Manager Mario Lara, there

10  are encampments that pose public safety concerns that necessitate an immediate response.

11  For example, as set forth in the Declaration of Bryce Heinlein, the City conducted a joint

12  outreach operation to seek camp compliance and to offer safe alternative shelter to

13  approximately 38 encampments and 31 people located at 28th and C Streets in Sacramento

14  from July 12 – July 21, 2023.  (Heinlein Decl. ¶ 11.)  This particular location was heavily

15  inhabited by both tent encampments and out of compliance vehicles and since early 2023,

16  had been the source of countless calls from the community complaining of criminal activity

17  including narcotic activity, prostitution, theft and vandalism.  During this operation, 12,400

18  pounds of trash and debris and 813 syringes were disposed of.  (Heinlein Decl. ¶ 11.)

19      This is a staggering six tons of trash and 800+ syringes for just *one* site with fewer than

20  40 people.  Syringes pose a public safety health hazard to all, and the City must be able to

21  address encampments like these that contribute to community blight and crime.  It cannot be

22  reasonably supported that such conditions are acceptable or should be allowed to persist.

23  Further, contrary to plaintiffs' inflammatory allegations regarding the conditions at Miller

24  Park as set forth in their accompanying declarations, it does not constitute an increased risk

25  of harm as set forth in the Declaration of Nick Golling.  The actions of the City to clear

26  encampments where necessary and consistent with its enforcement protocols is essential to

27  protecting the City and all its residents.

28  / / /

CITY OF SACRAMENTO'S OPPOSITION TO PLAINTIFFS' EX PARTE PARTE MOTION FOR TRO
1310277

1    **B.     PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS.**

2         With respect to plaintiffs' request to enjoin the clearing of *all* encampments within the

3    City, which they erroneously term as "sweeps", such a broad request for relief does not

4    consider the individualized circumstances at stake.  First, plaintiffs' contention that the

5    summer heat of 90 degrees alone can and should be used to halt the entirety of the City's

6    efforts in addressing public safety concerns posed by certain encampments is overly broad

7    and unlikely to succeed on the merits.  Contrary to plaintiffs' assertions that the City is

8    disregarding its own homeless response protocols and as set forth in the Declaration of

9    Mario Lara, 90 degrees is not an upper limit set by the City of Sacramento; rather, given the

10   Court's 2022 Orders enjoining the City from clearing encampments from approximately the

11   end of July 2022 to mid-September 2022, this was included to reflect the possibility that

12   temperature thresholds could be as low as 90 degrees.  Further, heat is one factor to consider

13   among many other factors and the City has never utilized heat as the sole consideration

14   when there are immediate public health and safety risks.  (Lara Decl. ¶ 3.)  In addition,

15   Exhibit C to the Declaration of Crystal Sanchez setting forth the August 2023 forecast is not

16   reliable as set forth in the Declaration of Jan Null, a meteorologist with training and

17   experience in weather forecasts.

18        Second, plaintiffs' supporting declarations focus on Miller Park and make inflammatory

19   statements and assumptions lacking basis in fact.  As set forth in the Declaration of the City's

20   Homeless Services Manager Nick Golling, he conducted a surprise inspection of Miller Park

21   on July 25, 2023 following comments made by Charles Pfost, a declarant in this matter.  In

22   sum, the conditions at Miller Park do not constitute a state created danger as plaintiffs'

23   assert.  (See Golling Decl. ¶ 14.)

24        Third, as to plaintiffs' contention that the City's critical infrastructure ordinance is a

25   "means to effectively ban homeless persons from areas that provide more natural protection

26   from the intense heat" is simply without merit.  (ECF No. 36; ¶ 25.)  Plaintiffs are incorrect

27   that the 500' buffer applies to *all* critical infrastructure designated by the City.  Thus, Exhibit

28   I to the Declaration of Crystal Sanchez is not accurate.  The 500-ft. buffer is only around

schools as per the City Manager as approved by City Council vote on October 18, 2022 (See Decl. of Mario Lara, Ex. A.)  Per Sacramento City Code sections 8.140.030(A)(2)-(3) and 8.140.030(B)(2)-(3), the default buffer around designated critical infrastructure is 25 feet around the critical infrastructure plus 25 feet from vehicular or pedestrian entrances and exits of said critical infrastructure.  Thus, plaintiffs' reliance on the Declaration of Crystal Sanchez for the proposition that the homeless are banned from 41.65% of the City's 99.4 square miles and are completely banned from 78.74% of the City should be disregarded in its entirety. (See ECF No. 36-1; ¶ 19.)

### C.   PLAINTIFFS ARE NOT LIKELY TO SUFFER IRREPARABLE HARM IN THE ABSENCE OF RELIEF.

Plaintiffs' TRO should be denied as there have been multiple 100+ degree days in Sacramento and numerous 90+ degree days this summer.  Plaintiffs do not articulate *how* plaintiffs will be specifically harmed between now and August 10th other than making generalized assumptions and conclusions.  Plaintiffs could have sought injunctive relief at an earlier date prior to the start of the summer since the harm they allege now existed in June of 2023.  While plaintiffs may argue that they were engaged in discussions with the City as set forth in the Declaration of Anthony Prince, the conditions identified in plaintiffs' Motion now do not set forth that they are likely to be irreparably harmed in any sort of legally recognizable manner by the City and thus, the court's analysis can and should simply end here.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) (in light of Winter, without a showing of irreparable harm in the first instance, no balancing of remaining factors is permitted).

### D.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGHS IN FAVOR OF DENYING THE TRO.

For a TRO to issue, Plaintiffs have the burden of making a strong showing that the balance of harms tips in their favor.  *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (2019).  When balancing both parties' harms, the court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."

7

1  *Winter, supra*, 555 U.S. at 24 (quotation omitted).  When the government is the target of the

2  injunction, these factors merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the balance

3  of harms and public interest strongly disfavors the issuance of a TRO.  The right of local

4  governmental officials to make necessary decisions to protect against unsafe and unsanitary

5  conditions risking public safety for all outweighs plaintiffs' desire to remain where they are.

6  In the City's declarations filed concurrently, it has presented compelling evidence that

7  clearing encampments when necessary and in accordance with the City's protocols and

8  ordinances and within the discretion of the City's legislative function and police powers.

9  Here, plaintiffs rely on entirely unsubstantiated 'state created danger' declarations of

10  laypersons, none of which negate the deference afforded to the City's public health and

11  safety determinations, much less satisfy plaintiffs' heavy burden of proof in seeking

12  extraordinary injunctive relief.

13  **V.   <u>CONCLUSION</u>**

14  Based on the foregoing, the City respectfully requests that the Court deny plaintiffs'

15  motion for issuance of a temporary restraining order.

16

17

18  DATED:  August 2, 2023                    SUSANA ALCALA WOOD,
                                              City Attorney
19

20                                   By:   <u>/s/ GRACE L. PAK</u>
21                                         **GRACE L. PAK**
                                           Senior Deputy City Attorney
22
                                           Attorneys for Defendant
23                                         CITY OF SACRAMENTO

24

25

26

27

28

EXHIBIT B

SUSANA ALCALA WOOD, City Attorney (SBN 156366)
**GRACE L. PAK, Senior Deputy City Attorney (SBN 263733)**
glpak@cityofsacramento.org
CITY OF SACRAMENTO
915 I Street, Room 4010
Sacramento, CA  95814-2608
Telephone:  (916) 808-5346
Facsimile:   (916) 808-7455

Attorneys for Defendant CITY OF SACRAMENTO

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SACRAMENTO HOMELESS UNION, a local of the CALIFORNIA HOMELESS UNION/STATEWIDE ORGANIZING COUNCIL, on behalf of itself and those it represents; BETTY RIOS; DONTA WILLIAMS; FALISHA SCOTT and all those similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SACRAMENTO, a political subdivision of the State of California; CITY OF SACRAMENTO, a municipal corporation; and DOES 1 – 100,<br><br>Defendants. | Case No.:  2:22-cv-01095-TLN-KJN<br><br>**DEFENDANT CITY OF SACRAMENTO'S** *AMENDED* **OPPOSITION TO PLAINTIFFS' MOTION FOR REINSTATEMENT OF PRIOR PRELIMINARY INJUNCTION OR FOR NEW PRELIMINARY INJUNCTION AND REQUEST FOR HEARING**<br><br>Judge:     Hon. Troy L. Nunley<br><br>Complaint Filed: June 24, 2022 |

1

# TABLE OF CONTENTS

Page(s)

Table of Authorities....................................................................................4

I.   INTRODUCTION............................................................................6

II.  STATEMENT OF FACTS................................................................8

   1.  City's Department of Community Response Efforts ...................8

   2.  Expert Declarations for Meteorologist Jan Null and Professor Lewis Halsey......9

   3.  Public Safety Concerns Posed by Encampments................................10

III. LEGAL STANDARD FOR PRELIMINARY INJUNCTION .............................11

IV.  ARGUMENT ................................................................................11

   A.   THE RECENT NINTH CIRCUIT DECISION IN *JOHNSON V. CITY OF GRANTS PASS* HAS NO BEARING ON THIS CASE BECAUSE THIS CASE DOES NOT IMPLICATE THE EIGHTH AMENDMENT ..............................................................11

       1.  The Ordinances at Issue in *Grants Pass* are Readily Distinguishable from the City of Sacramento Ordinance with Which Plaintiffs Take Issue.................................................12

       2.  Grants Pass Does Not Prohibit Restrictions on Sleeping in Public............13

   B.   PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS BECAUSE THERE IS NO STATE-CREATED DANGER .........14

       1.  *Jeremiah v. Sutter County* and *Cobine v. City of Eureka* are Distinguishable.........................................................14

       2.  Plaintiffs Cannot Show That They are At Greater Risk.....................16

       3.  Abating Encampments Do Not Increase Plaintiffs' Risk of Harm in Violation of the Fourteenth Amendment right to Bodily Integrity ..........17

   C.   PLAINTIFFS ARE NOT LIKELY TO SUFFER IRREPARABLE HARM AS EXCESSIVE HEAT ALLEGATIONS ARE OVERSTATED AND BASED ON OVERLY GENERALIZED ASSUMPTIONS THAT RELY ON HEARSAY AND UNSUPPORTED FACTS...................................................18

CITY'S *AMENDED* OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1302838

D.    THE BALANCE OF EQUITIES DOES NOT TIP IN FAVOR OF
        PLAINTIFFS ......................................................................................19

        1.  City Can Designate Critical Infrastructure ...............................19

        2.  City's Critical Infrastructure is Narrower than the Federal Standard........20

E.    ISSUANCE OF A PRELIMINARY INJUNCTION IS NOT IN THE
        PUBLIC'S INTEREST ........................................................................22

F.    SHOULD THE COURT ISSUE A PRELIMINARY INJUNCTION,
        IT SHOULD BE NARROWLY TAILORED ........................................22

V.  CONCLUSION ......................................................................................23

CITY'S *AMENDED* OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1302838

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Aitken v. City of Aberdeen*,
    393 F.Supp.3d 1075 (W.D. Wash. 2019) ............................................................13

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011)..............................................................................11

*Board of County Com'rs of Bryan County, Okl. v. Brown*,
    520 U.S. 397 (1997) ............................................................................................16

*Cobine v. City of Eureka*,
    250 F. Supp. 3d 423 (N.D. Cal. 2017)....................................................... 14, 15, 16

*Gomes v. Cty. of Kauai*,
    481 F. Supp. 3d 1104 (D. Haw. 2020) .................................................................13

*Jeremiah v. Sutter County*,
    No. 2:18-cv-00522, 2018 WL 1367541 (E.D. Cal. Mar. 16, 2018)..................... 14, 15

*Johnson v. City of Grants Pass*,
    72 F.4th 868 (9th Cir. 2023) .......................................................................*passim*

*Kennedy v. City of Ridgefield*,
    439 F.3d 1055 (9th Cir. 2006)..............................................................................16

*Le Van Hung v. Schaaf*,
    2019 WL 1779584 (N.D. Cal. Apr. 23, 2019).......................................................13

*Lindsey v. Normet*,
    405 U.S. 56 (1972) ..............................................................................................16

*Mahoney v. City of Sacramento*,
    No. 2:20-cv-00258, 2020 WL 616302 at *1, 3 (E.D. Cal. Feb. 10, 2020).................17

*Miralle v. City of Oakland*,
    2018 WL 6199929, at *2 (N.D. Cal. Nov. 28, 2018)..............................................13

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................................22

*Price v. City of Stockton*,
    390 F.3d 1105 (9th Cir. 2004)..............................................................................11

*Winter v. NRDC*,
    555 U.S. 7 (2008).................................................................................7, 11, 18, 22

CITY'S *AMENDED* OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1302838

**State Cases**

*Richeson v. Helal*,
 158 Cal. App. 4th 268 (2007)...................................................................20

**Federal Statutes**

42 U.S.C. § 5195c(e) ................................................................................21

**State Statutes**

Cal. Civ. Code § 2080.10 .........................................................................15

Homeland Security Act of 2002 ................................................................21

Sac. City Code, § 8.140 ................................................................. 20, 21, 22

Sac. City Code, § 8.140.020 .....................................................................19

Sac. City Code, § 8.140.030(a)-(b) ...........................................................20

Sac. City Code, § 8.140.040(a) .................................................................20

Sac. City Code, §§ 8.140.050-060 .............................................................20

**Constitutional Provisions**

Eighth Amendment................................................................................*passim*

Fourteenth Amendment .........................................................................*passim*

Cal. Const. art. IX, § 5 .............................................................................20

Cal. Const. art. XI, § 5(a) .........................................................................20

Cal. Const. art. XI, §§ 5(a), 7 ...................................................................20

**Other Authorities**

https://www.cisa.gov/topics/critical-infrastructure-security-and-
 resilience/critical-infrastructure-sectors ................................................21

Kae Lani Palmisano, *Here are 6 places where Sacramento lives up to its name 'City
 of Trees'*, Sacramento Bee, May 27, 2023 ............................................... 7

CITY'S *AMENDED* OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1302838

**I.   <u>INTRODUCTION</u>**

The homelessness crisis impacts not only people experiencing homelessness ("PEH"), but the broader community of housed residents, businesses, and neighborhoods as well.  It is currently the greatest challenge facing the City of Sacramento ("City") and steps have been taken and continue to be taken to prioritize increasing the availability of shelter, services, and permanent housing for PEH.  However, while the City remains committed to improving the plight of PEH, the City must also recognize and balance its obligation to ensure that *all* residents, unhoused and housed alike, are able to safely live and work in the City and enjoy its public spaces.

Plaintiffs SACRAMENTO HOMELESS UNION, a local of the CALIFORNIA HOMELESS UNION/STATEWIDE ORGANIZING COUNCIL, on behalf of itself and those it represents; BETTY RIOS; DONTA WILLIAMS; FALISHA SCOTT (hereinafter "Plaintiffs") seek a preliminary injunction to enjoin the City from clearing homeless encampments until late September 2023 based on unsupported declarations reliant on hearsay, misstatements, and speculation that displacing PEH during the alleged "excessive" or "extreme" heat of the summer constitutes a state-created danger in violation of the Fourteenth Amendment.  Moreover, Plaintiffs are simply incorrect that the conditions at Miller Park, a City-sanctioned safe ground camping site for PEH, are a state-created danger. Nothing could be further from the truth as PEH are safer and have access to food, water, showers, restroom facilities, and services at Miller Park.  In fact, the City Council on August 1, 2023 authorized the City Manager to create new safe ground sites to respond to the urgent need to address homeless encampments on its public property.

The premise of Plaintiffs' request for a preliminary injunction is fatally flawed as it assumes that clearing of encampments leaves PEH with a "Hobson's choice" because the City has never forced PEH to go to Miller Park.  Moreover, Plaintiffs', without any support, make the conclusory assumption that when homeless encampments are cleared, the only other places for them to go are "the unprotected streets of the City" where the "burning sun exists".  (ECF No. 36 at ¶ 42.)  This assumes that *all* PEH live in shaded areas and that the

CITY'S *AMENDED* OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1    only place for PEH to relocate to is in the sun or in unshaded areas.  The City of Sacramento

2    is home to one million trees[1].  It belies common sense that issuance of preliminary injunction

3    would somehow protect PEH by allowing them to remain in shaded areas of the City when

4    there are innumerable shaded areas throughout the City.

5         As this Court recognized in its August 2, 2023 order issuing a temporary restraining

6    order enjoying the City from clearing encampments belonging to the unhoused, the TRO is

7    broad.  (ECF No. 39 at 6:5.)  The impact of the Court's issuance of the TRO on August 3,

8    2023 has had an immediate effect on the City's ability to ensure public safety for its residents

9    and any future preliminary injunction will severely hamper the City's ability to timely

10   respond to crimes and violations of City ordinances at some encampments.

11        The Court should deny Plaintiffs' Motion for Reinstatement of the Prior Preliminary

12   Injunction or for New Preliminary Injunction.  Preliminarily, as set forth in its Order (ECF

13   No. 39 at 6:3-4.), the City addresses in this Opposition what effect, if any, the Ninth Circuit

14   decision of *Johnson v. City of Grants Pass*, 72 F.4th 868 (9th Cir. 2023) has on this case.  The

15   City's position is that *Grants Pass* is not applicable to this case because it does not implicate

16   the Eighth Amendment.

17        Plaintiffs are unable to meet any of the *Winter v. NRDC* factors to support issuance of a

18   preliminary injunction in this case.  First, Plaintiffs are not likely to succeed on the merits

19   because there is no state-created danger or violation of bodily integrity.  Second, Plaintiffs are

20   not likely to suffer irreparable harm because Plaintiffs' claims as to excessive heat and its

21   effects are overstated.  Third, the balance of equities does not trip in Plaintiffs' favor as the

22   City is able to designate critical infrastructure and enforce ordinances to protect it.  Finally,

23   the public interest is not served because there are legitimate public safety concerns and health

24   risk posed by some encampments.  Assuming, *arguendo*, any preliminary injunction is issued

25   by the Court, it must necessarily include the County of Sacramento as well since a

26   preliminary injunction based on "extreme" or "excessive" heat applies equally to the County

27   and its public areas as it does to the City.

28

---

[1]  Kae Lani Palmisano, *Here are 6 places where Sacramento lives up to its name 'City of Trees'*, Sacramento Bee, May 27, 2023, https://www.sacbee.com/sacramento-city-guides/get-outside/article273825965.html.

1302838    CITY'S *AMENDED* OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## II.  STATEMENT OF FACTS

The City incorporates by reference the previous declarations submitted by the City in support of its opposition to Plaintiffs' motion for temporary restraining order filed on August 2, 2023.  (ECF No. 38.)  Specifically, the Declarations of Sacramento Police Department ("SPD") Captain Bryce Heinlein (ECF No. 38-1); meteorologist Jan Null (ECF No. 28-3); Assistant City Manager Mario Lara (ECF No. 38-3); and Department of Community Response ("DCR") Homeless Services Manager Nick Golling (ECF No. 38-4).

### 1.    City's Department of Community Response Efforts

As provided in the concurrently filed Supplemental Declaration of Nick Golling and Declaration of Ben Worrall, Social Services Manager for DCR, the City's approach to engaging with and assisting PEH is intensive and involves the coordination of multiple City department, the County of Sacramento, and local non-profits.

In Mr. Golling's Supplemental Declaration, he personally visited Miller Park om August 4 and August 5, 2023.  The conditions observed, contrary to the hyperbole and fiction set forth in Plaintiffs' supporting declarations, were acceptable and in fact, better than the conditions that PEH experience in unsanctioned encampments on public property.  (See Golling Decl. Ex. A.)  For example, the clients who Mr. Golling spoke with at Miller Park safe ground during his inspection were in active crises when DCR outreach teams first met with them while they were in the streets prior to enrollment at Miller Park. Perhaps this is one of the reasons that historically, the Miller Park safe ground program has shown that 40% of the guests who exit the program do so to a positive exit destination such as indoor emergency shelter, transitional, and permanent housing.  (Golling Decl. ¶ 9.)  As Mr. Golling observes, "[w]hen people are not in danger and are removed from crises, they often can reclaim their autonomy, and get back to making decisions about their future. This becomes easier when there are 24-hour staff as well as full time case managers that can tend to needs, address concerns, and assist with navigating needs related to behavioral health, income, housing, etc."  (Golling Decl. ¶ 10.)

In Mr. Worrall's declaration, he explains how DCR actively engages with PEH during

CITY'S *AMENDED* OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
1302838

1    extreme weather conditions.  He also provides statistics of calls received by DCR and context

2    of how last year's injunction affected the number of self-referral calls received by DCR.  "The

3    false sense of security brought by a staying of compliance actions is clearly shown in the

4    number of self-referral calls received by DCR in the two months immediately following last

5    summer's injunction. During the time period of the preliminary injunction last year, DCR

6    received a total of 372 unhoused self-referral calls which are calls made by unhoused

7    community members to 311 seeking services for themselves from DCR. Immediately

8    following last summer's injunction there were 71 more self-referral calls (443 total calls),

9    clearly demonstrating an increased need and desire for services immediately following the

10   previous halt in compliance efforts."  (Worrall Decl. ¶ 15.)

11        2.    Expert Declarations for Meteorologist Jan Null and Professor Lewis
12              Halsey

13        In the Declaration of Lewis Halsey, a Professor of Environmental Physiology at the

14   University of Roehampton in London, United Kingdom, filed concurrently, who studies the

15   effects of ambient temperatures on the behavior, physiology and metabolic rate (energy

16   expenditure) of people, he concludes that he does not "consider that requests for persons to

17   move location in Sacramento when air temperatures are around 90F/32C are putting those

18   people at undue health risks."  (Halsey Decl. ¶ 2.)  As previously set forth in the Declaration

19   of Mario Lara (ECF No. 38-3), Mr. Lara clarified that "90 degrees is not an upper limit set

20   by the City of Sacramento; rather, given the Court's 2022 Orders enjoining the City from

21   clearing encampments from approximately the end of July 2022 to mid-September 2022, this

22   was included to reflect the possibility that temperature thresholds could be as low as 90

23   degrees.  Further, heat is one factor to consider among many other factors and the City has

24   never utilized heat as the sole consideration when there are immediate public health and

25   safety risks." (Lara Decl. ¶ 3.)

26        Professor Halsey further opines "[t]he term 'excessive temperatures' is not meaningfully

27   applied to 90F/32.2C. Contra to the Declaration of Mayra Pastore, paragraphs 3 and 4, it is

28   not the case that even prolonged exposure to 90F/32.2C is likely to result in heat exhaustion

9

CITY'S *AMENDED* OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1   or associated ailments. The scientific literature does not provide direct empirical evidence of

2   irreversible damage to the body's organs when people are exposed even long term to

3   temperatures around 90F/32C or indeed higher. Moreover, some of my own work provides

4   evidence that the body copes well with high temperatures."  (Halsey Decl. ¶ 3.)

5          In the Supplemental Declaration of Jan Null, he corrects the points raised in the

6   Declarations of Crystal Sanchez and Dr. Mayra Pastore and provides reliable data to rebut

7   the fallacy that an extended forecast is reliable.  Significantly, he also states that "[t]he

8   normal time of maximum heating in Sacramento is between 2:00 and 4:00 pm. The relatively

9   rapid cooling between 4:00 pm and 7:00 pm reflects the effects of the "Delta Breeze" and the

10  influx of cooler air from the coast and through the Sacramento-San Joaquin Delta."  (Null

11  Decl. ¶ 10.)

12                    3.     Public Safety Concerns Posed by Encampments.

13         Prior to the Court's issuance of its Temporary Restraining Order on August 3, 2023, the

14  City had two scheduled clean-ups planned in the City the week of August 7, 2023, the first is

15  located at W Street and Alhambra Blvd. and the second, is located at Ninos Parkway in the

16  Natomas area.  As set forth in the Declaration of SPD Captain Daniel Monk and Parks Sgt.

17  Danielle Luther, both encampments pose immediate public safety risks.  For example, at W

18  Street and Alhambra Blvd., "[f]rom January 2023 to date, Sacramento Police officers have

19  responded to this location to advise residents of sidewalk obstruction ordinances, conducted

20  probation searches, and investigated several persons at this location in relation to allegations

21  of street narcotic sales."  (Monk Decl. ¶ 5.)  In fact, on August 6, 2023, SPD received a

22  report of an unhoused female who was attacked with a razor by another unhoused female

23  while she was sleeping inside her tent near the Alhambra/W Street corridor and sustained

24  several non-threatening lacerations during the altercation.  SPD conducted a canvass with

25  negative results.  The victim advised that the suspect frequents the Alhambra Blvd. corridor.

26  (Monk Decl. ¶ 6.)

27         In the Declaration of Sgt. Danielle Luther, she states that the biggest concerns at Ninos

28  Parkway in Natomas are "needles, vector issues, and dry, grassy location. To her knowledge,

CITY'S *AMENDED* OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1302838

1  they have not had a fire yet in this area, but if one were to break out, it would move

2  incredibly quickly given the landscape.  Further, given the proximity of this encampment to

3  residences and electrical towers, it poses an extreme fire hazard and a significant public

4  safety risk."  (Luther Decl. ¶ 8.)

5       In addition, in the Declaration of Daniel Bowers, it shows how uncleared encampments

6  give rise to vector issues, such as rodents, which can cause communicable outbreaks of

7  diseases.

8  **III.  LEGAL STANDARD FOR PRELIMINARY INJUNCTION**

9       A preliminary injunction is an "an extraordinary remedy never awarded as of right."

10  *Winter v. NRDC*, 555 U.S. 7, 24 (2008).  To obtain preliminary injunctive relief, including a

11  TRO, plaintiffs must show that: a) they are likely to succeed on the merits; b) plaintiffs are

12  likely to suffer irreparable harm in the absence of relief; c) the balance of equities tips in

13  plaintiffs' favor; and d) an injunction is in the public interest.  *Id.* at 20.  *Winter v. NRDC*

14  affirmed that irreparable harm has to be "likely" as opposed to just "possible."  *Id.* at 22; *see*

15  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) (in light of *Winter*,

16  without a showing of irreparable harm in the first instance, no balancing of remaining factors

17  is permitted).  Injunctions must be "narrowly tailored … to remedy only the specific harms

18  shown by the plaintiffs."  *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004).

19  **IV.  ARGUMENT**

20       **A.    THE RECENT NINTH CIRCUIT DECISION IN *JOHNSON V. CITY OF***
21       ***GRANTS PASS* HAS NO BEARING ON THIS CASE BECAUSE THIS CASE**
         **DOES NOT IMPLICATE THE EIGHTH AMENDMENT.**

22       In its August 3, 2023 Order, the Court ordered that the "parties shall address what effect,

23  if any, the Ninth Circuit decision in *Johnson v. City of Grants Pass* has on the instant case.  72

24  F.4th 868 (9th Cir. 2023)."  (ECF No. 39 at p. 6.)  The legal basis for the Court's issuance of

25  a temporary restraining order is the state-created danger doctrine under the Fourteenth

26  Amendment.  Indeed, the Court has opined that "Plaintiffs have shown a likelihood of

27  success on a Fourteenth Amendment state-created danger claim."  (ECF No. 29 at p. 5.)

28       At bottom, *Johnson v. City of Grants Pass* is an Eighth Amendment case  challenging the

constitutionality of specific ordinances imposing fines on the PEH.  Plaintiffs here are not challenging the constitutionality of any City ordinance and were in no way fined.  At no point in the 155 pages that comprise the Amended Opinion and the statements respecting, and dissents from, the denial of rehearing *en banc*, does *Grants Pass* consider the state-created danger doctrine.  None of the claims addressed in this Court's previous injunctive order concern the Eighth Amendment.  (See ECF No. 22.)

1.      The Ordinances at Issue in *Grants Pass* are Readily Distinguishable from the City of Sacramento Ordinance with Which Plaintiffs Take Issue.

*Grants Pass* concerns five provisions of the Grants Pass Municipal Code, one of which prohibits sleeping on public sidewalks, streets, alleyways, and in any pedestrian or vehicular entrance to public or private property abutting a public sidewalk; another prohibits occupying a campsite on all public property; and a third prohibits camping in public parks, including overnight parking, which was amended after the Ninth Circuit decided *Martin v. City of Boise*.  *Johnson v. City of Grants Pass*, 72 F.4th 868, 875-76 (9th Cir. 2023).  Critically, the Ninth Circuit found that, taken together, the city's ordinances amounted to a jurisdiction-wide camping ban, unlawful under *Martin v. City of Boise* in the absence of sufficient, alternative shelter. *Grants Pass*, 79 F.4th at 894, n. 33 ("[T]he City has not established any realistically available place within the jurisdiction for involuntarily homeless individuals to sleep").

By contrast, the City ordinance relating to Critical Infrastructure and Wildfire Risk Areas with which Plaintiffs take issue does not amount to a jurisdiction-wide camping ban. Plaintiffs claim that the City has designated 41.65% of the its 99.4 square miles as critical infrastructure, by "[a]dding the restriction against camps 'within 500 feet' of such facilities . . . ."  (ECF No. 36 at p. 6.)  Plaintiffs' claims are demonstrably false, as the City has not imposed a 500-foot boundary around <u>all</u> such facilities.  Even assuming that Plaintiffs' claims were accurate, *Grants Pass* permits the City to prohibit camping upon and adjacent to its critical infrastructure.  "*Martin* made clear . . . that a city is not required 'to provide sufficient shelter for the homeless, or allow anyone who wishes to sit, lie, or sleep on the streets . . . at

CITY'S *AMENDED* OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

any time and at any place.'"  *Grants Pass*, 72 F.4th at 877 (citations omitted).

Plaintiffs further claim that, taking into account private property, camping is prohibited in 78.74% of the City's 99.4 square miles.  First, *Martin v. City of Boise* held only that "the Cruel and Unusual Punishment clause 'prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter."  *Grants Pass*, 72 F.4th at 890 (emphasis added) (citation omitted).  Even assuming that camping were off limits in 78.74% of the City, "*Martin* says that anti-sleeping ordinances may be enforced, consistent with the Eighth Amendment, so long as there is a '*single place* where [the person] can lawfully be'"  *Grants Pass*, 72 F.4th at 906 (Collins, J., dissenting) (emphasis in original).  Plaintiffs do not claim, and cannot establish, that there is not a single place within the City for the unhoused to camp, without which Plaintiffs cannot prevail upon an Eighth Amendment claim.

2.  <u>*Grants Pass* Does Not Prohibit Restrictions on Sleeping in Public</u>

*Grants Pass* reaffirms that "the government may evict or punish sleeping in public in some locations, provided there are other lawful places within the jurisdiction for involuntarily homeless individuals to sleep."  *Grants Pass*, 79 F.4th at 894, n. 33, *citing Shipp v. Schaff*, 379 F. Supp. 3d 1033, 1037 (N.D. Cal. 2019); *Aitken v. City of Aberdeen,* 393 F.Supp.3d 1075, 1082 (W.D. Wash. 2019); *Gomes v. Cty. of Kauai*, 481 F. Supp. 3d 1104, 1109 (D. Haw. 2020); *Miralle v. City of Oakland*, 2018 WL 6199929, at *2 (N.D. Cal. Nov. 28, 2018); *Le Van Hung v. Schaaf*, 2019 WL 1779584, at *5 (N.D. Cal. Apr. 23, 2019).  "It does not establish an unrestrained right for involuntarily homeless persons to sleep anywhere they choose.  Nor does it require jurisdictions to cede all public spaces to involuntarily homeless persons.  The argued notion that *Martin* and *Grants Pass* work together to guarantee a 'federal constitutional 'right' . . . to camp or to sleep on sidewalks and in parks, playgrounds, and other public places' is completely absent from the opinion."  *Grants Pass*, 79 F.4th at 914-15 (Silver and Gould, JJ., joint statement respecting the denial of rehearing *en banc*).

"The holding in *Grants Pass* is not that involuntarily homeless persons in the City of Grants Pass and elsewhere in the Ninth Circuit are allowed to sleep wherever and whenever

they wish . . . . When there is no shelter space, jurisdictions may still enforce limitations on sleeping at certain locations.  The assertion that jurisdictions must now allow involuntarily homeless persons to camp or sleep on every sidewalk and in every playground is plainly wrong.  Jurisdictions remain free to address the complex policy issues regarding homelessness in the way those jurisdictions deem fit, subject to the single restriction that involuntarily homeless persons must have '*somewhere*' to sleep and take rudimentary precautions (bedding) against the elements." *Grants Pass*, 79 F.4th at 915 (Silver and Gould, JJ., joint statement respecting the denial of rehearing *en banc*) (emphasis in original) (citation omitted).

In statements respecting, or dissents from, the denial of rehearing *en banc*, numerous judges took the position that the Eighth Amendment must be applied narrowly to enable efforts by local governments to address the homelessness crisis.  "Under our federal system, state and local governments . . . are primarily entrusted with the power and duty to protect the common welfare of our towns, cities, and neighborhoods, and to ensure that our streets, squares, and sidewalks remain clean and safe.  (Citation omitted.)  The reason for such 'legislative responsibility over criminal law is fundamental: the criminal law exists to protect the safety of citizens, and ensuring safety of the people is one of the things that popular governments exist to do.'" *Grants Pass*, 79 F.4th at 932 (O'Scannlain, J., statement respecting the denial of rehearing *en banc*).  "[W]e must allow local leaders—and the people who elect them—the latitude to address on the ground the distinctly local features of the present crisis of homelessness and lack of affordable housing." *Grants Pass*, 79 F.4th at 945 (Bress, J., dissenting from the denial of rehearing *en banc*).

**B.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS BECAUSE THERE IS NO STATE-CREATED DANGER**

Plaintiffs are unlikely to succeed on merits because there is no state-created danger and no violation of bodily integrity under the Fourteenth Amendment.

1.    *Jeremiah v. Sutter County* and *Cobine v. City of Eureka* are Distinguishable

Despite their many bald assertions that the City has violated the state-created danger

1    doctrine, Plaintiffs have not cited, and cannot cite, a single controlling case holding that

2    abating encampments occupied by PEH during inclement weather invariably constitutes a

3    state-created danger.  In granting Plaintiffs' TRO, the Court cited to its prior July 29, 2022

4    Order (ECF No. 22) and adopted its previous reasoning for issuance of the TRO.  (ECF No.

5    39, 5:3-4.)  In ECF No. 22, the Court cited to two cases, *Jeremiah v. Sutter County*, (No. 2:18-

6    cv-00522-TLN-KJN) 2018 WL 1367541 (E.D. Cal. Mar. 16, 2018) and *Cobine v. City of*

7    *Eureka*, 250 F. Supp. 3d 423 (N.D. Cal. 2017).  Both cases are readily distinguishable from

8    this case.

9        In *Jeremiah*, plaintiffs averred that they had received notice to vacate a river bottom, and

10   that any property left on public property after 30 days would be considered abandoned and

11   disposed of.  *Jeremiah*, 2018 WL 1367541, at *2.  Notably, this Court did not find that Sutter

12   County had actually confiscated plaintiffs' personal property, including their temporary

13   shelters, but found that, in light of then-recent wind, rain, and cold weather—and the

14   county's past efforts to remove plaintiffs' essential needs—the county would knowingly place

15   the homeless at increased risk of harm it if were to confiscate and seize plaintiffs' shelter and

16   possessions.  *Jeremiah*, 2018 WL 1367541, at *5.  In that case, the court was concerned with

17   removing life necessities during inclement weather.  In this case—even if the City were to

18   abate encampments occupied by PEH—the City's own protocol requires the safekeeping of

19   their life necessities, including tents and other protection from the elements, for at least 60

20   days, consistent with California Civil Code section 2080.10.  Thus, the City of Sacramento is

21   dissimilar from Sutter County because it does not confiscate PEH property.

22       In their TRO application, Plaintiffs cite to *Cobine v. City of Eureka*, 250 F. Supp. 3d 423

23   (N.D. Cal. 2017) for the proposition that courts have found a strong public interest in

24   maintaining the protection afforded by the Constitution to those most in need of such

25   protections.  (ECF No. 36 at p. 12.)  In *Cobine*, the plaintiffs alleged that the City of Eureka

26   violated the state-created danger doctrine by evicting persons experiencing homelessness

27   from a particular encampment and prohibiting them from residing in their own tents and

28   makeshift shelters on public property.  *Cobine v. City of Eureka*, 250 F. Supp. 3d 423, 433

CITY'S *AMENDED* OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1302838

(N.D. Cal. 2017). *Cobine* does not support a finding that the City of Sacramento violated the state-created danger doctrine—quite the contrary. The court found that "the generalized dangers of living on the street pre-existed [p]laintiffs' relocation from the [encampment]. From allegations in the amended complaint," as is true here, "it appears that the encampment residents were permitted to sleep in a City-owned parking lot or were offered temporary emergency shelter accommodations. (Citation omitted.)" The court observed that "[t]he [then-]current circumstances are certainly not ideal, but the [c]ourt [found] that they do not amount to a deliberate indifference of placing [p]laintiffs in an inherently more dangerous situation than they had faced previously." *Cobine*, 250 F. Supp. 3d at p. 433.

2.    Plaintiffs Cannot Show That They are At Greater Risk

There is no fundamental right to housing. *Lindsey v. Normet*, 405 U.S. 56, 74 (1972). However, the Ninth Circuit recognizes liability under substantive due process where a state or local official acts to place a person in a situation of known danger with deliberate indifference to their personal or physical safety. *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061-62 (9th Cir. 2006). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 410 (1997). "In examining whether [the city] affirmatively places an individual in danger, [the court does] not look solely to the agency of the individual, nor [does the court rest its] opinion on what options may or may not have been available to the individual. Instead, [the court] examine[s] whether [the city] left the person in a situation that was more dangerous than the one in which they found him." *Kennedy*, 439 F.3d at 1062 (citation omitted). Here, Plaintiffs cannot show a likelihood of success in showing that clearing encampments in the summer, and specifically here, in August and late-September, puts the unhoused at greater risk than the situation in which they currently reside.

Here, Plaintiffs focus on one aspect of the plight affecting PEH—the weather. However, all other social wellbeing, physical health, and psychological aspects are improved with the ability to reside at a site such as Miller Park as opposed to an unsanctioned encampments

CITY'S *AMENDED* OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1302838

1   within the City.  At Miller Park, PEH have access to clean water; food; non-congregate

2   space; security; restrooms; showers; canopies with misters; cots that are 19" off the tent floor;

3   24-7 staffing; coordination of services with staff that specialize PEH in accessing mainstream

4   services such as Medi-Cal and Cal Fresh enrollment, behavioral health assessments, job,

5   income, and housing applications; and a range of other social services all of which are not

6   easily accessible for PEH living in crisis on the streets.  (See Suppl. Decl. of Nick Golling.)

7   Thus, PEH are placed in a better and safer environment at Miller Park than they would be

8   otherwise subsisting on the streets in unmanaged public spaces.

9             3.      Abating Encampments Do Not Increase Plaintiffs' Risk of Harm in
                      Violation of the Fourteenth Amendment Right to Bodily Integrity.
10

11          In conclusory fashion, Plaintiffs raise the substantive due process right to bodily integrity

12   only once.  Plaintiffs aver that they raise a serious question as to whether abating

13   encampments affirmatively increases their risk of harm in violation of the Fourteenth

14   Amendment's right to bodily integrity.  (ECF No. 36 at 9:11-12.)  Here, too, Plaintiffs have

15   not cited, and cannot cite, a single controlling case holding holds that abating encampments

16   occupied by persons experiencing homelessness during inclement weather invariably violates

17   their right to bodily integrity.  And, the City is unaware of any such case.  This District has

18   rejected attempts to stretch the substantive due process right to bodily integrity beyond its

19   breaking point.  In *Mahoney v. City of Sacramento*, (No. 2:20-cv-00258-KJM-CKD) 2020 WL

20   616302 at *1, 3 (E.D. Cal. Feb. 10, 2020), unhoused plaintiffs alleged that, by causing the

21   removal of a porta-potty unlawfully placed for their use within the public right-of-way, the

22   City of Sacramento violated their substantive due process right to bodily integrity.  The court

23   observed, however, that "they cite[d] no controlling authority decided by the Ninth Circuit

24   or the Supreme Court."  Moreover, the non-controlling cases they did cite "do not expressly

25   recognize a free-floating constitutional right to private elimination in all circumstances."

26   *Mahoney*, 2020 WL 616302, at *3.

27

28

CITY'S *AMENDED* OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1302838

**C.    PLAINTIFFS ARE NOT LIKELY TO SUFFER IRREPARABLE HARM AS EXCESSIVE HEAT ALLEGATIONS ARE OVERSTATED AND BASED ON OVERLY GENERALIZED ASSUMPTIONS THAT RELY ON HEARSAY AND UNSUPPORTED FACTS.**

The crux of Plaintiffs' argument is that "excessive" or "extreme" heat poses a state-created danger under the Fourteenth Amendment because the "impact of exposure of unsheltered persons to extreme heat may include irreversible aggravation of underlying medical conditions, permanent damage to vital organs and even death." (ECF No. 36 at ¶ 29.) Thus, Plaintiffs argue that the element of irreparable harm is satisfied. However, the declarations provided in support of Plaintiffs' position rely on hearsay, speculation and inferences that are unsupported in fact and the City objects to them on the grounds that they are unreliable and cannot be used to support a sweeping injunction as Plaintiffs request. A mere "possibility" of irreparable injury is insufficient to support an injunction. *Winter*, 555 U.S. at 22.

In reliance on three declarations from Lisa Barnes, Lacy Dubois, and Angela Wallace, Plaintiffs make the illogical leap that all PEH are similarly situated. (See ECF No. 36-3.) Not all PEH live with health conditions that are exacerbated specifically by heat. Therefore, any injunction that includes all PEH within the City is overbroad and not narrowly tailored based on the evidence proffered by Plaintiffs.

In the Supplemental Declaration of Nick Golling, he went to both Miller Park and W St/Alhambra encampment on August 4 – 6, 2023 to assess ground temperatures. At Miller Park, no resident sleeps directly on the tent floor. Rather, they have 19" cots, cold water, canopies with misters, restrooms, food, and other resources and services as described in Mr. Golling's declaration and as observed in the photos and video of Miller Park. At Alhambra and W Street, the pavement temperatures are hot which contradicts Plaintiffs' assertion that all PEH in the shade at all times of day. Clearly, there are encampments that do see periods of direct sunlight during the day. Not all PEH are equally situated within the City, therefore, to make conclusory assumptions that enjoining the City's ability to move encampments will necessarily keep PEH safer from "excessive" or "extreme" temperatures is false. Moreover, at the Alhambra and W encampment, PEH residing there do not have a reliable source of

CITY'S *AMENDED* OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1302838

1  drinking water or facilities as resident have at Miller Park.

2  **D.    THE BALANCE OF EQUITIES DOES NOT TIP IN FAVOR OF PLAINTIFFS.**

3
4         1.     City Can Designate Critical Infrastructure

5        The Sacramento City Council adopted an ordinance on February 25, 2020, entitled,

6  "Protection of Critical Infrastructure and Wildfire Risk Areas." (Pak Decl. ¶ 2.)  Citing at

7  least 1,009 fires associated with encampments occupied by persons experiencing

8  homelessness over a six-month period in 2019 and the ensuing damage to a Department of

9  Utilities ("DOU") facility, impeded access to another DOU facility and to the Sacramento

10  Water Treatment Plant, and damage to levees related to such encampments, the City staff's

11  report explains that "[t]he purpose of the ordinance is to mitigate the threat of fire and other

12  potential causes of destruction and damage to and interference with, critical infrastructure

13  and wildfire risk areas and similarly sensitive areas, in order to protect the health, safety, and

14  welfare of the public, by authorizing the removal of persons and their personal property in,

15  on, or near those areas." (Pak Decl. ¶ 3; Ex. B at pp. 2-3.)

16        By its terms, the ordinance identifies as critical infrastructure levees and any other real

17  property or facility that the city manager designates, and that the city council approves by

18  resolution, "as being so vital and integral to the operation or functioning of the city that its

19  damage, incapacity, disruption, or destruction would have a debilitating impact on the public

20  health, safety, or welfare."  (See Sac. City Code, 8.140.020 attached to the ECF No. 38-1 as

21  Ex. A.)  After a months-long assessment of real property and facilities as well as consultation

22  with subject matter experts and stakeholders, the city manager designated as critical

23  infrastructure additional parcels and facilities that house vulnerable populations, government

24  operations, utilities, healthcare providers, public safety and transportation infrastructure, and

25  public gathering spaces.  (Pak Decl. ¶ 4, Ex. C.)  In July 2021, the Sacramento City Council

26  adopted the city manager's designation.

27        In general terms, the ordinance prohibits camping and storing personal property (1) on,

28  within 25 feet of, and within 25 feet of a pedestrian or vehicular entrance to, or exit from,

CITY'S *AMENDED* OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1302838

1  critical infrastructure, (2) on portions of a public right-of-way that, under local, state, or

2  federal law, must remain free of obstruction to first responders, (3) within hollow sidewalks,

3  and (4) in wildfire risk areas.  (See Sac. City Code, § 8.140.030(a)-(b).)  The ordinance

4  provides that, except for violations that pose an imminent threat to public health or safety,

5  which the city may abate immediately, the city may abate the foregoing violations upon 24

6  hours' notice.  (Sac. City Code, § 8.140.040(a).)  Should any person willfully prevent, delay,

7  resist, obstruct, or otherwise interfere with the city's abatement, they are subject to

8  enforcement action.  (See Sac. City Code, §§ 8.140.050-060.)

9     As City staff's report explains, "[t]he proposed ordinance is an exercise of the City's

10  authority to protect the public health, safety, and welfare as recognized by the Ninth Circuit .

11  . . . The ordinance is geographically limited. Possible summary abatement under the

12  ordinance does not apply to the entirety of the City.  It is limited to real property upon which

13  the presence of unauthorized personal property poses a heightened threat to the health and

14  safety of residents.  Encampments and associated personal property of unsheltered homeless

15  persons would not be subject to such summary abatement on the remainder of property in

16  the City."  (Pak Decl. ¶ 3; Ex. B at p. 4.)

17     California Constitution Article IX, Section 5 provides that "[i]t shall be competent in

18  any city charter to provide that the city governed thereunder may make and enforce all

19  ordinances and regulations in respect to municipal affairs . . ."  Cal. Const. art. XI, § 5(a); *see*

20  also *Richeson v. Helal*, 158 Cal. App. 4th 268, 277 (2007) ("The state Constitution gives

21  California cities broad and flexible power to promote the public welfare.").  Under the

22  powers granted to it by the California Constitution and its charter, the City is responsible for

23  the general safety and welfare of its residents within its territory. Cal. Const. art. XI, §§ 5(a),

24  7.

25        2.   City's Critical Infrastructure is Narrower than the Federal Standard.

26     The City's scope of designated "critical infrastructure" within the meaning of Chapter

27  8.140 of the Sacramento City Code, as approved by the Sacramento City Council, is

28  narrower than the federal standard as interpreted by the United States Department of

Homeland Security's Cybersecurity and Infrastructure Security Agency ("CISA").  "Critical Infrastructure is federally defined as "systems and assets, whether physical or virtual, so vital to the United States that the incapacity or destruction of such systems and assets would have a debilitating impact on security, national economic security, national public health or safety, or any combination of those matters." 42 U.S.C. § 5195c(e).  Presidential Policy Directive -- Critical Infrastructure Security and Resilience (PPD-21, Feb. 13, 2013), in furtherance of the Homeland Security Act of 2002, as amended, explicitly directs the United States Department of Homeland Security (DHS) to "identify and prioritize critical infrastructure" in support of "[p]roactive and coordinated efforts . . . to strengthen and maintain secure, functioning, and resilient critical infrastructure – including assets, networks, and systems – that are vital to public confidence and the Nation's safety, prosperity, and well-being." CISA performs that function on behalf of DHS.

PDD-21 specifies 16 critical infrastructure sections from infrastructure falling into any one category classifies as "critical infrastructure" for federal purposes. Those 16 sectors are as follows: (1) Chemical; (2) Commercial Facilities; (3) Communications; (4) Critical Manufacturing; (5) Dams; (6) Defense Industrial Base; (7) Emergency Services; (8) Energy; (9) Financial Services; (10) Food and Agriculture; (11) Government Facilities; (12) Healthcare and Public Health; (13) Information Technology; (14) Nuclear Reactors, Materials and Waste; (15) Transportation Systems; (16) Water and Wastewater Systems. CISA publishes Sector Specific Plans for each of the 16 critical infrastructure sections, which are available under each section heading at https://www.cisa.gov/topics/critical-infrastructure-security-and-resilience/critical-infrastructure-sectors.

There are notable examples of the federal scope of critical infrastructure being broader as described in CISA's respective Sector Specific Plans than the City's local scope for purposes of Chapter 8.140 of the Sacramento City Code.  For example, the Sector Specific Plan for Commercial Facilities includes casinos, retail centers, and shopping malls. The Sector Specific Plan for Food and Agriculture includes restaurants.  The Sector Specific Plan for Government Facilities covers facilities owned or leased by federal, state, local, tribal, or

CITY'S *AMENDED* OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1  territorial governments.  The City has been far more restrictive in limiting application of

2  Chapter 8.140 of the Sacramento City Code to government facilities with a history of prior

3  disruption (e.g., schools, courthouses) or providing life-saving or life-protecting services (e.g.,

4  police stations, fire stations, hospitals).

5  **E.     ISSUANCE OF A PRELIMINARY INJUNCTION IS NOT IN THE
        PUBLIC'S INTEREST**.

6

7  When balancing both parties' harms, the court "should pay particular regard for the

8  public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S.

9  at 24 (2008) (quotation omitted).  When the government is the target of the injunction, these

10  factors merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Here, the balance of harms

11  overwhelmingly tips in the City's favor.  As set forth in the Declarations of Assistant City

12  Manager Mario Lara, Captain Daniel Monk, Sgt. Danielle Luther, and Daniel Bowers, the

13  City has set forth the risks caused by unsanctioned homeless encampments within the City.

14  The right of local governmental officials to make necessary decisions to protect against

15  unsafe and unsanitary conditions risking public safety for all outweighs Plaintiffs' desire to

16  remain where they are.  PEH do not have quasi property rights to public spaces to the

17  detriment of others.  In the City's declarations filed concurrently, it has presented compelling

18  evidence that clearing encampments when necessary and in accordance with the City's

19  protocols and ordinances and within the discretion of the City's legislative function and

20  police powers. Here, plaintiffs rely on entirely unsubstantiated 'state created danger'

21  declarations of laypersons, none of which negate the deference afforded to the City's public

22  health and safety determinations, much less satisfy plaintiffs' heavy burden of proof in

23  seeking extraordinary injunctive relief.

24  **F.     SHOULD THE COURT ISSUE A PRELIMINARY INJUNCTION, IT
        SHOULD BE NARROWLY TAILORED.**

25

26  Assuming *arguendo* that the Court elects to grant a preliminary injunction, such an

27  injunction should be narrowly tailored given that the City has set forth ample grounds

28  showing the detrimental effects of restraining or enjoining the City from clearing

1  encampments.  To be narrowly tailored, the Court should permit critical infrastructure

2  including 500' from school and its sidewalk ordinance to be enforced.  Further, the City

3  should be permitted to clear encampments during cooler parts of the day such as the

4  mornings.  Finally, camp management should be permitted to attend to the debris, vector,

5  and safety issues of encampments.

6  **V.   CONCLUSION**

7      Based on the foregoing, the City of Sacramento respectfully requests that the Court deny

8  plaintiffs' Motion for Reinstatement of Prior Preliminary Injunction or For New Preliminary

9  Injunction and dissolve the Temporary Restraining Order issued on August 3, 2023.  An

10  injunction essentially granting PEHs quasi-property rights in public property of their own

11  choosing, to the detriment of other citizens' health and safety, based on deficient factual

12  assumptions and speculative, if not unsupportable, pseudo-scientific conclusions about

13  inclement weather.

14

15  DATED:  August 7, 2023                          SUSANA ALCALA WOOD,
                                                     City Attorney
16

17                                       By:    /s/ GRACE L. PAK

18                                              **GRACE L. PAK**

19                                              Senior Deputy City Attorneys

20                                              Attorneys for Defendant
                                                CITY OF SACRAMENTO
21

22

23

24

25

26

27

28

1302838